IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

THE CHAMBERLAIN GROUP, INC.,

                Plaintiff,

       v.

TECHTRONIC INDUSTRIES CO.,
LTD., TECHTRONIC INDUSTRIES
NORTH AMERICA, INC., ONE
WORLD TECHNOLOGIES, INC.,
OWT INDUSTRIES, INC., ET
TECHNOLOGY (WUXI) CO. LTD.,
and RYOBI TECHNOLOGIES, INC.,

              Defendants.

Case No.  16 C 6097

Judge Harry D. Leinenweber

REDACTED

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Chamberlain Group, Inc.'s Motion for a Preliminary Injunction [ECF No. 8]. For the reasons stated herein, the Court grants the Motion.

### I. BACKGROUND

The Plaintiff, the Chamberlain Group, Inc. ("CGI"), based in Illinois, entered the Garage Door Opener ("GDO") market in 1958. Nine years later it introduced what was to become the market leading GDO, the Liftmaster. CGI has become well known for its development of safety measures and other innovative technologies and currently is the owner of approximately 350 patents. Currently GCI's Liftmaster is the number-one professionally installed GDO and its GDOs are present in a

majority of garages in America. CGI has approximately a ███ market share in the GDO market. It also is the leader in the sale of ancillary products.

In 2003, CGI filed an application for a patent entitled Movable Barrier Operators Status Condition Transception Apparatus and Method, which was granted in 2007 as Patent No. 7,224,275 (the "'275 patent"). The invention was described as "a moveable barrier operator [with] a wireless status condition data transmitter that wirelessly transmits status condition messages to one or more remote peripherals." The '275 patent was to become the basis for CGI's subsequent product called MyQ Technology. The MyQ technology allows the owner, using a CGI smartphone app, to monitor and control the status of the GDO remotely.

In 2006, CGI filed an application for a patent entitled Barrier Movement Operator Battery Backup and Power Equipment Battery Charging Center, which was granted in 2009 as Patent No. 7,635,966 (the "'966 patent"). The invention was described as a battery back-up for a barrier movement operator, which is capable of being used to power tools often stored in garages.

The Defendants, Techtronic Industries Co. Ltd., Techtronic Industries North America, Inc., One World Technologies, Inc., OWT Industries, Inc., Et Technology (Wuxi) Co. Ltd., and Ryobi Technologies, Inc. (collectively, "TTI") sell products under an

- 2 -

extensive portfolio of manufacturing brand names and also provide products for sale by third parties. TTI has considerable expertise in designing and selling power tools and accessories and owns a broad portfolio of intellectual property, including lithium-ion battery technology for portable, rechargeable batteries and battery charging stations. GDOs make up only a small portion of TTI's sales since it only recently extended into the GDO market.

In May of this year, TTI unveiled the Ryobi GDO, which it commenced selling through Home Depot's physical and on-line stores. CGI contends that the Ryobi GDO embodies the patented ideas expressed in its '275 and '966 parents. The Ryobi GDO includes a battery pack feature which is removable and can be used to power more than 70 Ryobi branded tools. The Ryobi GDO also includes a system for sending status updates wirelessly. When used in conjunction with the Ryobi smartphone app, the user is allowed to monitor and control the Ryobi GDO's status remotely, similar to CGI's MyQ system. At the time TTI introduced its Ryobi GDO, Home Depot was CGI's ███ ██ customer and accounted for approximately ██ of CGI's retail GDO sales.

As a result of the introduction of the Ryobi GDO at Home Depot, CGI experienced an initial drop in sales for the two months succeeding the introduction. Since that time, Home Depot

reduced the price for the CGI GDO products which apparently caused a substantial increase in sales of CGI's products. Home Depot retains sole authority to set pricing. Home Depot initially funded the price decrease but then requested that CGI provide it with a rebate to absorb some of the price differential. CGI initially did so, but subsequent efforts between CGI and Home Depot to agree on a fixed rebate broke down so that CGI is not funding any price decrease decided upon by Home Depot. CGI publishes manufacturer's suggested pricing but has no authority to enforce any specific pricing with regard to Home Depot. There was no sales information available as to current sales of CGI's products at Home Depot subsequent to the week ending July 24, 2016.

