**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE CHAMBERLAIN GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:16-cv-06097 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| TECHTRONIC INDUSTRIES CO. LTD., | ) | |
| TECHTRONIC INDUSTRIES NORTH | ) | The Honorable Harry D. Leinenweber |
| AMERICA, INC., ONE WORLD | ) | |
| TECHNOLOGIES, INC., OWT | ) | Magistrate Judge Sydney Schenkier |
| INDUSTRIES, INC., ET TECHNOLOGY | ) | |
| (WUXI) CO. LTD., and RYOBI | ) | |
| TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## AMENDED ANSWER TO COMPLAINT

Defendants, Techtronic Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc. (collectively "Defendants"), file this Amended Answer to the Complaint ("Complaint") by Plaintiff The Chamberlain Group, Inc. ("CGI," "Chamberlain," or "Plaintiff") and state as follows:

## GENERAL ALLEGATIONS

1.      CGI is a company incorporated under the laws of the State of Connecticut with its principal place of business in Elmhurst, Illinois.

**ANSWER:**      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis, deny them.

2.      CGI was founded in 1906 and offers innovative access control devices including residential garage door openers, commercial door operators, gate access solutions, home connectivity products, and related accessories. CGI is the leader in residential garage door openers and commercial door operators, with products grounded in safety, security, connectivity, and reliability.

**ANSWER:**      Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis, deny them.

3.     Amongst other product offerings, CGI develops, manufactures, and sells the well-known LiftMaster® products, which have been recognized as the number one brand of professionally installed garage door openers as well as highly preferred Do-It-Yourself Chamberlain® branded products, which are present in a majority of garages in America. As an inventive company, always seeking ways to better serve its customers and consumers with additional features and functionality (in addition to safety and security), CGI also offers its MyQ® technology for remote monitoring and control of the home and business, including garage doors, lights, and gates, both as a retrofit for most major brands of garage door openers and on LiftMaster® and Chamberlain® MyQ®-enabled product lines.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph, and on that basis, deny them.

4.     In order to continually improve its product offerings for its customers and consumers, CGI invests substantial resources in research and development of access control products—including in developing products having new and improved functionality, quality, and security.  Over the years, CGI has received accolades for being an innovation leader in this field of technology and has received numerous seminal and valuable patents for its inventions. CGI relies upon its patents to maintain and protect its reputation as the industry leader in access control technology, and to protect its customers and consumers from inferior and/or imitation devices that may suffer from safety, security or other issues.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph, and on that basis, deny them.

5.     CGI's patents in this field include U.S. Patent No. 7,635,966 (referred to herein as the '966 patent), which claims, e.g., inventions for a system that provides a rechargeable battery backup for a barrier movement operator, such as garage door or gate openers, that comprises a barrier movement operator for controlling the movement of a moveable barrier, a head unit for commanding the movable barrier, a battery charging station in electrical communication with at least one rechargeable battery and in electrical communication with the head unit, circuitry electrically connected to the battery charging station to supply power from the rechargeable battery to the head unit, and electrically powered equipment other than and physically separate or separable from the barrier movement operator that comprises an apparatus for receiving the rechargeable battery and to be powered by the rechargeable battery to perform a predetermined function.

**ANSWER:**     Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph, and on that basis, deny them.

6.     The '966 patent's inventions provide many new and useful features. For example, the '966 patent describes a novel battery charging station that derives power from a fixed storage location where a garage door head unit is installed, where a single battery can be used to provide backup power to the garage door motor in addition to providing power to tools that are often

2

utilized or stored in a garage such as a saw, a drill or a light. The '966 inventions allow users to conveniently minimize the number of batteries and battery charging stations that are needed to keep on hand and to realize the cost and space savings benefits associated with the '966 inventions.

**ANSWER:**    Denied.

7.    CGI's patents in this field further include U.S. Patent No. 7,224,275 (referred to herein as the '275 patent), which claims, e.g., inventions for a movable barrier operator comprising a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states, a movable barrier interface that is operably coupled to the controller, a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that: corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations contained in this paragraph, and on that basis, deny them.

8.    The '275 patent's inventions provide many new and useful features. For example, the '275 patent describes a novel method of wirelessly monitoring the status of features that can be associated with the environment of modern garage door openers.  The '275 patent also provides users with the security and assurance of knowing that the conditions being monitored are unique to the user and not to neighboring systems.

**ANSWER:**    Denied.

9.    Together, the '966 and '275 patents are referred to herein as the "Asserted Patents."  The United States Patent and Trademark Office ("USPTO") examined the Asserted Patents over a period of many years. The USPTO considered whether the inventions that they describe and claim were both new and also not obvious in light of prior patents, articles, inventions, and other references. The USPTO also rigorously assessed the language used to describe and claim the inventions.  After this thorough examination, the USPTO determined that the inventions were inventive and patentable.

**ANSWER:**    Defendants admit that the '966 and '275 patents are referred to in the

Complaint as the "Asserted Patents."  Defendants are without knowledge or information

sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph,

and on that basis, deny them.

10. The USPTO considered and examined the '966 patent for over a three year period, starting when the patent was filed on June 28, 2006. The '966 patent includes 22 distinct inventions/claims.

**ANSWER:** Defendants admit that the '966 patent lists a filing date of June 28, 2006 and that the '966 patent lists 22 claims on its face. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph, and on that basis, deny them.

11. The USPTO considered and examined the '275 patent for a four year period, starting when the patent was filed on May 29, 2003. The '275 patent includes 31 distinct inventions/claims.

**ANSWER:** Defendants admit that the '275 patent lists a filing date of May 29, 2003 and that the '275 patent lists 31 claims on its face. Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph, and on that basis, deny them.

12. On information and belief, Defendant Techtronic Industries Co., Ltd. ("TTI") is a Hong Kong based global power equipment and floor care company founded in 1985 with current annual revenue of approximately $5 Billion Dollars. See http://www.ttigroup.com/en/investor_relations/financial_summary/financial_highlights/index.php?cat=fullyear. On information and belief, it has its principal place of business at Unit B-F 24/F CDW Building, 388 Castle Peak Road, Tsuen Wan, New Territories, Hong Kong. On information and belief, TTI makes 74.9% of its sales in North America and 78.8% of its sales are in the power equipment, accessories and hand tools area into which the Accused Controller Products now fall. See http://www.ttigroup.com/en/investor_relations/financial_summary/turnover_breakdown_analysis.php?cat=fullyear.

**ANSWER:** Defendants admit that TTI is a world-class leader in design, manufacturing and marketing of Power Tools, Outdoor Power Equipment, and Floor Care and Appliances for consumers, professional and industrial users in the home improvement, repair and construction industries. *See* http://www.ttigroup.com/en/our_company/. Defendants admit that TTI was founded in 1985, although its unique and growing portfolio of world-famous brands stretch back at least one hundred and fifty years. Defendants admit that TTI lists its principal

place of business is at 29/F, Tower 2, Kowloon Commerce Centre, 51 Kwai Cheong Road, Kwai Chung, New Territories, Hong Kong. Defendants admit that TTI's annual revenue is approximately $5 billion and that TTI's Turnover Breakdown Analysis lists that TTI's sales by location for the year ending December 31, 2015 were 74.9% for North America and that 78.8% of its sales by business are associated with Power Equipment, Accessories and Hand Tools. See http://www.ttigroup.com/en/investor_relations/financial_summary/turnover_breakdown_analysis .php?cat=fullyear.

13. On information and belief, Techtronic Industries North America, Inc. is a wholly owned subsidiary of the Hong Kong entity TTI and is a corporation organized under the laws of Delaware, having a principal office located at 303 International Circle, Suite 4900, Hunt Valley, Maryland 21030.

**ANSWER:** Admitted, with the caveat that the correct suite number for the principal office is Suite 490.

14. On information and belief, One World Technologies Inc. is a Delaware corporation with its principal place of business at 1428 Pearman Dairy Road, Anderson, South Carolina 29625.

**ANSWER:** One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment ("TTIPE") is a Delaware corporation with its principal place of business at 1428 Pearman Dairy Road, Anderson, South Carolina 29625.

15. On information and belief, OWT Industries Inc. is a Delaware corporation having its principal place of business at 225 Pumpkintown Highway, Pickens, South Carolina.

**ANSWER:** Admitted.

16. On information and belief, Et Technology (Wuxi, Co., Ltd.) is a Chinese corporation with its principal place of business at Xiqun Road (East Section), Xinqu Meicun Industrial Cluster Zone Wuxi 214112 Zhejiang China. On information and belief, all of the Accused Controller Products are made by Et Technology in China and are later imported into the United States by Et Technology and TTI.

**ANSWER:** Defendants admit that Et Technology manufactures the Accused Controller Products. Defendants deny that the Accused Controller Products are imported into the

United States by Et Technology and TTI. Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and on that basis, deny them.

17. On information and belief, Ryobi Technologies, Inc. is a corporation organized under the laws of Delaware, having a principal office located at 1428 Pearman Dairy Road, Anderson, South Carolina 29625.

**ANSWER:** Denied.

18. On information and belief, Defendants jointly make, use, sell, offer for sale or import the Ryobi Ultra-Quiet Garage Door Opener, Model No. GD200 ("Accused Controller Products").

