IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., | |
| Plaintiff, | |
| v. | |
| TECHTRONIC INDUSTRIES CO., LTD., TECHTRONIC INDUSTRIES NORTH AMERICA, INC., ONE WORLD TECHNOLOGIES, INC., OWT INDUSTRIES, INC., ET TECHNOLOGY (WUXI) CO. LTD., and RYOBI TECHNOLOGIES, INC., | Case No. 16 CV 6097 |
| | Judge Harry D. Leinenweber |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff The Chamberlain Group, Inc. ("Chamberlain") filed this lawsuit alleging that certain models of Defendants' Ryobi-branded garage door openers ("GDOs") infringe two patents it holds on GDO technology. On March 22, 2017, the Court granted Defendants leave to amend their Answer with respect to one of these patents - U.S. Patent No. 7,635,966 ("the '966 patent") - and Defendants added associated factual allegations along with an inequitable conduct affirmative defense and counterclaim, an unclean hands affirmative defense, and monopoly counterclaims. The '966 patent is directed to a GDO system including a battery charging station in electrical communication with at least one

rechargeable battery and with the head unit of a GDO to supply power to the head unit in the event of power failure, along with physically separate electrically powered equipment capable of being powered by the at least one rechargeable battery.

Before the Court is Plaintiff The Chamberlain Group, Inc.'s Motion for Summary Judgment on Defendants' Inequitable Conduct and Antitrust Claims [ECF No. 415]. For the reasons stated herein, the Court grants the Motion. As such, the testimony of Defendants' antitrust expert will prove irrelevant at trial, and so the Court grants Plaintiff's Motion to Exclude Dr. Anne Layne-Farrar's Expert Opinions and Testimony [ECF No. 417].

## I. <u>BACKGROUND</u>

The Court assumes familiarity with its decision granting Defendants leave to amend. The following facts are undisputed unless otherwise noted.

Mr. James J. Fitzgibbon ("Fitzgibbon") is an engineer who holds and at all relevant times held the position of "Director of Intellectual Capital" at Chamberlain. (ECF No. 511-1 ("Pl.'s Resp.") ¶¶ 1-3.) His responsibilities include(d) maintaining the company's patent portfolio, reviewing office actions issued by the United States Patent Office ("PTO"), and working with inventors and patent counsel during prosecution, including attorneys at the Chicago-based law firm Fitch Even Tabin & Flannery ("Fitch Even"). (*Id.* ¶ 6.) Instead of exploiting a

physical database of files or prior art, Fitzgibbon uses his knowledge and his "large memory of different patents" when determining what to send to Fitch Even during patent prosecution. (*Id.* ¶ 5.) During the relevant 2003-2010 timeframe, Fitzgibbon was the only person at Chamberlain who received copies of the PTO's office actions. (*Id.* ¶ 4.) As a general practice, Fitzgibbon looks up any prior art references cited therein. (*Id.* ¶ 9.)

Fitzgibbon is a listed inventor of U.S. Patent No. 7,786,619 to Crusius ("the '619 patent"), the original assignee of which was Chamberlain. (Pl.'s Resp. ¶ 7.) The '619 patent is directed to a backup source of DC power for a movable barrier operator (such as a GDO) in which a battery "in circuit at all times with the barrier movement operator power supply" utilizes "in part, the AC/DC conversion capability of the barrier movement system" to power the operator in the event of an AC outage. ('619 patent at 1:35-40 & Abstract.) According to Fitzgibbon, Chamberlain made a product called the "EverCharge" battery that embodied the '619 patent invention, which Sears also sold under its "Craftsman" brand as a "DieHard" battery ("*Craftsman*"). (Pl.'s Resp. ¶ 8.) Fitzgibbon was also involved in prosecuting Chamberlain's U.S. Patent App. No. 2003/0063715 ("*Peplinski*"), which is directed to a GDO system that uses one or more batteries (maintained by one or more battery chargers)

to provide GDO backup power in case of electrical power outage. The system monitors backup batteries and other components and initiates a stored service call to a dealer or other individual when batteries or other components require replacement. (*See, Peplinski* at Abstract.)