## II. **GENERAL RULES FOR PRELIMINARY INJUNCTION**

CGI has filed this suit to enforce its intellectual property rights concerning, among others, the '275 and the '966 patents. They have now moved for a preliminary injunction to restrain TTI from selling its Ryobi GDOs and related products. To obtain a preliminary injunction the patent holder must establish four propositions: first, that it has a strong likelihood of success on the merits; second, that it is likely to suffer irreparable harm but for a preliminary injunction and therefore it has no adequate remedy at law; third, that equity heavily favors an injunction, *i.e.,* that the harm to the

- 4 -

plaintiff greatly outweighs the harm to defendant; and, fourth, that the public interest weighs in favor of a preliminary injunction. *See, Abbott Laboratories v. Sandoz, Inc.,* 544 F.3d 1341, 1344 (Fed. Cir. 2008).

While at trial a defendant need prove invalidity by clear and convincing evidence, at the preliminary injunction stage the accused infringer need only show that there is a "substantial question as to the patent's invalidity or infringement." *LifeScan Scotland v. Shasta Techn.,* 734 F.3d 1361, 1366 (Fed. Cir. 2013).

Irreparable harm can assume a number of different forms, including lost market share, price erosion, lost goodwill and downstream sales. *See, Robert Bosch LLC v. Pyon Mfg. Corp.,* 659 F.3d 1142, 1151 (Fed. Cir. 2011). The mere possibility of irreparable harm is inconsistent with the characterization of injunctive relief as an extraordinary remedy and requires a "clear showing" that a plaintiff is entitled to relief. *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 22 (2008).

### III.  **THE PATENTS IN SUIT**

#### A.  **The '275 Patent**

Claim 1: A moveable barrier operator comprising:
a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states;

- 5 -

a movable barrier interface that is operably coupled to the
controller;
a wireless status condition data transmitter that is operably
coupled to the controller, wherein the wireless status condition
data transmitter transmits a status condition signal that:
corresponds to a present operational status condition defined,
at least in part, by at least two operating states from the
plurality of operating states; and comprises an identifier that
is at least relatively unique to the movable barrier operator,
such that the status condition signal substantially uniquely
identifies the movable barrier operator.

Claim 5: The movable barrier operator of claim 1 wherein the
plurality of operating states includes at least one of:
moving a movable barrier in a first direction;
moving the movable barrier in a second direction;
reversing movement of the movable barrier;
halting movement of the movable barrier;
detecting a likely presence of an obstacle to movement of the
movable barrier;
detecting a likely proximal presence of a human;
receiving a wireless remote control signal;
receiving a wireline remote control signal;
receiving a learning mode initiation signal;
a lighting status change;
a vacation mode status change;
detecting a likely proximal presence of a vehicle;
and receiving an operating parameter alteration signal.

### B.  The '966 Patent

Claim 9: A battery charging apparatus, comprising:
a battery charging station in electrical communication with a
rechargeable battery and in electrical communication with a head
unit of a barrier movement operator for supplying power to at
least one rechargeable battery, the at least one rechargeable
battery being removably connectable to electrically powered
equipment other than and physically separate or separable from
the barrier movement operator to provide power to the
electrically powered equipment; and circuitry electrically
connected to the battery charging station to supply power from
the at least one rechargeable battery to the head unit.
Claim 14: The battery charging apparatus of claim 9, wherein the
electrically powered equipment comprises a tool.

## IV.  INFRINGEMENT OF THE '275 PATENT

TTI has a difficult task to demonstrate the lack of infringement by its Ryobi GDO since its technical expert, Dr. Madisetti, did not examine the Ryobi GDO.  On the other hand, CGI's technical expert, Dr. Rhyne ("Rhyne"), purchased a Ryobi GDO and dismantled it and, with the assistance of CGI engineers, conducted extensive testing.  Their testing included the use of WireShark protocol analyzer, which constitutes a method of capturing data as it is being transmitted by the Ryobi controller over WiFi link using the Ryobi router to a Media Access Control (MAC) address.  From the results of the WireShark analysis, Rhyne was able to demonstrate the type of data transmitted and the addressee.  Based on his examination and experience, Rhyne concluded that the Ryobi GDO met each of the elements of Claim 1 of the '275 patent.  Rhyne explained that the crux of his infringement analysis revolved around the concept of the GDO controller being self-aware, *i.e.,* that it did not rely upon any external sensors to obtain the status conditions of the GDO, and which it was able to transmit upon request.  Such status conditions include garage door open/shut, and garage lights on/off.  According to his testimony, Rhyne's examination of the Ryobi GDO demonstrated to him that the GDO obtained and transmitted similar data without the aid of external sensors.