**ANSWER:** Defendants admit that TTIPE offers for sale a product called the Ryobi Ultra-Quiet Garage Door Opener, Model No. GD200. Defendants deny the remaining allegations set forth in this paragraph.

19. The Accused Controller Products are now being offered for sale nationwide. Sales of this garage door opener will damage CGI's hard-earned position in the marketplace and good reputation and irreparably harm CGI in other ways.

**ANSWER:** Defendants admit that TTIPE offers its Ryobi Ultra-Quiet Garage Door Opener, Model No. GD200 for sale exclusively at Home Depot stores located in various jurisdictions the United States. Defendants deny the remaining allegations.

20. Defendants' actions have caused CGI harm, and will cause further harm to CGI if they continue. In addition, Defendants' knowing acts of infringement will frustrate CGI's ongoing strong business relationships, contracts, and potential contracts, with resulting lost sales and profits, and otherwise are or will cause substantial harm to CGI's business.

**ANSWER:** Denied.

21. As a result of Defendants' actions, CGI was forced to file this lawsuit to protect its patented innovations and its reputation as the leader in the control access industry.

**ANSWER:** Denied.

## JURISDICTION AND VENUE

22.     This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. §§ 1 *et seq.*  The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:**     Defendants admit that the Complaint purports to be an action for patent infringement arising under 35 U.S.C. §§ 1 *et seq*.  Defendants admit that this Court would have subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a), but Defendants deny that they have committed any act of infringement in this district or elsewhere.

23.     On information and belief, Defendants are subject to personal jurisdiction in the State of Illinois and the Northern District of Illinois because they are doing and have done substantial business in this District, including business relating to the sale and distribution of the Accused Controller Products.  Defendants have continuous and systematic business contacts with the State of Illinois and directly, or through subsidiaries and intermediaries such as retailers, conduct business in Illinois by shipping, distributing, offering for sale, selling, and advertising (including the provision of an interactive web page*, see, e.g*.,: https://www.ryobitools.com/power-tools/products/list/category/garage-door-opener) the Accused Controller Products in the State of Illinois and the Northern District of Illinois. Defendants, directly, or through subsidiaries and intermediaries such as retailers, have purposefully and voluntarily placed the Accused Controller Products into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in the Northern District of Illinois.  Therefore, the exercise of jurisdiction over Defendants is appropriate under the applicable jurisdictional statutes and would not offend traditional notions of fair play and substantial justice.

**ANSWER:**     Defendants admit that the Ryobi Ultra-Quiet Garage Door Opener, Model No. GD200 is distributed and sold in this District and the State of Illinois.  Defendants deny the remaining allegations contained in this paragraph.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and/or 1400(b), because, among other reasons, Defendants are subject to personal jurisdiction in this judicial district and have committed acts of infringement in this judicial district.

**ANSWER:** Defendants admit that venue is proper in this district under 28 U.S.C. §§ 1391(b) and/or 1400(b), but deny that this District is the most convenient and reserve their right to seek transfer pursuant to 28 U.S.C. §§ 1404. Defendants deny the remaining allegations contained in this paragraph.

## COUNT I
### (Infringement of U.S. Patent No. 7,635,966)

25. Plaintiff incorporates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:** Defendants incorporate and reassert all answers in the preceding paragraphs as if fully set forth herein.

26. On December 22, 2009, the USPTO duly and legally issued the '966 patent, entitled "*Barrier Movement Operator Battery Backup And Power Equipment Battery Charging Center,*" to Brian Butler. A true and correct copy of the '966 patent is attached as Exhibit A.

**ANSWER:** Defendants admit that Exhibit A was appended to the Complaint, and that Exhibit A purports to be a copy of the '966 patent which bears the title "*Barrier Movement Operator Battery Backup And Power Equipment Battery Charging Center*" with a listed date of issuance of December 22, 2009. Defendants deny the remaining allegations of this paragraph.

27. CGI is the owner, by assignment, of all rights, title and interest in the '966 patent, including the right to recover damages for past infringement.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis, deny them.

28. Defendants have infringed and continue to infringe the '966 patent in this District and throughout the United States by making, using, importing, offering for sale and/or selling one or more of the Accused Controller Products, in addition to the Ryobi One+ rechargeable battery, which practice one or more of the claims of the '966 patent. For example, based on CGI's current investigation, the Accused Controller Products infringe at least claim 9 of the '966 patent as follows:

| Claim 9: A battery charging apparatus, comprising: | Defendants' advertising and product information show how the Accused Controller Products in addition to the Ryobi One+ rechargeable battery meet this claim element: |
|---|---|

Introducing the next generation of garage door openers with the Ryobi Ultra-Quiet Garage Door Opener. The ultra-powerful motor will quietly open and close large doors with ease due to the 2HPs for faster openings.

Ultra-Quiet Garage Door Opener, Ryobi Power Tools, https://www.ryobitools.com/power-tools/products/details/802 (last accessed May 19, 2016).

This product is designed to be powered by either a RYOBI ONE+™ 18V lithium-ion (Li-ion) battery pack (DC mode) or by electric power (AC mode). The unit will operate in AC mode whenever it is connected to an electric power source. It will switch to DC mode when an approved battery pack is installed and the unit is not connected to an AC power source.

Operator's Manual Garage Door Opener GD200 at p. 36, https://manuals.ttigroupna.com/system/files/9593/original/GD200_698_trilingual.pdf (last accessed May 19, 2016).



Operator's Manual Garage Door Opener GD200 at p. 36, https://manuals.ttigroupna.com/system/files/9593/original/GD200_698_trilingual.pdf (last accessed May 19, 2016).



Ultra-Quiet Garage Door Opener, Ryobi Power Tools, https://www.ryobitools.com/power-tools/products/details/802 (last accessed May 19, 2016).

| | |
|---|---|
| **a battery charging station** in electrical communication with a **rechargeable battery** and in electrical communication with a **head unit of a barrier movement operator** for supplying power to at least one rechargeable battery | Defendants' advertising and product information show how the Accused Controller Products in addition to the Ryobi One+ rechargeable battery meet this claim element:<br><br>This product is designed to be powered by either a RYOBI ONE+™ 18V lithium-ion (Li-ion) battery pack (DC mode) or by electric power (AC mode). The unit will operate in AC mode whenever it is connected to an electric power source. It will switch to DC mode when an approved battery pack is installed and the unit is not connected to an AC power source.<br><br>Operator's Manual Garage Door Opener GD200 at p. 36, https://manuals.ttigroupna.com/system/files/9593/original/GD200_698_trilingual.pdf (last accessed May 19, 2016).<br><br>CHARGING A BATTERY PACK<br>See Figure 65.<br>Battery packs are shipped in a low charge condition to prevent possible problems. Therefore, you should charge them before first use. If the garage door opener does not charge the battery pack under normal circumstances, return |

both the battery pack and garage door opener to your nearest repair center for electrical check.

- Connect the garage door opener to an AC power supply.
- Install battery pack into the garage door opener as described earlier.
- Press on the battery pack to be sure contacts on the battery pack engage properly with contacts in the garage door opener.
- The battery pack may become slightly warm to the touch while charging. This is normal and does not indicate a problem.
- When the battery pack is fully charged, you may remove the battery pack or leave it in the battery port to provide DC power if needed.



Operator's Manual Garage Door Opener GD200 at p. 36, https://manuals.ttigroupna.com/system/files/9593/original/GD200 _698_trilingual.pdf (last accessed May 19, 2016).

11



Ultra-Quiet Garage Door Opener, Ryobi Power Tools, https://www.ryobitools.com/power- tools/products/details/802 (last accessed May 19, 2016).

| | |
|---|---|
| the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment; | Defendants' advertising and product information show how the Accused Controller Products in addition to the Ryobi One+ rechargeable battery meet this claim element:<br><br><br><br>The RYOBI 18V ONE+ System has more than 50 tools that work with the same battery platform, giving you the ultimate versatility in tool selection to get your job finished. With upgraded LITHIUM+ batteries, you can get more done in less time and improve the performance of every RYOBI 18V tool ever made. No matter how you add it up, ONE+ is the one system that delivers more.<br><br>About the ONE+ System, https://www.ryobitools.com/power-tools/products/list/family/one-plus (last accessed May 19, 2016). |

12





18V One+ Hammer Drill Kit, https://www.ryobitools.com/power-tools/products/details/657 (last accessed May 19, 2016).

| | |
|---|---|
| circuitry electrically connected to the <mark>battery charging station</mark> to supply power from the at least one <mark>rechargeable battery</mark> to the <mark>head unit.</mark> | Defendants' advertising and product information show how the Accused Controller Products in addition to the Ryobi One+ rechargeable battery meet this claim element:<br><br>CHARGING A BATTERY PACK<br>See Figure 65.<br>Battery packs are shipped in a low charge condition to prevent possible problems. Therefore, you should charge them before first use. If the garage door opener does not charge the battery pack under normal circumstances, return both the battery pack and garage door opener to your nearest repair center for electrical check.<br>• Connect the garage door opener to an AC power supply.<br>• Install battery pack into the garage door opener as described earlier.<br>• Press on the battery pack to be sure <mark>contacts on the battery pack engage properly with contacts in the garage door opener</mark>.<br>• The battery pack may become slightly warm to the touch while charging. This is normal and does not |

indicate a problem.
- When the battery pack is fully charged, you may remove the battery pack or leave it in the battery port to provide DC power if needed.