From approximately 1990 until his retirement in 2007, Mr. Kenneth Samples ("Samples") was Chamberlain's outside prosecution counsel at Fitch Even. (Pl.'s Resp. ¶ 12.) His primary contact at Chamberlain was Fitzgibbon, and "from time to time" the two discussed whether Chamberlain needed to conduct prior art searches. (*Ibid.*) Samples prepared and filed *Peplinski,* the application leading to the '619 patent, and the application leading to the '966 patent. (*Id.* ¶¶ 13-15.) On April 7, 2006, the PTO issued an office action rejecting certain claims of the '619 patent application as anticipated by *Peplinski*'s disclosure of a battery backup apparatus for use with a barrier movement operator. (*Id.* ¶ 16.) Between April 19 and June 14, 2006, Samples billed time to Chamberlain for prosecution work on the '966 patent on five occasions and for prosecution work on the '619 patent on three occasions. (*Id.* ¶¶ 18-19.) Specifically, on April 26, 2006, Samples billed time to the '966 patent prosecution matter; one day later, he billed time to the '619 patent prosecution matter. (*Id.* ¶ 20.) On October 10, 2006, Samples filed a response to the office action,

traversing the Examiner's rejection of the '619 patent claims by distinguishing the technology taught by *Peplinski*. (*Id.* ¶ 17.)

Whereas Samples signed the communications with the PTO regarding the '619 patent, Mr. Nicholas Peters ("Peters") was the Fitch Even attorney in charge of submitting Chamberlain's responses to office actions during prosecution of the '966 patent. Fitch Even billing records indicate that he performed no prosecution work on the '619 patent prior the '966 patent's issuance on December 22, 2009, but as early as April 2009 he received emails concerning prosecution of a Canadian application related to the '619 patent. (*Compare,* Pl.'s SOF ¶ 6; *with,* Defs.' Resp. ¶ 6; *see also,* ECF No. 487 at Ex. 1 ("Defs.' Resp.") ¶ 23.) Although he could not recall considering whether any art other than that cited by the Examiner was material to the '966 patent application, Peters testified to his general practice of submitting "references that I know are material to a patent application." (Defs.' Resp. ¶ 7.)

During prosecution of the '966 patent, neither Fitzgibbon nor the Fitch Even attorneys disclosed the '619 patent, *Craftsman*, or *Peplinski* to the PTO. (Indeed, Chamberlain did not file an information disclosure statement or otherwise disclose any prior art.) As a rationale for withholding these references, Fitzgibbon characterized the following sentences in the background section of the '966 patent as "[f]ully

describ[ing] the important part of the operation of the product":

> Some current barrier movement operators can be powered
> via a backup battery. These barrier movement
> operators receive power from the backup battery in the
> event of a power disruption from the electrical outlet
> and can be operated as long as the backup battery has
> a sufficient amount of electrical power stored. These
> battery backups are independent items which are
> typically used only for operating the barrier movement
> operator. These systems require some method to
> recharge the batteries either built into the operator
> or as an additional power supply for battery charging.

(Pl.'s Resp. ¶ 11; '966 patent at 1:31-42; *see also,* Defs.'
Resp. ¶¶ 1-2, 17.) Chamberlain's infringement expert, Dr.
Rhyne, admitted during his deposition that the disclosures in
*Peplinski* and the '619 patent are more extensive than this terse
summary of prior art backup battery systems, but opined that "in
the '966, the – the basic GDO is pretty much a given, and the
point of novelty is the point that you have a battery that's
removably connectable to other electrical equipment." (Pl.'s
Resp. ¶¶ 26-27.)

At his deposition, Samples had no recollection of any of
the three references at issue, of any steps he may have taken to
comply with his duty of candor to the PTO, or of his intent in
2006 regarding prosecution of the '966 patent. (Pl.'s Resp. ¶¶
21-25.) However, he testified that he never knowingly withheld
references from the PTO or did "nefarious things"; that, as a
general matter, he and Fitzgibbon "submitted what we should";

and that he had no knowledge of Fitzgibbon or Chamberlain seeking to withhold references or saying "anything dishonest in connection with the prosecution of Chamberlain patents." (Defs.' Resp. ¶¶ 8-11.)