- 7 -

Rather than examine the Ryobi GDO and dispute Rhyne's findings, TTI's expert, Dr. Madisetti ("Madisetti", took issue with Rhyne's interpretation of some of the terms of Claim 1 of the '275 patent. In particular, Madisetti contended that Rhyne incorporated into his interpretation of Claim 1 the concept of a "self-aware" controller, which does not appear in the claim language. This is important because Madisetti argued that it is clear from the specific language of Claim 1, and reinforced by the language of dependent Claim 5, that the controller of Claim 1 is not totally self-aware, because many of the activities set forth in dependent Claim 5, such as detecting the presence of an obstacle, the proximal presence of a human, and the proximal presence of an vehicle must include the use of external sensors. Therefore self-awareness is not a limitation on the claim. This contention by Dr. Madisetti is more material to the issue of invalidity rather than the issue of infringement.

Rhyne responded to this criticism by pointing out that dependent Claim 2 distinguishes itself from Claim 1 by adding to Claim 1, "a condition status sensor that is operably coupled to the controller." Therefore the only reasonable way to reconcile the difference between Claim 1 and Claim 2 is that Claim 1 eschews condition sensors in favor of a controller that does not rely on external sensors. With respect to the list of

- 8 -

operational states that do appear to require external sensors, Rhyne responded that the author appeared to include such operational states so as to claim such states which might through future invention be able to be sensed by the controller without external sensors.

Based on the foregoing, the Court at this time finds that CGI has established a likelihood of success on the issue of infringement of Claim 1 of the '275 patent by the Ryobi GDO. As the Court has indicated, the crux of the issue is the '275 patent's description of a self-aware controller in Claim 1. Rhyne's testimony on this point was convincing, and Madisetti, who did not examine the Ryobi GDO, did not effectively rebut evidence that it piggybacked on the '275's description of a self-aware controller defined by a plurality of operating states.

## V. ALLEGED INVALIDITY OF THE '275 PATENT

TTI argues that without disagreement from CGI, that controllers, moveable barrier interfaces, and wireless transmitters were all well known in the art prior to the issuance of the '275 patent. Also, without disagreement from CGI, wireless transmitters, WiFi, the smart phone app, and smart phones are not covered by the patent in suit. TTI further argues that a number of prior references either include all of the limitations of the '275 claims or anticipated them.

Specifically, Dr. Madisetti relied on Menard, Tazuna and several other patents that described capabilities such as raising and lowering moveable barriers through the use of controllers that wirelessly transmitted various states of the moveable barriers. In response, Dr. Rhyne was able to show that in each reference, unlike with the '275 patent, the controller relied upon external sensors in order to receive the information to be transmitted wirelessly. Further, Rhyne was able to show that two prior art references, Morris and Chang, specifically involved communications between external sensors and the GDO controller, which then transmitted wirelessly the information so received from the sensors. Thus he argued the examiner clearly understood that the prior art covered the use of external sensors to communicate states or statuses to the controller and still approved the issuance of the '275 patent. In other words, the only way to distinguish the '275 patent from the prior art was for the examiner to conclude that the '275 patent does not rely on external sensors.

Because none of the prior art suggested by Dr. Madisetti taught the concept of the "self-aware" controller, TTI has not raised a "substantial question as to invalidity." *See, Amazon.com v. Barnesandnoble.com,* 239 F.3d 1343, 1359 (Fed. Cir. 2001).

## VI.  WHETHER THE RYOBI GDO INFRINGES THE '966 PATENT

TTI's argument as to non-infringement of the '966 patent is two-fold. First, it points out that the Ryobi GDO does not sell a battery with its GDO; the battery is sold separately. Thus it argues that the Ryobi GDO does not include "at least one rechargeable battery." Second, TTI argues that Claim 9 does not provide for the use of the battery as a backup, but as an alternate source for powering the barrier movement operator.