Operator's Manual Garage Door Opener GD200 at p. 36, https://manuals.ttigroupna.com/system/files/9593/original/GD200_698_trilingual.pdf (last accessed May 19, 2016).

**ANSWER:**   Denied.

29.   All Defendants have been placed on notice of the '966 patent at least as early as on or about May 25, 2016.

**ANSWER:**   Defendants admit that they received notice of the '966 patent on May 25, 2016 when they were served with a Complaint alleging infringement of the '966 Patent in civil action no. 16-cv-5544 in this District.

30.   Defendants have also induced and/or are inducing the infringement of the '966 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Controller Products in addition to the Ryobi One+ rechargeable battery. These products, as provided by Defendants to their customers and used as intended and instructed, infringe the '966 patent and Defendants have known of this infringement since at least since at least the filing of this Complaint and/or the date this Complaint was served upon Defendants. Defendants sold and/or offered for sale these products, and are continuing to do so, to retailers, specifically intending to actively encourage them to sell the infringing devices for use in the United States in a manner that Defendants know to be infringing. Defendants have also sold and/or offered for sale these products, and are continuing to do so, to end users and others, specifically intending to actively encourage them to use the infringing devices in the United States in a manner that

Defendants know to be infringing. *See, e.g.,* Defendants' marketing of the Accused Controller Products and Ryobi One+ battery as depicted in the claim charts above.

**ANSWER:**     Denied.

31.     Defendants have also contributed to and/or are contributing to the infringement of the '966 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Controller Products in addition to the Ryobi One+ rechargeable battery. Defendants have made and/or sold these products with knowledge that these products are especially designed for use as a component of a patented system, apparatus and kit, and/or an apparatus for use in a patented process, and are not staple articles of commerce suitable for substantial noninfringing use. For example, among other things, Defendants actively and knowingly sell these products and provide the manuals and other documentation for these products to customers and others for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process. These products are especially designed for use as a component of a patented system, apparatus and kit and/or an apparatus for use in a patented process, constitute a material part of the invention, are sold by Defendants for the designed use, and are not a staple article of commerce suitable for substantial noninfringing use. On information and belief, Defendants' customers and consumers have used these products in the United States in this manner and infringed the '966 patent.

**ANSWER:**     Denied.

32.     As a result of Defendants' infringement of the '966 patent, Plaintiff has suffered and will continue to suffer damages. Plaintiff is entitled to recover from Defendants the damages adequate to compensate for such infringement in an amount to be determined at trial.

**ANSWER:**     Denied.

33.     Defendants' acts of infringement of the '966 patent herein have been committed and are being committed with full knowledge of Plaintiff's rights in the patent.  On information and belief, Defendants have acted and are continuing to act despite an objectively high likelihood that their actions constituted direct and/or indirect infringement of a valid patent, and knew or should have known of that objectively high risk since at least the filing of this Complaint and/or the date this Complaint was served upon Defendants.  Defendants' acts, since at least the filing of this Complaint and/or the date this Complaint was served upon Defendants, constitute willful and deliberate infringement, entitling Plaintiff to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

**ANSWER:**     Denied.

34.     Defendants' acts of infringement have caused and will continue to cause irreparable harm to Plaintiff, for which there is no adequate remedy at law, entitling Plaintiff to injunctive relief.

**ANSWER:**     Denied.

<u>**COUNT II**</u>
<u>**(Infringement of U.S. Patent No. 7,224,275)**</u>

35.     Plaintiff incorporates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

**ANSWER:**    Defendants incorporate and reassert all answers in the preceding paragraphs as if fully set forth herein.

36.     On May 29, 2007, the USPTO duly and legally issued the '275 patent, entitled "*Movable Barrier Operators Status Condition Transception Apparatus And Method*," to James J. Fitzgibbon. A true and correct copy of the '275 patent is attached as Exhibit B.

**ANSWER:**    Defendants admit that Exhibit B was appended to the Complaint, and that Exhibit B purports to be a copy of the '275 patent which bears the title "*Movable Barrier Operators Status Condition Transception Apparatus And Method*" with a listed date of issuance of May 29, 2007.  Defendants deny the remaining allegations of this paragraph.

37.     CGI is the owner, by assignment, of all right, title and interest in the '275 patent, including the right to recover damages for past infringement.

**ANSWER:**    Defendants are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph, and on that basis, deny them.

38.     Defendants have infringed and continue to infringe the '275 patent in this District and throughout the United States by making, using, importing, offering for sale and/or selling one or more of the Accused Controller Products, which practice one or more of the claims of the '275 patent. For example, based on CGI's current investigation, the Accused Controller Products infringe at least claim 1 of the '275 patent as follows:

| Claim 1: A movable barrier operator comprising: | Defendants' advertising and product information show how the Accused Controller Products meet this claim element:<br><br>Introducing the next generation of garage door openers with the Ryobi Ultra-Quiet Garage Door Opener. The ultra-powerful motor will quietly open and close large  doors with ease due to the 2HPs for faster openings.<br><br>*Ultra-Quiet Garage Door Opener*, Ryobi Power Tools, https://www.ryobitools.com/power-tools/products/details/802 (last accessed May 19, 2016). |
| --- | --- |
| a controller having a plurality of potential operational status | Defendants' advertising and product information show how the Accused Controller Products meet this claim element: |

| | |
|---|---|
| conditions defined, at least in part, by a plurality of operating states | <br>Main Board<br><br>Internal Photos, Application for Equipment Authorization, FCC ID VMZGD200, *available at* https://www.fcc.gov/general/fcc-id-search-page. |
| |  |

| | |
|---|---|
| | *Ryobi Garage Door Opener Module System*, http://ryobitools.com/gdo/ (last accessed May 19, 2016). |
| a movable barrier interface that is operably coupled to the ==controller== | Defendants' advertising and product information show how the Accused Controller Products meet this claim element:  *Operator's Manual Garage Door Opener GD200* at p. 19, https://manuals.ttigroupna.com/system/files/9593/original/ GD200_698_trilingual.pdf (last accessed May 19, 2016).  *Operator's Manual Garage Door Opener GD200* at p. 25, https://manuals.ttigroupna.com/system/files/9593/original/ GD200_698_trilingual.pdf (last accessed May 19, 2016). |

| | |
|---|---|
| | <br><br>THE UNCOVER EUT VIEW 1<br><br>Internal Photos, Application for Equipment Authorization, FCC ID VMZGD200, *available at* https://www.fcc.gov/general/fcc-id-search-page. |
| ==a wireless status condition data transmitter== that is operably coupled to ==the controller== | Defendants' advertising and product information show how the Accused Controller Products meet this claim element:<br><br><br><br>WIFI MODE (Front)<br><br>Internal Photos, Application for Equipment Authorization, FCC ID VMZGD200, *available at* https://www.fcc.gov/general/fcc-id-search-page (red boxes and annotations in original). |
| wherein the wireless status condition data transmitter transmits a status condition signal that: | Defendants' advertising and product information show how the Accused Controller Products meet this claim element:<br><br>**APP ENHANCED**<br>Connect your smartphone to the RYOBI Garage Door Opener right out of the box. No additional purchase, |

<table>
<tr>
<td></td>
<td>just visit the Google Play or Apple app stores.<br>• Control your garage door from anywhere you have wireless signal<br>• Monitor your garage door remotely<br>• Get enhanced functionality out of your RYOBI Garage Door Opener Modules<br><em>Module System</em>, http://ryobitools.com/gdo/module-system/#app-enhanced (last accessed May 19, 2016).</td>
</tr>
<tr>
<td></td>
<td><br><em>Ryobi Garage Door Opener Module System</em>, http://ryobitools.com/gdo/ (last accessed May 19, 2016).</td>
</tr>
<tr>
<td>corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating states; and</td>
<td>Defendants' advertising and product information show how the Accused Controller Products meet this claim element:</td>
</tr>
</table>

| | |
|---|---|
| |  *Ryobi Garage Door Opener Module System*, http://ryobitools.com/gdo/ (last accessed May 19, 2016). |
| comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator. | Defendants' advertising and product information show how the Accused Controller Products meet this claim element: |



*Ryobi Garage Door Opener Module System*, http://ryobitools.com/gdo/ (last accessed May 19, 2016). Plaintiff's testing showed messages being sent from the unit tested by Plaintiff that included the MAC address of the wifi chip in that unit:



Photo showing MAC address of unit tested by Plaintiff.



Exemplary capture of a packet showing a message sent including the MAC address of the unit tested by Plaintiff (MAC address highlighted).

**ANSWER:**   Denied.

39.   All Defendants have been placed on notice of the '275 patent at least as early as on or about May 25, 2016.

**ANSWER:**   Defendants admit that they received notice of the '275 patent on May 25, 2016 when they were served with a Complaint alleging infringement of the '275 Patent in civil action no. 16-cv-5544 in this District.