Finally, the factual predicates for Defendants' monopoly counterclaims warrant a brief mention. Chamberlain does not practice and has never practiced the '966 patent. (Defs.' Resp. ¶ 25.) Perhaps as a consequence, Defendants' claims under Section 2 of the Sherman Act and under the Illinois Antitrust Act charge Chamberlain with monopolizing the U.S. market for residential GDOs by asserting the '966 patent in this litigation. (*Id.* ¶¶ 27-28.) According to Defendants' antitrust expert, Dr. Layne-Farrar, Defendants' alleged antitrust injury consists solely of litigation expenses incurred in defending Chamberlain's infringement suit – costs she pegs at $1.4 million. (*Id.* ¶ 48.)

## II.  LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts

and draw reasonable inferences in the light most favorable to
the nonmovant.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  The
Court may not weigh conflicting evidence or make credibility
determinations.  *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629
F.3d 697, 704 (7th Cir. 2011).

## III. **DISCUSSION**

Defendants assert inequitable conduct and unclean hands as
affirmative defenses to infringement of the '966 patent,
incorporating the allegations fully set forth in their
inequitable conduct and monopoly counterclaims.  The Court's
treatment of Chamberlain's Motion thus proceeds in two parts –
first, an analysis of whether Chamberlain is entitled to
judgment as a matter of law on the inequitable conduct issues,
and then an examination of Defendants' monopoly counterclaims
charging Chamberlain with asserting a fraudulently obtained
patent to anticompetitive effect.

### A.   **Inequitable Conduct**

"Patent applicants have a duty to prosecute patent
applications in the PTO with candor, good faith, and honesty."
*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, 607
F.3d 817, 829 (Fed. Cir. 2010) (internal quotation marks and
alteration omitted); *see also,* 37 C.F.R. § 1.56(a).  Breach of
this duty – "including affirmative misrepresentations of
material facts, failure to disclose material information, or

submission of false material information – coupled with an intent to deceive, constitutes inequitable conduct." *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d 982, 999 (Fed. Cir. 2007).

For a defendant to succeed in proving inequitable conduct, it must adduce clear and convincing evidence that (1) "the patentee acted with the specific intent to deceive the PTO"; and (2) the undisclosed reference(s) were but-for material to patentability. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011) (en banc). To show that the patentee acted with the specific intent to deceive the PTO, a defendant must prove "that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Id.* at 1290. A failure of proof on any element precludes a finding of inequitable conduct, entitling the plaintiff to judgment as a matter of law. *See, ibid.* ("Proving that the applicant knew of a reference, *should have known* of its materiality, and decided not to submit it to the PTO does not prove specific intent to deceive.") (emphasis added). To meet the "clear and convincing" standard, specific intent to deceive must be "the single most reasonable inference able to be drawn from the evidence." *Ibid.* (quoting *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). If more than one reasonable inference is possible,

"intent to deceive cannot be found." *Therasense*, 649 F.3d at 1290-91.

Clearing away some residue, the Court first notes that Defendants have adduced no evidence concerning the role of ancillary Fitch Even figures mentioned in their amended answer, such as Timothy Levstik, Steven Parmelee, and Joshua Smith. They also appear to abandon any claim that Peters committed inequitable conduct. Indeed, in their brief opposing summary judgment, Defendants expressly limit their arguments to "Messrs. Fitzgibbon and Samples." (ECF No. 415 ("Defs.' Br.") at 4.) As such, the Court grants summary judgment to Chamberlain in relevant part and restricts the ensuing analysis to the key players – Fitzgibbon and Samples.

It is unclear whether Chamberlain disputes the materiality of the three withheld references, as it did when Defendants sought leave to amend their answer. But no matter: The Court need not engage in a detailed analysis of whether *Peplinski*, the '619 patent, and *Craftsman* were but-for material, because Defendants have failed to adduce evidence from which specific intent to deceive is the single most reasonable inference.