First, the dispute as to Claim 9: CGI responds by showing that TTI's advertisements all focus on the fact that its GDO includes a battery recharge station and that there are available for sale batteries that can be recharged in the recharging station that can also be used to operate power tools. CGI also argues that while Claim 9 does not specifically state that the battery is a backup source, nevertheless the "summary of the invention at column 1, line 54 and 55 clearly state that the invention is directed to a system including a rechargeable battery backup." The "detailed description, column 3, lines 19-26 states 'a rechargeable battery backup is provided for use with a barrier movement operator.'" Furthermore, figure 6 to the '966 patent shows the method of utilization of the removable rechargeable battery, which clearly shows its role as a backup power source.

- 11 -

As to TTI's other argument, the law suggests it is of little import whether TTI sells the backup battery in the actual box with the Ryobi GDO. As CGI pointed out in closing arguments, TTI sells the battery alongside the system, and this coupled with the design of a rechargeable station integrated into the Ryobi GDO could constitute potential direct infringement, or at least contributory infringement. *See, e.g., Ricoh Co. v. Quanta Computer Inc.,* 5505 F.3d 1325, 1337-39 (Fed. Cir. 2008). This is especially true given the evidence that TTI's advertising juxtaposed both the battery and the GDO together, and that at one time TTI gave new purchasers of a Ryobi GDO a free battery. In short, the facts above demonstrate a likelihood that TTI's Ryobi GDO also infringes Chamberlain's '966 patent.

## VII. ALLEGED INVALIDITY OF THE '966 PATENT

TTI further argues that the '966 patent was well known in the prior art, specifically citing the Peplinski and Weik patents. Peplinski describes the use of one or more batteries to provide backup power to the GDO in the event of an electric power outage. Weik provides two different scenarios regarding power sources or lack thereof. First, where a fire door is powered by AC and there is a power outage, the fire door is equipped with a socket which will allow a portable battery to be plugged into power the fire door. The battery is portable and

- 12 -

is brought to the scene by a service person. The second scenario is where the fire door does not have AC power and a battery is permanently installed to operate the fire door.

It seems clear that neither prior art reference standing alone covers the '966 patent. But Dr. Madisetti testified that a person having ordinary skill in the art would combine the two references, such that the Peplinski battery would be removable as described in Weik. This is essentially an argument that the combination was obvious.

In response, Dr. Rhyne argued that neither Peplinski nor Weik describe a removable battery that can be used to power other devices and that the situation they seek to remedy is not relevant to the '966 patent. To argue against obviousness, Rhyne pointed to one of TTI's own documents describing "new innovation opportunities" in which it outlined possible steps to expand its tool market. One of the ideas listed on the document was a removable GDO battery that would be compatible in certain Sears power tools. He took the document to be a form of praise of the concept behind the '966 patent.

A patent is not necessarily invalid simply because it was obvious "to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it." *In re*

- 13 -

*O'Farrell,* 853 F.2d 894, 903 (Fed. Cir. 1988). It may well be that the combination in question was obvious; this case is young and the record is not yet fully developed. Registered patents are presumed valid, and TTI has not raised a substantial question at this juncture as to the '966 patent's invalidity based on obviousness or any other argument.

## VIII. **IRREPARABLE HARM**

The Federal Circuit has held that irreparable harm requires a showing that, absent an injunction, the patentee is likely to suffer irreparable harm, and that a causal nexus exists relating the alleged harm to the alleged infringement. *See, Apple Inc. v. Samsung Electronics Co.,* 735 F.3d 1352, 1360 (Fed. Cir. 2013). The question is whether the allegations of harm are pertinent to the injunctive relief analysis or whether the patentee is merely seeking "to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant." *Apple Inc. v. Samsung Electronics Co.,* 695 F.3d 1370, 1374 (Fed. Cir. 2012). As was testified to by CGI's economic expert, Christopher Bakewell, the types of harm that can occur from infringement by a direct competitor are lost sales and market share, price erosion, and loss of future sales, customer relationships, referrals, and accessories.