40.   Defendants have also induced and/or are inducing the infringement of the '275 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Controller Products and the Ryobi app. These products, as provided by Defendants to their customers and used as intended and instructed, infringe the '275 patent and Defendants have known of this infringement since at least the filing of this Complaint and/or the date this Complaint was served upon Defendants. Defendants sold and/or offered for sale one or more of these products, and are continuing to do so, to retailers, specifically intending to actively encourage them to sell the infringing devices for use in the United States in a manner that Defendants know to be infringing. Defendants have also sold and/or offered for sale these products, and are continuing to do so, to end users and others, specifically intending to actively encourage them to use the infringing devices in the United States in a manner that Defendants

know to be infringing. *See, e.g.*, Defendants' marketing of the Accused Controller Products and the Ryobi app as depicted in the claim charts above.

**ANSWER:**     Denied.

41.     Defendants have also contributed to and/or are contributing to the infringement of the '275 patent by making, using, importing, offering for sale and/or selling one or more of the Accused Controller Products and the Ryobi app. Defendants have made and/or sold these products with knowledge that these products are especially designed for use as an apparatus for use in a patented process and are not staple articles of commerce suitable for substantial noninfringing use.  For example, among other things, Defendants actively and knowingly sell these products and provide the manuals and other documentation for these products to their customers and others for use as an apparatus in a patented process. These products are especially designed for use as an apparatus in a patented process, constitute a material part of the invention, are sold by Defendants for the designed use, and are not a staple article of commerce suitable for substantial noninfringing use. On information and belief, Defendants' customers and consumers have used these products in the United States in this manner and infringed the '275 patent.

**ANSWER:**     Denied.

42.     As a result of Defendants' infringement of the '275 patent, Plaintiff has suffered and will continue to suffer damages. Plaintiff is entitled to recover from Defendants the damages adequate to compensate for such infringement, in an amount to be determined at trial.

**ANSWER:**     Denied.

43.     Defendants' acts of infringement of the '275 patent herein have been committed and are being committed with full knowledge of Plaintiff's rights in the patent.  On information and belief, Defendants have acted and are continuing to act despite an objectively high likelihood that their actions constituted direct and/or indirect infringement of a valid patent, and knew or should have known of that objectively high risk since at least the filing of this Complaint and/or the date this Complaint was served upon Defendants. Defendants' acts constitute willful and deliberate infringement, entitling Plaintiff to enhanced damages under 35 U.S.C. § 284 and reasonable attorneys' fees and costs.

**ANSWER:**     Denied.

44.     Defendants' acts of infringement have caused and will continue to cause irreparable harm to Plaintiff, for which there is no adequate remedy at law, entitling Plaintiff to injunctive relief.

**ANSWER:**     Denied.

## ANSWER TO PLAINTIFF'S PRAYER FOR RELIEF

The prayer for relief includes requests for relief to which no response is required. To the extent that the prayer for relief is interpreted to include any factual allegations, Defendants deny the same and expressly deny that Plaintiff is entitled to any relief whatsoever, whether as sought in its Prayer For Relief, or otherwise, in connection with this civil action. Defendants request that the Court deny the judgment and requested relief set forth in Plaintiff's Prayer For Relief, or otherwise, at the conclusion of the Complaint.

## GENERAL DENIAL

Except as expressly admitted herein, Defendants deny each and every allegation contained in Plaintiff's Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

Defendants assert the following defenses in response to the allegations in Plaintiff's Complaint. Defendants reserve the right to amend or supplement its Answer and defenses as may be warranted by the information developed through subsequent discovery. All such defenses are pleaded in the alternative, and do not constitute an admission of liability or that Plaintiff is entitled to any relief whatsoever.

### FIRST AFFIRMATIVE DEFENSE
### (Invalidity/Unpatentability)

1. The claims of the '966 patent and '275 patent are invalid, void, or unenforceable for failing to comply with one or more of the requirements of the Patent Laws of the United States, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 113, and 132. Based on Defendants' review of the prior art in the limited time since the filing of the complaint, Defendants have already identified several references that appear to invalidate one or more claims of the '966 and '275 patents, including but not limited to U.S. Patent Nos. 6,243,010,

6,326,754, 6,392,537, 6,484,784, 6,923,676 and 7,786,619, U.S. Patent Application Publication Nos. 2002/0183008 and 2003/0063715, as well as additional prior art garage door openers, such as the Craftsman model 139.53919 garage door opener and well known wireless standards, none of which were ever disclosed to the U.S. Patent Office.

## SECOND AFFIRMATIVE DEFENSE
### (Failure To Mark)

2. To the extent that Plaintiff or patentee, its licensees, and/or alleged predecessors-in-interest to the '966 and '275 patents, failed to properly mark any of their relevant products as required by 35 U.S.C. § 287 or otherwise give proper notice that Defendants' actions allegedly infringed the '966 and '275 patents, Defendants are not liable to Plaintiff for any acts performed before it received actual notice that it was allegedly infringing the '966 and '275 patents.

## THIRD AFFIRMATIVE DEFENSE
### (No Costs For Invalid Claims)

3. Plaintiff's requested relief is barred or otherwise limited by 35 U.S.C. § 288.

## FOURTH AFFIRMATIVE DEFENSE
### (Unavailability of Injunctive Relief)

4. Plaintiff is not entitled to injunctive relief because any injury to it is not immediate or irreparable, Plaintiff would have an adequate remedy at law, the balance of hardships favors no injunction, and the public interest is best served by no injunction.

## FIFTH AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

5. Plaintiff's Complaint fails to state a claim on which relief can be granted because the court lacks subject matter jurisdiction over Techtronic Industries North America, Inc.

**SIXTH AFFIRMATIVE DEFENSE**
**(Inequitable Conduct)**

6. The '966 Patent is unenforceable due to inequitable conduct committed by CGI before the United States Patent and Trademark Office ("PTO"). TTI incorporates by reference the allegations of Paragraphs 1-106 of its First Counterclaim herein.

**SEVENTH AFFIRMATIVE DEFENSE**
**(Unclean Hands)**

7. The '966 Patent is unenforceable to due to CGI's uncleans hands. TTI incorporates by reference the allegations of Paragraph 1-132 of its First, Second, and Third Counterclaims herein.

## COUNTERCLAIMS

For the counterclaims, Counterclaim-Defendants One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment, and OWT Industries, Inc. (collectively, "TTI") allege as follows:

## NATURE OF THE ACTION

1.      This action arises out of fraudulent actions of The Chamberlain Group, Inc.'s ("CGI") agents in prosecuting 7,635,966 (the "'966 Patent") and CGI's unlawful efforts to restrain trade or commerce and to maintain a monopoly for retail garage door openers ("GDO") in the United States.  By its own admission, CGI "dominates" the GDO market, with a market share of 70%-80% in the United States.

2.      As detailed herein, CGI has engaged in various acts for the purpose, and with the effect, of illegally restraining trade and maintaining its monopoly in the GDO market in the United States.

3.      CGI's overall scheme includes, through its inequitable conduct at the United States Patent and Trademark Office ("PTO"), fraudulently obtaining patents for GDOs and enforcing those patents against TTI.

4.      CGI's scheme has had the purpose and effect of (a) unreasonably restraining, suppressing and eliminating competition, including that from TTI, in the relevant GDO market; (b) illegally maintaining CGI's monopoly in the relevant market for GDOs; (c) fixing, raising, maintaining or stabilizing the price of GDOs at supracompetitive levels; and (d) overcharging GDO purchasers millions of dollars by depriving them of the benefits of competition.

5.      These counterclaims are brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 ILCS 10/1 et seq. and the United States patent laws, 35 U.S.C. § 101 et seq., and the Declaratory Judgment Act, 35 U.S.C. § 2201.

## PARTIES

6.      Counterclaim-Defendant One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment ("TTIPE") is a Delaware corporation with its principal place of business at 1428 Pearman Dairy Road, Anderson, South Carolina 29625.

7.      Counterclaim-Defendant OWT Industries Inc. is a Delaware corporation with its principal place of business at 225 Pumpkintown Highway, Pickens, South Carolina.

8.      According to its Complaint, CGI is a Connecticut corporation with its principal place of business in Elmhurst, Illinois.

## JURISDICTION AND VENUE

9.      This Court has original jurisdiction over the subject matter of the antitrust counterclaims pursuant to the provisions of 28 U.S.C. §§ 1331 and 1337, with this action arising under the Constitution and the laws of the United States, including the antitrust laws of 15 U.S.C. §§ 1, et seq.  Pursuant to 28 U.S.C. § 1367, this Court also has jurisdiction over the Illinois state claim because it is related to the federal claims.

10.     The declarative counterclaims arise under the United States patent laws, 35 U.S.C. § 101 et seq., and seek declaratory relief for which this Court has subject matter jurisdiction pursuant to 35 U.S.C. §§ 271 and 281, and 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

11.     An actual and justiciable controversy exists under the Declaratory Judgment Act with respect to the alleged infringement, validity, and enforceability of the "Patents-In-Suit."

12.     The Court has personal jurisdiction over CGI by virtue of its filing of this action, as well as having its principal place of business and regularly conducting business within Illinois in sufficient volume and frequency to confer personal jurisdiction in this district.