### 1. *Knowledge of the References*

With respect to the first *Therasense* prong, Defendants have adduced evidence sufficient to show that, during the crucial timeframe, Fitzgibbon knew of the three references and that

Samples knew of *Peplinski* and the '619 patent. As a named inventor of the '619 patent, Fitzgibbon was surely aware of that reference and testified that he was aware of the later *Craftsman* device embodying the patent. Through his position on Chamberlain's Intellectual Capital Committee and involvement in reviewing office actions, Fitzgibbon also seems to have known of *Peplinski* and was involved in its prosecution. Similarly, Samples prosecuted the '619 patent and *Peplinski* applications, making it clear and convincing that he knew of these two references. As such, Chamberlain is not entitled to judgment as a matter of law that its agents were unaware of the three withheld references.

### 2. *Knowledge of the References' Materiality*

Moving to the second prong, things become more problematic for Defendants because they have not shown that Fitzgibbon or Samples knew the references were material to the '966 patent. Instead, they adduce evidence only that, by virtue of Fitzgibbon's role as an inventor and in prosecution as well as the proximity of Samples's '619 patent prosecution work to his '966 patent prosecution work, the two men knew of the references and were likely familiar with their disclosures. The case law mandates proof of something more than knowledge of and working familiarity with the subject references for a defendant to survive summary judgment on the second *Therasense* prong. For

example, none of the deposition testimony Defendants obtained suggests either individual's actual recognition of the importance of the undisclosed information. *Cf., Am. Calcar, Inc. v. Am. Honda Motor Co.*, 768 F.3d 1185, 1191 (Fed. Cir. 2014) (finding that an inventor who helped develop the patent application "knew the information was material because he himself acknowledged the importance of the information he possessed"). What is more, Defendants adduce nothing to suggest that Fitzgibbon or Samples learned of key features of the invention from the undisclosed references. *See, Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1335 (Fed. Cir. 2012).

Failing circumstantial evidence suggesting knowledge of materiality, might the references nevertheless so clearly and convincingly bear on the patentabilty of the '966 patent that mere familiarity with them supports an inference of knowledge of their materiality? It is clear enough that *Peplinski*, the '619 patent, and *Craftsman* disclose GDOs with backup batteries that can be charged by the GDO power supply and used to power the GDO in the event of power failure. As an initial matter, the Court is not willing to countenance Defendants' assertion that all "prior art related to 'movable barrier operator' batteries and battery charging apparatus would have been material to the patentability of the '966 patent." (Defs.' Br. at 9.) Rather, there must be some nexus between the disclosures of the prior

art and the (claimed) point of novelty of the patented technology - use of such a GDO battery backup with other separate electrically powered equipment. With regard to such a nexus, Defendants point to an implicit teaching of the references and a structural feature of one of the '966 patent's independent claims, but it is difficult to conceive how either makes an inference of contemporaneous knowledge tenable.

First, Defendants contend that the GDO-only backup batteries of the three undisclosed references could be removed and inserted into a second, separate GDO, thus rendering the references material to the '966 patent's claimed "other electrically powered equipment other than and physically separate or separable from" the GDO. ('966 patent at 7:48-50.) Although they furnish no evidence that Fitzgibbon or Samples subscribed to this contorted reading, Defendants offer the following testimony of Dr. Rhyne in support of this theory:

> Q. Do you agree that a garage door opener qualifies as electrically powered equipment?
>
> A. I can't – yes, I – that's simply put, yes, that's electrically powered equipment.