The evidence produced at the hearing demonstrated that the Ryobi GDO is a direct competitor to the CGI GDO in the Home Depot market. They both are targeting customers who want "connected" GDOs, *i.e.,* those connected by the controller to smart phones through wireless transmissions. The evidence further showed that GDOs are relatively inelastic, since people normally are only in the market for GDOs if they are building a new home or garage or their existing GDO is in need of replacement. At the time of TTI's product launch in May, 2016, CGI had an approximate ███ market share of the GDO market. Genie had an approximate ███ of the market and "others" had the balance, approximately ███. Moreover, prior to the Ryobi launch, Home Depot accounted for approximately ███ of CGI's retail sales of GDOs.

While sales data of the Ryobi GDO were not available, the data did show a marked reduction in CGI sales immediately after the product launch. The evidence also showed that, after Home Depot made a significant unilateral reduction in price for CGI's signature unit, sales increased dramatically for the next 5 weeks. This fact alone suggests that the launch of the Ryobi GDO has caused price erosion. The evidence further showed that Home Depot has requested that CGI contribute to the cost of the price reduction through the form of rebates. CGI was willing to do so on a short-term basis, but negotiations for a more

- 15 -

permanent arrangement at this time had fallen through. The Court finds that there is clear evidence of price erosion caused by the Ryobi product launch.

While there is no clear evidence that there will be a reduction in CGI's market share, nevertheless basic economic reasoning dictates that it should be suspected. Assuming that the Ryobi introduction at Home Depot is successful (there is some circumstantial evidence that it is successful, such as preferential product location and advertising in Home Depot), there has to be some loss of market share on CGI's part. Since the product is relatively inelastic, a sale of a Ryobi GDO most likely comes at the expense of one of the other brands. Since CGI has almost ███ times the market share of Genie, one would expect that for every four Ryobi GDOs sold by Home Depot ███ would be lost by CGI and ██ by Genie.

The evidence also showed the sale of accessories are a very profitable part of the GDO market and that accessory sales accounted for approximately ██ of CGI's gross profit. Consequently, loss of market share of GDOs would have a substantial impact on the overall gross profit picture. There is a substantial risk of loss of market share, profits, and price erosion that would be directly connected to the entry of the TTI Ryobi GDO. The Court thus finds that CGI will suffer irreparable harm if a preliminary injunction is not granted.

The Court pauses for an important note: the above analysis regarding irreparable harm bears only on the Court's ultimate decision on CGI's '275 patent. That is because, as at least two witnesses noted at the hearing, CGI's GDOs currently do not practice the '966 patent relating to the removable backup battery. CGI has not sold commercially a GDO including the technology behind that patent. That necessarily means that the concerns regarding market share, price erosion, and lost profits have no applicability as to the '966 patent. CGI therefore has not proven irreparable harm based on infringement of the '966 patent.

## IX. **THE BALANCE OF HARDSHIPS**

The evidence showed that the GDO market is not significant from TTI's perspective. TTI has a multibillion dollar business of which GDOs constitute no more than one percent of its business. Prior to May of this year it had not sold a single GDO, and since the Court has agreed to hold the trial as early as February 2017, a delay of four months, while harmful, would not be critical to the health of TTI. On the other hand, GDOs are the core business of CGI and a loss would be much more serious to CGI than it would be to TTI. The Court therefore finds that balance of hardships favors CGI. Certainly if TTI is successful at trial, a judgment of money damages would redress any wrong an injunction might impose.

- 17 -

## X.   THE PUBLIC INTEREST

While increased competition arguably is in the public interest, nevertheless protecting the interests of patent holders is also in the public interest because a strong, viable patent system inevitably leads to increased innovation. Here, as in *Apple Inc. v. Samsung Electronics Co.,* 809 F.3d 633, 647 (Fed. Cir. 2015), an injunction would not keep some lifesaving drug off the market; rather it would make the marketing of GDOs more orderly and allow a final resolution of the issue of infringement and invalidity.

### XI.   CONCLUSION

For the reasons stated herein, the Court grants CGI's Motion for a Preliminary Injunction [ECF No. 8]. The Court's decision relates to the finding that CGI has carried its burden in requesting a preliminary injunction only as to the '275 patent.

**IT IS SO ORDERED.**

_____
        Harry D. Leinenweber, Judge
        United States District Court

Dated:  SEP 1 5 2016