13.     Venue is appropriate for Counterclaim-Defendants' declarative counterclaims because CGI has consented to the propriety of venue in this Court by filing its claims for patent

infringement in this Court. Venue is proper in this district for the antitrust counterclaims at least because of 28 U.S.C. § 1391(b) and (c) and 15 U.S.C. § 22 because CGI is an Illinois corporation that regularly transacts business in this district and is subject to personal jurisdiction in this district.

**COUNT I**
**FRAUD ON THE PATENT OFFICE REGARDING THE '966 PATENT**

14. Counterclaim-Defendants reallege and incorporate by reference, as if fully set forth herein, the allegations of Paragraphs 1-13 of these Counterclaims.

15. The '966 Patent is unenforceable due to inequitable conduct committed by CGI's agents, including Mr. Fitzgibbon and its attorneys, before the PTO. When it filed the '966 Patent Application in 2006, CGI had at least two pending prior art patent applications describing barrier movement operators with battery backup systems, but it failed to disclose either of them to the PTO in connection with that application. In fact, CGI failed to disclose *any* prior art reference in connection with the '966 Patent Application.

16. After the Examiner rejected the claims of the '966 Patent Application based on non-CGI prior art references, CGI argued the '966 Patent claims were patentable because those references did not teach a battery used to power a movable barrier head unit. Yet CGI simultaneously knowingly withheld its own prior art applications that expressly taught using a battery to power a movable barrier head unit.

**James J. Fitzgibbon**

17. Since 1998, James J. Fitzgibbon has held the position of "Director of Intellectual Capital" at CGI. In that position, Mr. Fitzgibbon is responsible for patent portfolio management. Further, Mr. Fitzgibbon works with inventors and patent counsel to help generate patent applications and determine which applications to pursue and which to drop.

30

18.     According to Mr. Fitzgibbon, he also is an engineering expert within CGI.

19.     In 2006, Mr. Fitzgibbon was a member of CGI's Intellectual Capital Committee.

20.     According to Mr. Fitzgibbon, CGI's Intellectual Capital Committee monitors the patent portfolio with him and determines which ideas CGI will pursue to patent applications.  In particular, he and other members of the Intellectual Capital Committee review Invention Disclosures prepared by CGI employees and determine which disclosures will move forward to patent applications.

21.     CGI prepares Invention Disclosures for the majority of inventions it conceives.

22.     Once the Intellectual Capital Committee determines to pursue a patent application, it turns the matter over to outside patent counsel such as Fitch, Even, Tabin & Flannery ("Fitch Even").  Mr. Fitzgibbon meets with outside counsel to prepare the application.

23.     During the prosecution of CGI's patent applications, Mr. Fitzgibbon reviews Office Actions initiated by the PTO and prepares responses to them with outside patent counsel.

## Prosecution History

24.     On June 28, 2006, Kenneth Samples of Fitch Even filed the '966 Patent (then, U.S. Patent Application Serial No. 11/477,344) with the PTO on behalf of the inventor and applicant, Brian Butler.  On its face, the '966 Patent indicates that it was assigned to CGI.

25.     Despite being the named inventor of the '966 Patent, Mr. Butler had no involvement in the decision to file the application for the '966 Patent.  For example, he did not have any role in writing the application and does not recall any conversations with outside counsel regarding its prosecution.

26.     In contrast, Mr. Fitzgibbon, CGI's Director of Intellectual Capital, was substantially involved in the prosecution of the '966 Patent.   Mr. Fitzgibbon and CGI's

Intellectual Capital Committee reviewed Mr. Butler's Invention Disclosure and decided to pursue a patent application.

27.     Moreover, during the prosecution of the '966 Patent, Mr. Fitzgibbon received copies of Office Actions and reviewed them with Fitch Even. He also had access to the prior art references cited in the Office Actions.

28.     As discussed in more detail below, Mr. Fitzgibbon also was substantially involved in CGI's applications for *Peplinski* and the '619 Patent, for which he is the named inventor.

29.     Throughout the filing and prosecution of the '966 Patent, no one involved with the '966 Patent for CGI filed any Information Disclosure Statement or other disclosure of prior art with the PTO. In particular, CGI failed to notify the PTO of CGI's own prior art applications that taught using a battery to power a movable barrier head unit.

30.     On August 8, 2004, the Examiner issued a non-final rejection of the claims of the '966 Patent, finding the claims obvious over U.S. Patent No. 7,002,312 to Wojciak, Jr. ("Wojciak") in view of U.S. Patent Application Publication No. 2002/0180600 to Kirkland et al. ("Kirkland").

31.     In a November 4, 2008 request for reconsideration, CGI, through Mr. Fitzgibbon and its attorney Nicholas T. Peters, also of Fitch Even, attempted to overcome these objections, arguing that Wojciak does not teach a battery that is rechargeable or used to power a head unit, and that the battery in Kirkland is not rechargeable and cannot provide power to a barrier movement operator head unit.

32.     On February 10, 2009, in response to CGI's arguments about Wojciak, the Examiner issued another non-final rejection, finding the claims of the '966 Patent obvious over Wojciak in view of U.S. Patent No. 5,781,107 to Ji ("Ji").

33.     In a May 11, 2009 Office Action Response, CGI, through Mr. Fitzgibbon and its attorney Mr. Peters, amended the claims of the '966 Patent to overcome the Examiner's rejection.  CGI, through Mr. Peters, argued that Wojciak does not teach a rechargeable battery connected through circuitry to provide power to the head unit of a barrier movement operator, and does not teach electrically powered equipment other than and physically separable from the barrier movement operator.  CGI, through Mr. Fitzgibbon and Mr. Peters, further argued that to the extent the Ji prior art reference discloses the electrically powered equipment recited in claim 1, it does not disclose (a) the equipment comprising an apparatus for receiving the at least one rechargeable battery, where the equipment can be powered by the at least one rechargeable battery to perform a predetermined function, or (b) the rechargeable battery is charged by and used by a barrier movement operator.  CGI, through Mr. Fitzgibbon and Mr. Peters, concluded that Wojciak and Ji do not teach the claimed invention of the '966 Patent "no matter how these references are combined."

34.     CGI, through Mr. Fitzgibbon and Mr. Peters, further argued that claims 9 and 19 of the '966 Patent contain limitations similar to that of claim 1 and are patentable over the Wojciak and Ji prior art references for the same reasons.  As to claim 15, CGI, through Mr. Fitzgibbon and Mr. Peters, argued the combination of the Wojciak and Ji prior art references does not disclose detecting whether the at least one rechargeable battery is in electrical communication with a battery charging station.

35.     On August 8, 2009, the Examiner, relying on the arguments made by CGI in its May 11, 2009 Office Action Response, issued a Notice of Allowance, stating:

> The prior art does not disclose or suggest for following Claims 1, 9, 15 and 19 limitations: "… battery charging station in electrical communication with at least one rechargeable battery and in electrical communications with the head unit to

supply power … barrier movement operable [sic] having head unit … circuitry electrically connected to the battery charging station to supply power from the at least rechargeable [sic] battery to the head unit [sic] … powered equipment … physically separate or separable from the barrier movement operator … perform predetermined function"

36.     In addition to those mentioned above, other attorneys or persons substantively involved in the preparation or prosecution of the application and associated with Applicant and CGI include Steven G. Parmelee, an attorney with Fitch Even who prepared and filed at least the November 6, 2009 fee transmittal for the application; Timothy Levstik, an attorney with Fitch Even who prepared and filed at least the March 23, 2010 request for recalculation of patent term adjustment in view of Wyeth; and Joshua Smith, a technical advisor with Fitch Even who participated in at least an April 30, 2009 examiner interview during prosecution of the application.

### Materiality of *Peplinski*

37.     During prosecution of the '966 Patent, neither Mr. Fitzgibbon, CGI's attorneys, nor any other individual involved with the 966 Patent ever disclosed U.S. Patent Application No. 2003/0063715, published in 2003 ("*Peplinski*"), to the PTO.

38.     *Peplinski* is material prior art that discloses a barrier movement operator with a battery backup system.  CGI owned the *Peplinski* application and therefore knew of *Peplinski* when it filed the application leading to the '966 Patent.   Mr. Fitzgibbon was involved with the prosecution of *Peplinski*.

39.     The Preamble of Claim 9 of the '966 Patent requires "a battery charging apparatus."

40.     *Peplinski* likewise discloses a "back-up battery system" that "uses one or more battery chargers to maintain the back-up batteries in a charged state." *Peplinski* ¶ [0008].

*Peplinski* further discloses that "the battery backup and charging circuit 200 . . . maintain[s] the batteries in a charged state." *Id*. ¶ [0022].

41.     Claim 9a of the '966 Patent requires "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery."

42.     Annotated Figure 2 of *Peplinski* similarly illustrates a battery charging station that supplies power to rechargeable batteries. *Peplinski* discloses that "the battery backup and charging circuit 200 . . . maintain[s] the batteries in a charged state." *Peplinski* ¶ [0022]; *see also id*. ¶ [0023] ("This 18 volt DC current is supplied to the battery backup and charging circuit 200 during ordinary usage to maintain the batteries in a charged state.").