(Rhyne Dep. Tr. at 153:24-154:2.) To the extent this testimony – given in a vacuum without regard to the full wording of the limitation – supports Defendants' argument at all, it comes nowhere close to establishing what they need to overcome their lack of evidence suggesting Fitzgibbon's or Samples's knowledge

of materiality: that the technology disclosed in the three references at issue was so clearly and convincingly material to a fair reading of the '966 patent that familiarity with the references alone should suffice under *Therasense*. In this vein, Chamberlain notes that Defendants' first expert conceded that *Peplinski* does not disclose "electrically powered equipment other than and physically separate or separable from" the GDO; it was only upon retaining a second expert that Defendants posited this second-GDO reading of the claim language. Moreover, the Court wonders what benefit would inhere in removing the '619 patent's, *Peplinski*'s, or *Craftsman*'s backup battery from one GDO and using it in a second, separate GDO. Each compatible other GDO would already have its own backup battery with coextensive capabilities. Perhaps, in the event that a power outage affecting GDO-2 follows on the heels of a malfunction in GDO-2's charging capabilities, the backup battery of GDO-1 could be removed and used to power GDO-2. But this far-fetched scenario presupposes both misfiring charging technology – a situation on which the '966 patent specification is mute - and a contiguous power outage that only selectively affects a user's multiple GDOs. And, as the Patent Trial and Appeal Board indicated in declining to institute *inter partes* review of the '966 patent, "removing the back-up battery from the first garage door opener to power the second garage door

opener likewise would defeat the principal purpose of Peplinski's system for the first garage door opener and cause unwanted service calls from the first garage door opener." *One World Technologies, Inc. d/b/a Techtronic Indus. Power Equip. v. The Chamberlain Group, Inc.*, IPR2016-01846, Paper 8, at 15 (P.T.A.B. Mar. 24, 2017). The mere potential for using the undisclosed references' backup battery with a second, separate GDO does not clearly and convincingly establish an inference of contemporaneous knowledge of materiality vis-à-vis the "electrically powered equipment" limitation pervading the '966 patent claims.

The second argument Defendants marshal to support an inference of knowledge of materiality invokes the technical structure of claim 9, which does not recite the "electrically powered equipment" construction as an express limitation (but nonetheless includes it as a functional condition of the rechargeable battery claimed in the battery charging station limitation). Absent that limitation, claim 9 only requires a battery charging apparatus comprising a battery charging station in communication with a rechargeable battery and a GDO head unit, and circuitry electrically connected to the battery charging station – features that the three undisclosed references indisputably teach. The Court feels that this facet of claim 9 bears more on the materiality of the references than

it does on the separate and distinct inquiry of whether Fitzgibbon or Samples had knowledge of their materiality. Indeed, it seems a stretch to prioritize this distinction in the language of one claim over other evidence suggesting with at least equal force that the two men would have regarded as the inflection point of patentability the GDO backup battery's capability to power separate electrical equipment. For example, the first words of the specification disclose that the invention relates "particularly to a rechargeable battery backup for use with *both* a barrier movement operator *and electrically powered equipment such as a power tool*." ('966 patent at 1:8-11 (emphasis added).) Recall also Dr. Rhyne's similar proposal that the point of novelty of the '966 patent is a battery removably connectable to other electrical equipment. Neither alone nor in tandem with Defendants' first argument does claim 9's technical structure furnish clear and convincing evidence of Fitzgibbon's or Samples's knowledge of materiality.

### 3. Deliberate Decision to Withhold the References

But even if Defendants sufficiently establish the first two *Therasense* prongs, there is a profound dearth of evidence concerning a deliberate decision to withhold the three references from the PTO. To the extent Defendants fault Samples for forgetfulness, this is legally insufficient: Courts cannot rely on a witness's "inability to offer a good faith explanation

as a basis to infer a deliberate decision to withhold." *1st Media, LLC v. Elec. Arts, Inc.*, 694 F.3d 1367, 1375-76 (Fed. Cir. 2012). Casting aspersions on Fitzgibbon's failure to maintain paper files does not advance the ball either. Allowing experience and memory to drive disclosure is at best an equivocal factor in the deliberate-decision-to-withhold-known-material-information calculus. In any event, Defendants fail to cite any case law for the proposition that a patent applicant must run detailed prior art searches or maintain physical files prior to responding to office actions. What is more, despite the fact that Fitzgibbon "need not offer any good faith explanation unless the accused infringer first carried his burden to prove a threshold level of intent to deceive by clear and convincing evidence," *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1368 (Fed. Cir. 2008), Fitzgibbon testified concerning his subjective good faith that the background section of the '966 patent discloses the relevant teachings of the prior art.