*Fig. 2*

43.     Figure 2 also illustrates that the battery back-up and charging circuit is in electrical communication with the rechargeable batteries and the head unit.  More specifically, *Peplinski* explains that:

> [D]uring ordinary usage (no external power failure), an external power source 170 provides the power for energizing the various components of the controller 70, including the battery back-up and charging circuit 200.  As shown in FIG. 2, the external power source provides AC voltage, which is transformed and rectified to yield 18 volts DC. This 18 volt DC current is supplied to the battery backup and charging circuit 200 during ordinary usage to maintain the batteries in a charged state.
>
> In addition, during ordinary usage (no external power failure, the external power source 170 provides 24 volts of rectified DC current to the battery back-up and charging circuit 200. During normal operation, this 24 volts is supplied through the garage door operator and represents power supplied to the garage door operator.  When a power failure occurs, however, this 24 volts is no longer supplied to the battery back-up and charging circuit 200, and relays are energized to connect the battery back-up and charging circuit 200 to the garage door operator power board, as described hereinafter.  Accordingly, during a power outage, the battery back-up and charging circuit 200 provides the power for energizing the various elements of the controller 70.

*Id.* ¶¶ [0022-23].

44.     Claim 9b of the '966 Patent requires "the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment."

45.     Similarly, *Peplinski*'s batteries could be removed from a first garage door opener and used to power a second, identical garage door opener.  *Peplinski* ¶ [0008].  A skilled artisan would have appreciated that a second garage door operator as disclosed in *Peplinski* is "electrically powered equipment other than and physically separate or separable from the [first

garage door operator].'' Thus, *Peplinski*'s rechargeable battery is removably connectable to and can provide power to a second garage door operator as disclosed in the '966 Patent.

46. Claim 9c of the '966 Patent requires "circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit.''

47. Figure 2 below of *Peplinski* illustrates circuitry electrically connected to the battery backup and charging circuit (i.e., the battery charging station) to supply power from the at least one rechargeable battery to the head unit. *Peplinski* further discloses that:

> When a power failure occurs, [] this 24 volts is no longer supplied to the battery back-up and charging circuit 200, and relays are energized to connect the battery back-up and charging circuit 200 to the garage door operator power board. Accordingly, during a power outage, the battery back-up and charging circuit 200 provides the power for energizing the various elements of the controller 70.

*Peplinski* ¶ [0023]; *see also id.* ¶ [0038].



*Id.* at Fig. 2 (color and annotation added).

48.     Annotated Figure 6b below further discloses how the battery backup and charging circuit is electrically connected to and provides power to the head unit.  Specifically, *Peplinski* discloses relays, switches, and conductors that permit "two back-up batteries B1 and B2 [to] provide voltage to the garage door operator 10 if there is an external power failure."  *Id.* ¶ [0036].



*Id.* at Fig. 6b (color and annotation added).

49.   Thus, *Peplinski* was highly material to the proposed claims of the '966 Application.

50.   But for the failure of Mr. Fitzgibbon, Mr. Samples, and any other individual associated with the prosecution of the '966 Patent to disclose *Peplinski* to the PTO, the '966 Patent would not have issued.

### Materiality of the '619 Patent

51.   During prosecution of the '966 Patent, neither Mr. Fitzgerald, Mr. Samples, nor any other individuals involved with the '966 Patent disclosed CGI's U.S. Patent No. 7,786,619 (the "'619 Patent"), previously published in 2005 as U.S. Patent Application No. 2005/0057100, to the PTO.

52.   The '619 Patent is material prior art that discloses a barrier movement operator with a battery backup system.  CGI owned the '619 Patent and therefore knew of it when it filed

the '966 Application. Mr. Fitzgibbon is the named inventor of the '619 Patent and was substantially involved with its prosecution.

53. The Preamble of Claim 9 of the '966 Patent requires "a battery charging apparatus."

54. The '619 Patent similarly discloses that "[b]attery backup 39 includes a nominally 24 volt battery 37 which is charged and maintained in a charge state by a battery charge and control circuit 41 and conductors 47 and 49." '619 Patent at 2:24-26; *see also id.* at 2:38-42. Moreover, claim 1 of the '619 Patent requires a "battery backup apparatus" that charges a battery: "battery backup apparatus comprising: a battery; a battery charging circuit coupled to the battery . . . the battery charging circuit configured to receive a DC voltage . . . to charge the battery . . . ." *Id.* at claim 1.

55. Claim 9a of the '966 Patent requires "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery."

56. Figure 1 of the '619 Patent likewise illustrates "a barrier movement operator 11 for controlling a motor 13 and thereby move a barrier (not shown)." '619 Patent at 1:51-52. It further discloses a set of components that control the moveable barrier:

> The barrier movement operator 11 comprises a ***barrier movement controller 15*** which responds to operational input signals and user generated input signals to control motor 13. A ***power supply 17*** received mains voltage at 110V AC 60 HZ at ***input terminals 19*** and converts a portion of the received voltage to DC. The barrier movement controller 15 is connected to receive DC voltage from power supply 17 via a ***conduction path 21*** and is connected to power supply 17 via a ***communication path 22*** so that the power supply can be monitored and controlled as need.

*Id.* at 1:54-64 (emphasis added).

57.    The '619 Patent also discloses a barrier movement operator 11 (outlined in blue in Figure 1 below), which is a head unit.  The barrier movement operator includes the barrier movement controller 15, power supply 17, and motor 13 operate together to control the position of the moveable barrier.  *See id.* at 1:51-64.  Furthermore, it acknowledges that "[b]arrier movement operators which control the position of a barrier are well known and not described in detail herein."  *Id.* at 1:53-54.



*Fig. 1*

*Id.* at Fig. 1 (color added).

58.    The '619 Patent further discloses that the head unit is supplied power from an external power source and, in the event of a power failure, from a battery.  *Id.* at 1:57-61 ("A power supply 17 receive[s] mains voltage at 110 V AC 60 HZ at input terminals 19 and converts a portion of the received voltage to DC" and "[t]he barrier movement controller 15 is connected to receive DC voltage from power supply 17."); *id.*, 2:27-54 ("If the mains voltage at input 19

fails . . . battery 37 will keep significant D.C. voltage in power supply 17 when it is used to power the barrier movement operator.").

59. Claim 9b of the '966 Patent requires "the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment."

60. Figure 1 of the '619 Patent similarly discloses a "[b]attery backup 39 [that] includes a nominally 24 volt battery 37 which is charged and maintained in a charged state by a battery charge and control circuit 41 and conductors 47 and 49." '619 Patent at 2:24-26.

61. It also discloses that the battery backup is separate from the barrier movement operator. The battery backup is connected to the barrier movement operator "[w]hen plug 32*b* [shown in orange below] is plugged into plug 32*a* [shown in green below]." *Id.* at 3:44-47.



*Id.* at Fig. 1 (color and annotation added).

62.     Moreover, Figure 1 illustrates that the battery backup is in electrical communication with the head unit (outlined in blue above) to supply power to the rechargeable battery.  More specifically, the '619 Patent discloses that:

> During normal operation, while mains voltage is present at input 19, a DC voltage is applied by resistor 29 to conductor 33 and is used to charge battery 37.  Battery charge and control arrangement 41 regulates the amount of current drawn from power supply 17 for this purpose. . . . If the mains voltage at input 19 fails . . . battery 37 will keep significant D.C. voltage in power supply 17 when it is used to power the barrier movement operator.

Id. at 2:37-54; see also id. at 3:44-47 ("When plug 32b (FIG. 1) is plugged into plug 32a and power is being provided between conductor 33 and 35 from power supply 17, the battery charge and control circuit 41 will enter, or remain in, the battery charge mode.").

63.     Claim 1 of the '619 Patent also clearly discloses this claim limitation:

> [A] battery backup apparatus comprising: a battery; a battery charging circuit coupled to the battery; and a conduction path between the battery and the moveable barrier operator . . . and the battery charging circuit configured to receive a DC voltage from the DC power supply located within the moveable barrier operator . . .  to charge the battery . . .   the battery backup voltage being provided from the battery when mains voltage to the movable barrier operator fails.

Id. at claim 1

64.     Claim 9c of the '966 Patent requires "circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit."

65.     The '619 Patent discloses this element as well, i.e., in the event of a power failure, the battery backup supplies power from the rechargeable battery to the barrier movement operator:

> **The battery is in circuit at all times with the barrier movement operator** power supply by means of a power diode and, when an

> AC mains power failure occurs, ***DC power is sent from the battery to power the barrier movement operator***.

'619 Patent at Abstract (emphasis added).

> If the mains voltage at input 19 fails, the DC voltage from power supply 17 will drop and the voltage between conductors will approach the 24 volts of battery 37. When this happens, battery 37 will act to keep 24V on conductor 33 via positively biased diode 43 and also on conductor 23 via positively biased diode 27. Thus, battery 37 will keep significant D.C. voltage in power supply 17 when it is used to power the barrier movement operator.

*Id.* at 2:38-54; *see also id.* at 3:61-65 ("[When] mains power fails . . . current will begin to flow from battery 37 via diode 43 and conductor 33 back to the barrier movement operator 11.").

66.     Thus, the '619 Patent would have been highly material to the prosecution of the proposed claims of the '966 Application.