Defendants make much of the fact that the prior art contains richer and more extensive treatment of certain claimed limitations than does the background section's terse summary. In particular, they urge that the summary's silence on the prior art's disclosure of a charging circuit, removable battery, and use with other electrically powered equipment inculpates

Chamberlain. (*See,* Defs.' Br. at 14.) Yet there is at least a
colorable case for inherent disclosure of a prior art charging
circuit and removable battery, respectively, given the summary's
acknowledgment that existing "systems require some method to
recharge the batteries *either built into the operator or as an
additional power supply for battery charging*." ('966 patent at
1:39-41 (emphasis added).) And recall also the absence of any
compelling reason to think Fitzgibbon or Samples knew that the
three references disclose the "electrically powered equipment"
limitation. The Court is therefore unconvinced that the two men
were "intentionally selective" in their disclosures or that the
detail otherwise absent from the '966 patent background was
material to patentability. *Am. Calcar*, 768 F.3d at 1190
("Partial disclosure of material information about the prior art
to the PTO cannot absolve a patentee of intent if the disclosure
is intentionally selective.") (citations omitted). There is
nothing in the record to elevate the inference that Fitzgibbon
or Samples intentionally limited the background discussion at
the expense of material information above any other inference of
permissible conduct. *Cf., Apotex, Inc. v. UCB, Inc.*, 763 F.3d
1354, 1362 (Fed. Cir. 2014) (finding an inference of intent to
deceive appropriate where the inventor testified that he "never
performed the experiments described in the patent, and yet he
drafted the examples in the specification entirely in past-tense

language" and directed counsel to "bolster those misrepresentations"). Such permissible conduct includes even "gross negligence or negligence under a 'should have known' standard," which "does not satisfy the intent requirement." *Therasense*, 649 F.3d at 1290; *see also*, *1st Media*, 694 F.3d at 1374-75 (holding that it is "not enough to argue carelessness, lack of attention, poor docketing or cross-referencing, or anything else that might be considered negligent or even grossly negligent").

Defendants will undoubtedly protest that the Court in granting them leave to assert inequitable conduct rejected the sufficiency of the disclosure in the '966 patent's background summary. But the Court's holding at that stage was uniquely indebted to the case's procedural posture – an *Exergen* appraisal of Defendants' proposed allegations against Chamberlain's Rule 12(b)(6) futility challenge. *See, The Chamberlain Group, Inc. v. Techtronic Indus. Co., Ltd.*, No. 16 C 6097, 2017 WL 1101092, at *9 (N.D. Ill. Mar. 22, 2017) (noting that the cases cited by Chamberlain were "inapposite because they all concern[ed] proof of inequitable conduct after the presentation of evidence"). Whereas deceptive intent at the pleading stage need only be plausible, proving it on the merits requires that it be the "single most reasonable" inference. *Id.* at *10 (citing *Itex*,

*Inc. v. Westex, Inc.*, 2010 WL 2901793, at *2 (N.D. Ill. July 21, 2010)).

Similarly, while the Court at that stage drew the "reasonable inference that non-disclosure of the references was accompanied by deceptive intent" based on the fact that "no one from Chamberlain or Fitch Even filed an information disclosure statement or submitted any prior art whatsoever during prosecution," it did so based on a case from a sister court decided on a motion to dismiss. *See, id.* at *13 (citing *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, No. 13 C 1686, 2014 WL 656753, at *5 (N.D. Ill. Feb. 20, 2014)). In fact, when it comes to deciding inequitable conduct on the merits, wholesale failure to bring prior art to the PTO's attention appears to forestall the sort of "affirmative conduct by the applicants showing not only specific awareness of materiality, but *careful and selective manipulation of where, when, and how much of the most material information to disclose.*" *1st Media*, 694 F.3d at 1375 (citing *Aventis*, 675 F.3d at 1335-36).