67.     But for the failure of Mr. Fitzgibbon, CGI's attorneys, and other individuals involved in the prosecution of the '966 Patent to disclose the '619 Patent to the PTO, the '966 Patent would not have issued.

### Materiality of the *Craftsman* Garage Door Opener

68.     During prosecution of the '966 Patent, neither Mr. Fitzgibbon, CGI's attorneys at Fitch Even, nor any other individuals involved with the '966 Patent disclosed the Craftsman model 139.53919 garage door opener ("*Craftsman*") to the PTO.

69.     CGI designed and manufactured *Craftsman* for Sears and was thereby aware of that product. *Craftsman* is material prior art, available at least as of November 2004, that teaches a garage door opener with a battery backup system.

70.     *Craftsman* discloses a battery charging station in electrical communication with at least one rechargeable battery and in electrical communication with the head unit of a barrier movement operator to supply power to the head unit.

71.   The Preamble of Claim 9 of the '966 Patent requires "a battery charging apparatus."

72.   *Craftsman* discloses a battery charging apparatus:



73.   Further, the *Craftsman* Manual describes how the garage door opener charges the batteries:

**3. Connect the BBU to the Motor Unit.**

- Disconnect the motor unit from the electrical outlet.
- Connect the BBU cord into the connector on the right side of the end panel on the motor unit. Connect the motor unit into the electrical outlet. The BBU will activate and all LEDs will turn on for 3 seconds.
- The green LED will begin flashing indicating the BBU is charging from the motor unit.

74.   In addition, *Craftsman* had a charging circuit that was already installed inside the *Craftsman* battery backup unit.

75.    Claim 9a of the '966 Patent requires "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery."

76.    *Craftsman* likewise discloses a battery charging station ("BBU") in electrical connection with the head unit to supply power to the rechargeable batteries inside the BBU:



77.    As shown below, the BBU contains two rechargeable batteries and circuitry to supply power to them from the head unit:



78.     The *Craftsman* Manual on page 32 further describes that the BBU is plugged into the head unit, which in turn is plugged into an electrical outlet to power the rechargeable batteries in the charging station.

**3. Connect the BBU to the Motor Unit.**

- Disconnect the motor unit from the electrical outlet.
- Connect the BBU cord into the connector on the right side of the end panel on the motor unit. Connect the motor unit into the electrical outlet. The BBU will activate and all LEDs will turn on for 3 seconds.
- The green LED will begin flashing indicating the BBU is charging from the motor unit.

79. Claim 9b of the '966 Patent requires "the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment."

80. *Craftsman* also discloses that it worked in conjunction with other garage door openers, as it is shipped with a remote control, shown below, designed to control three such systems, one for each button. A garage door opener is a form of electrically powered equipment as it takes power to perform a function, such as opening and/or closing a garage door.



81. The *Craftsman* Manual at page 37 also describes this operation of the garage door opener remote control:



82.     These other garage door openers taught by *Craftsman* are electrically powered equipment to which the batteries in the battery backup unit can be attached to perform the predetermined function of opening or closing another garage door.  Further, the BBU itself is electrically powered equipment separable from the barrier movement operator that can be powered by the rechargeable batteries taught by *Craftsman* to perform the predetermined function of powering a garage door opener.

83.     Claim 9c of the '966 Patent requires "circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit."

84.     As shown in the exemplary image below of the inside of the BBU, the *Craftsman* contains circuitry electrically connected to the battery charging station:



85.     As shown in the following exemplary image, the *Craftsman* battery charging station is connected to the head unit via a cord:



86.     As the *Craftsman* Manual explains, the batteries in the battery charging station supply power to the head unit.  For example, page 33 of the manual explains how to verify that the batteries supply power to the head unit:

> **1. Test the installed BBU with the motor unit.**
>
> To test the BBU, disconnect the motor unit power cord from the electrical outlet.
>
> - A solid yellow LED indicates the BBU is operating on battery power.
> - A flashing yellow LED with beep indicates the BBU is operating on battery power and that the battery charge is low.
> - To test the BBU is functioning properly, open and close the garage door.
> - Re-connect the motor unit power cord back into the electrical outlet.
> - Verify that the green LED is flashing on the BBU (indicates that the BBU is now charging).
> - Test completed.

87.     Thus, the *Craftsman* would have been highly material to the prosecution of the proposed claims of the '966 Application.

88.     But for the failure of Mr. Fitzgibbon, CGI's attorneys, and other individuals involved in the prosecution in the '966 Patent to disclose the *Craftsman* to the PTO, the '966 Patent would not have issued.

**Specific Intent**

89.     On information and belief, Mr. Fitzgibbon and other above-named individuals acted with specific intent to deceive the PTO when withholding the known material prior art references discussed above and misrepresenting the scope of the claims of the '966 Patent.

90.     As described above, through his position as CGI's Director of Intellectual Capital, Mr. Fitzgibbon had detailed knowledge of all the above-identified CGI patent applications and was substantially involved in their prosecutions.

91.     CGI prepared an Invention Disclosure for the '966 Patent that was reviewed by Mr. Fitzgibbon and other members of the Intellectual Capital Committee.  The Committee decided to pursue a patent application based on that Invention Disclosure.

92.     During the prosecution of the '966 Patent, Mr. Fitzgibbon received copies of Office Actions and reviewed them with Fitch Even.  He also had access to the prior art references cited in the Office Actions.  Mr. Fitzgibbon further provided his outside counsel with relevant prior art.

93.     Although Mr. Fitzgibbon is a named inventor on the '619 Patent and was substantially involved with the prosecution of that patent, reviewing and responding to Office Actions with outside counsel, he did not disclose the '619 Patent to the PTO during the prosecution of the '966 Patent.

94.     Mr. Fitzgibbon was aware of *Peplinski* during the prosecution of the '966 Patent because it was developed in CGI's Advanced Development Group, which he founded in 1998.  Nonetheless, he failed to disclose *Peplinski* to the PTO during the prosecution of the '966 Patent.

95.     Mr. Fitzgibbon was aware of the commercially successful *Craftsman* garage door openers with battery backup systems because it was manufactured by CGI, because it practiced the '619 Patent to which he was a named inventor, and because a *Craftsman* garage door opener was modified in the course of developing the disclosures for the '966 Patent.

96.     Mr. Fitzgibbon failed to disclose *Peplinski*, the '619 Patent, and *Craftsman* to deceive the PTO.

97.     Kenneth Samples, Nicholas Peters and Timothy Levstik had direct knowledge of the above-referenced prior art, including *Peplinski*, and the '619 Patent.  On CGI's behalf, Mr. Samples helped prosecute both *Peplinski* (until the application was abandoned) and the '619

Patent. Mr. Peters and Mr. Levstik were involved with the prosecution of the '619 Patent, during which the Examiner cited *Peplinski*.

98. Despite their direct knowledge of *Peplinski* and the '619 Patent, Mr. Samples, Mr. Peters, and Mr. Levstik failed to disclose any of them in connection with the '966 Patent.

99. On information and belief, Mr. Samples, Mr. Peters, and Mr. Levstik failed to disclose *Peplinski* and the '619 Patent to deceive the PTO as to the scope and content of the prior art.

100. Mr. Samples and Mr. Peters also failed to disclose *Peplinski* in connection with the '619 Patent. However, during that prosecution, the Examiner independently found *Peplinski*, and, on May 23, 2008, relied on it as the basis to reject the claims of the '619 Patent, which were directed to a battery backup apparatus for use with a moveable barrier operator, thereby reinforcing the materiality of *Peplinski* to battery backup apparatuses for use with a moveable barrier operator.

101. Despite the PTO's reliance on *Peplinksi* for rejecting one of CGI's other battery backup patents, Mr. Samples, Mr. Peters, and Mr. Fitzgibbon failed to disclose *Peplinski* in connection with the '966 Patent.

102. On November 4, 2008, Mr. Peters attempted to distinguish the claims of the '966 Patent from the prior art, arguing the cited prior art did not teach a rechargeable battery used to power a head unit. While making those arguments to the PTO, Mr. Peters knew *Peplinski* disclosed a rechargeable battery used to power a head unit because another examiner at the PTO had said so in connection with the '619 Patent. Yet, Mr. Peters failed to disclose *Peplinski* or the '619 Patent, both of which expressly taught a rechargeable battery used to power a head unit.

103.    Mr. Fitzgibbon and CGI's attorneys at Fitch Even had direct knowledge of the above-referenced prior art, including the *Craftsman*, which was produced by CGI, and numerous similar garage door opener products.

104.    Each of the above-cited prior art references was well known to Mr. Fitzgibbon, CGI's attorneys and representatives; indeed, the above cited prior art was either owned by CGI, cited against other CGI patents contemporaneously with the prosecution of the '966 Patent, or both.

105.    The failure of Mr. Fitzgibbon, CGI's attorneys, and others involved in the prosecution of the '966 Patent to disclose the above-cited prior art references to the PTO during prosecution of the '966 Patent shows a specific intent to deceive the PTO.  Their failure to disclose a single prior art reference confirms that intent.