In any event, the Court need not even reach the argument concerning the '966 patent's background section here, because Chamberlain has offered it as intent evidence concerning good faith and "the accused infringer has [not] first carried [its] burden to prove a threshold level of intent to deceive by clear and convincing evidence." *Star Scientific*, 537 F.3d at 1368.

But it is worth mentioning that even a more granular review does not convince the Court that its prior analysis matters here. For example, in crediting Defendants' allegations of materiality over Chamberlain's assertion of cumulativeness, the Court noted that the allegedly withheld references contained disclosures that appeared to contradict those in the '966 patent's summary. But it could only find one such disclosure: a mention in U.S. Patent No. 6,923,676 ("the '676 patent") of using its rechargeable backup battery to power "any number of electronic devices," which seemed to fly in the face of the summary's statement that prior art "battery backups are independent items which are typically used only for operating the barrier movement operator." *Ibid.* However, the Court went on to deny leave to amend with respect to the '676 patent because of the lack of any allegations plausibly suggesting that it was deliberately withheld with deceptive intent. *See, id.* at *12 ("The Court finds, however, that Defendants' intent allegations with respect to the '676 patent are too weak to meet *Exergen*'s demands."). As such, any contradiction of the '966 patent's prior art background summary must now flow from the three undisclosed references at issue. Defendants have pointed to no similar contradiction in *Peplinski, Craftsman,* or the '619 patent, and the Court could find none on its own.

To Defendants' final salvo that credibility determinations preclude summary judgment, the Court ripostes that this case presents no need to resolve conflicting testimony. Instead, the testimony and evidence adduced is basically in accord; it simply falls short of yielding a single, most reasonable inference of specific intent to deceive. *See, e.g., 1st Media*, 694 F.3d at 1376 ("That Lewis's and Sawyer's testimony was not credited by the district court does not overcome the shortcomings in Appellees' proof."); *cf., Am. Calcar*, 651 F.3d at 1335 ("Although the court found [the inventor's] testimony to be lacking in credibility, and we give considerable deference to that finding, . . . that alone is insufficient to find specific intent to deceive under the knowing and deliberate standard."); *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1344 (Fed. Cir. 2013) ("Submission of an affidavit containing fabricated examples of actual reduction to practice in order to overcome a prior art reference raises a strong inference of intent to deceive. . . . The district court also did not err when it decided not to credit Mr. Henderson's explanations for the repeated submission of false affidavits.").

*     *     *

In sum, Defendants rest their inequitable conduct case on the inventor status and general role of Fitzgibbon along with Samples's concurrent prosecution of the '619 and '966 patents;

Fitzgibbon's failure to maintain paper files; the general forgetfulness of the now 70-year-old Samples; a claim interpretation bringing a second GDO within the ambit of "electrically powered equipment other than and physically separate from the GDO" that there is little reason to think either Fitzgibbon or Samples contemplated; a technical and fastidious reading of claim 9 that speaks more to materiality than intent; and Chamberlain's failure to direct the Examiner to any prior art during prosecution of the '966 patent. However, these features of the actors and the patent's prosecution suffice only to show "[k]nowledge of the reference[s]" coupled with, at best, "knowledge of materiality"; alone, these say little about a deliberate decision to withhold and are "insufficient after *Therasense* to show an intent to deceive." *1st Media,* 694 F.3d at 1374-75. There is simply no basis on which a jury could find that the single most reasonable inference from the undisputed facts surrounding nondisclosure of the '619 patent, *Craftsman*, and *Peplinski* — even viewed in the light most favorable to Defendants — is an intent to deceive the PTO. The Court grants summary judgment to Chamberlain on Defendants' inequitable conduct affirmative defense and counterclaim. Consequently, Defendants' affirmative defense of unclean hands meets its end here as well. *See, e.g., Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 810 (Fed.

Cir. 1990); *Collaboration Props., Inc. v. Tandberg ASA*, No. 05 C 1940, 2007 WL 205065, at *7 (N.D. Ill. Jan. 25, 2007) (noting that an accused infringer's unclean hands defense based on alleged acts of inequitable conduct rises and falls based on those allegations).

As such, the Court grants summary judgment to Chamberlain on Defendants' inequitable conduct and unclean hands affirmative defenses as well as their inequitable conduct counterclaim.