106.    Intent to deceive the PTO is the single most reasonable inference to be drawn from the systematic failure of Mr. Fitzgibbon, CGI's attorneys at Fitch Even, and others at CGI to disclose material prior art.  It is otherwise wholly implausible that none of the persons involved in the prosecution of the '966 Patent would have thought to disclose at least one of these material references.

## COUNT II
## MONOPOLY IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

107.    Counterclaim-Defendants reallege and incorporate by reference, as if fully set forth herein, the allegations of Paragraphs 1-106 of these Counterclaims.

108.    The '966 Patent is unenforceable due to CGI's unlawful efforts to restrain trade or commerce and to maintain a monopoly for retail GDOs in the United States.  By its own admission, CGI "dominates" the GDO market, with a market share of 70%-80% in the United States.

109.    As detailed herein, CGI has engaged in various acts for the purpose, and with the effect, of illegally restraining trade and maintaining its monopoly in the GDO market in the United States.

110.    CGI's overall scheme includes, through its inequitable conduct at the PTO, fraudulently obtaining patents for GDOs and enforcing those patents against TTI.

111.    CGI's scheme has had the purpose and effect of (a) unreasonably restraining, suppressing and eliminating competition, including that from TTI, in the relevant GDO market; (b) illegally maintaining CGI's monopoly in the relevant market for GDOs; (c) fixing, raising, maintaining or stabilizing the price of GDOs at supracompetitive levels; and (d) overcharging GDO purchasers millions of dollars by depriving them of the benefits of competition.

### CGI Fraudulently Obtained the '966 Patent

112.    As described above in Paragraphs 14-106, which are incorporated by reference, during the prosecution of the '966 Patent, with knowledge and intent, CGI's agents failed to disclose material prior art—including its own patent, patent application, and commercialized garage door opener—and misrepresented the scope of the claims under examination to the PTO.

113.    By making misrepresentations and failing to disclose those material references, CGI committed fraud on the PTO.

### CGI Accused TTI of Infringing the Fraudulently Obtained the '966 Patent

114.    Despite its knowledge that it had fraudulently obtained the '966 Patent, CGI maintained and asserted that patent to exclude competition in the GDO market.

115.    On June 10, 2016, CGI filed a Complaint in this action alleging, among other things, that TTI infringes the '966 Patent.  (ECF No. 1.)

116.    CGI admits that none of its commercially available products practices the '966 Patent.

## The United States Market for Garage Door Openers

117.    TTI and CGI compete in the United States market for garage door openers.  In CGI's words, its GDO model "HD950WF and [the TTI] Ryobi GD200 are essentially sole competitors at their price point." (ECF No. 74 at 14.)

118.    According to CGI, "[p]rior to entry of Ryobi GD200 to the market, this was a two-player market dominated by CGI."  (ECF No. 74 at 14, 2)  CGI describes the market as "effectively . . . a two-player market- CGI and everyone else." (ECF No. 8 at 14.)

119.    CGI also admits its market dominance continues:  "CGI's dominance results in essentially a two competitor market, particularly for the segment of the market consisting of high price point products." (ECF No. 74 at 14.)

120.    As a result of that dominance, CGI acknowledges that it "has earned an estimated 70%-80% share of the US residential garage door market." (ECF No. 8 at 14.)

## CGI Alleges that TTI's Entrance into the GDO Market Will Lower Prices

121.    According to CGI, "[b]y entering the market at a lower price than CGI's comparable product, TTI harms CGI's ability to maintain prices on its products."  (ECF No. 74 at 22.)

122.    It further alleges that "[t]he presence of TTI's product in the market removes CGI from its previous strategically powerful position as a price leader in the GDO market."  (ECF No. 74 at 22.)

123.    Since TTI's "Ryobi GDO is offered at a lower price point than its comparable CGI model," CGI alleges it will "need to lower its pricing."  (ECF No. 8 at 15.)

**Unenforceability for Violations of the Sherman Act**

124.    By withholding material information that it was aware of from the PTO, CGI fraudulently obtained the '966 Patent.  With knowledge of that fraud, CGI then unlawfully attempted to enforce the '966 Patent against TTI in contravention of federal law and with the intention of restraining trade and commerce and restricting competition for the sale of GDOs.

125.    CGI has monopolized, restrained trade, and restricted competition in the United States retail GDO market in violation of Section 2 of the Sherman Act.  This market constitutes the relevant product and geographic market through which CGI has exercised market power and inflicted marketwide antitrust injury as described herein.

126.    CGI has substantial market power in the GDO market and by its own admission controls 70%-80% of that market.  Through its exercise of market power, CGI has inflicted antitrust injury on the relevant market, including GDO retailers and customers and consumers, by maintaining supracompetitive prices, stifling product innovation and blocking market entry.

127.    CGI's activities as alleged herein were within the flow of, and have substantially affected, interstate commerce.  GDOs sold by CGI are regularly shipped across state lines and sold through such national chains as Lowe's, Menards and The Home Depot.  The amount of interstate commerce for GDOs is not insubstantial.  For example, CGI receives millions of dollars annually for the sale of its GDOs in the relevant market.

**COUNT III**
**MONOPOLY IN VIOLATION OF THE ILLINOIS ANTITRUST ACT**

128.    Counterclaim-Defendants reallege and incorporate by reference, as if fully set forth herein, the allegations of Paragraphs 1-127 of these Counterclaims.

129.    CGI's activities as described above violate the Illinois Antitrust Act, 740 ILCS 10/1 et seq.

130. Upon information and belief, CGI has made and will continue to make substantial profits and gains to which it is not in law or equity entitled.

131. CGI's acts have damaged and will continue to damage TTI.

132. The '966 Patent is unenforceable due to violations of the Illinois Antitrust Act.

**COUNT IV**
**DECLARATION OF NON-INFRINGEMENT**

133. Counterclaim-Defendants reallege and incorporate by reference, as if fully set forth herein, the allegations of Paragraphs 1-132 of these Counterclaims.

134. An actual and justiciable controversy exists between Counterclaim-Defendants and Plaintiff with respect to the Patents-In-Suit. Absent a declaration of non-infringement, Plaintiff will continue to wrongfully assert the Patents-In-Suit against Counterclaim-Defendants, and thereby cause Counterclaim-Defendants irreparable injury and damage.

135. Counterclaim-Defendants do not make, use, sell, or offer for sale, any products, nor use any methods or services that infringe any claims the Patents-In-Suit, either literally or under the doctrine of equivalents, and Counterclaim-Defendants have not induced or contributed to the infringement of any claim of the Patents-In-Suit.

**COUNT V**
**DECLARATION OF INVALIDITY/UNPATENTABILITY**

136. Counterclaim-Defendants reallege and incorporate by reference, as if fully set forth herein, the allegations of Paragraphs 1-135 of these Counterclaims.

137. An actual and justiciable controversy exists between Counterclaim-Defendants and Plaintiff with respect to the validity and/or patentability of the Patents-In-Suit. Absent a declaration of invalidity and/or unpatentability, Plaintiff will continue to wrongfully assert the Patents-In-Suit against Counterclaim-Defendants, and thereby cause Counterclaim-Defendants irreparable injury and damage.

138.     The Patents-In-Suit are invalid and/or unpatentable under the provisions of Title 35, United States Code, including, but not limited to, sections 101, 102, 103, 112, and/or 132, and Counterclaim-Defendants are entitled to a declaration to that effect.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim-Defendants pray that the Court enter judgment:

(1)     declaring the '966 Patent unenforceable because CGI has committed fraud on the PTO;

(2)     finding that CGI has violated Section 2 of the Sherman Act;

(3)     finding that CGI has violated the Illinois Antitrust Act;

(4)     declaring that Counterclaim-Defendants do not infringe any claims of the Patents-In-Suit;

(5)     declaring that the claims of the Patents-In-Suit are invalid and unpatentable;

(6)     dismissing the Complaint with prejudice, insofar as it relates to Counterclaim-Defendants;

(7)     awarding TTI treble damages;

(8)     awarding TTI its attorneys' fees and costs of suit as required by Section 4 of the Clayton Act, 15 U.S.C. § 15 and Section 7 of the Illinois Antitrust Act, 740 ILCS 10/7(2), and as permitted under 35 U.S.C. § 285 for exceptional cases;

(9)     enjoining Plaintiff from litigating any action in any other court against Counterclaim-Defendants and/or their customers for infringement of the Patents-In-Suit; and

(10)     granting such other and further relief to Counterclaim-Defendants that this Court deems just and proper.

Dated:  May 18, 2017     Respectfully submitted,

          By: /s/ *Jason C. White*
            Jason C. White
            Michael J. Abernathy
            Sanjay K. Murthy
            Nicholas A. Restauri
            Morgan, Lewis & Bockius LLP
            77 W. Wacker Drive, Ste. 500
            Chicago, IL  60601
            Tel:  (312) 324-1000
            Fax:  (312) 324-1001
            E-mail: jason.white@morganlewis.com
               michael.abernathy@morganlewis.com
               sanjay.murthy@morganlewis.com
               nicholas.restauri@morganlewis.com

            *Attorneys for Defendants Techtronic Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that a copy of the foregoing document was served via CM/ECF on May 18, 2017

upon all counsel of record.

/s/        *Jason C. White*        
Jason C. White