## B. Monopoly

Defendants' monopoly claims against Chamberlain invoke Section 2 of the Sherman Act and the Illinois Antitrust Act. Both Defendants' counterclaims rest on the assertion that "[b]y withholding material information that it was aware of from the PTO, CGI fraudulently obtained the '966 Patent. With knowledge of that fraud, CGI then unlawfully attempted to enforce the '966 Patent against TTI" with the "intention of restraining trade and commerce and restricting competition for the sale of GDOs." (ECF No. 365 ("Am. Ans.") at Ctrclm. ¶ 124.) (Defendants' state antitrust counterclaim either substantially tracks the federal paradigm, see, e.g., *Laughlin v. Evanston Hosp.*, 550 N.E.2d 986, 990 (Ill. 1990), or is preempted. *See, e.g., Farag v. Health Care Service Corp.*, No. 17 C 2547, 2017 WL 2868999, at *3 (N.D. Ill. July 5, 2017) (Leinenweber, J.); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 363 F.Supp.2d 514, 543 (E.D.N.Y.

2005) (finding that "federal patent law preempts any state antitrust cause of action premised on" a "showing of misconduct before the PTO"); *see also, Semiconductor Energy Lab. Co., Ltd. v. Samsung Elec. Co., Ltd.*, 204 F.3d 1368, 1382 (Fed. Cir. 2000) (finding preemption where "the wrong alleged and for which state tort damages [were] sought [was] no more than bad faith misconduct before the PTO").)

Defendants bring "a species of monopolization claim that targets the use of a fraudulently obtained patent to obtain or maintain a monopoly." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 176 (1965). Defendants do not dispute that their monopoly counterclaims are *Walker Process* causes of action. (*See, e.g.,* Defs.' Br. at 16 ("Since TTI's claims for inequitable conduct should survive summary judgment, so too should TTI's *Walker Process* counterclaims pursuant to Section 2 of the Sherman act and the Illinois Antitrust Act.").) District courts must apply Federal Circuit law to the "fraudulently obtained" element of a *Walker Process* claim and their own regional Circuit law to the monopolization element. *See, Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998).

Here is a rare statement: The antitrust claims can be disposed of quickly. A party that fails to prove inequitable conduct cannot establish a *Walker Process* violation that is

premised on such conduct. *See, e.g., FMC Corp. v. Manitowoc Co.*, 835 F.2d 1411, 1417 (Fed. Cir. 1987) ("FMC's failure to establish inequitable conduct precludes a determination that it had borne its greater burden of establishing the fraud required to support its *Walker Process* claim."); *accord, Avery Dennison Corp. v. Continental Datalabel, Inc.*, No. 10 C 2744, 2010 WL 4932666, at *4 (N.D. Ill. Nov. 30, 2010). Because Chamberlain is entitled to summary judgment on Defendants' inequitable conduct counterclaim, so too is summary judgment proper on Defendants' *Walker Process* and state monopoly counterclaims.

As such, the Court grants summary judgment to Chamberlain on Defendants' *Walker Process*/monopoly counterclaims.

### C. Motion to Exclude

Defendants' antitrust expert, Dr. Layne-Farrar, offers testimony only on the antitrust implications of the '966 patent. In light of the ejection of Defendants' antitrust counterclaims from this case, her testimony will neither meet the threshold level of relevance nor "assist the trier of fact to understand the evidence or determine a fact in issue." FED. R. EVID. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). As such, Plaintiff's *Daubert* Motion is granted.

### III. <u>CONCLUSION</u>

For the reasons stated herein, the Court grants Plaintiff's Motion for Partial Summary Judgment [ECF No. 415]. As a result,

the testimony of Defendants' antitrust expert is no longer relevant, and so the Court grants Plaintiff's Motion to Exclude Dr. Anne Layne-Farrar's Expert Opinions and Testimony [ECF No. 417].

**IT IS SO ORDERED.**


_____
     Harry D. Leinenweber, Judge
     United States District Court

Dated: August 14, 2017