# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THE CHAMBERLAIN GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:16-cv-06097 |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| TECHTRONIC INDUSTRIES CO. LTD., | ) | |
| TECHTRONIC INDUSTRIES NORTH | ) | The Honorable Harry D. Leinenweber |
| AMERICA, INC., ONE WORLD | ) | |
| TECHNOLOGIES, INC., OWT | ) | Magistrate Judge Sydney Schenkier |
| INDUSTRIES, INC., ET TECHNOLOGY | ) | |
| (WUXI) CO. LTD., and RYOBI | ) | |
| TECHNOLOGIES, INC. | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RULE 50(A) MOTION FOR JUDGMENT AS A MATTER OF LAW AS TO INVALIDITY

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .......................................................................................................... 1

II.   LEGAL STANDARDS .................................................................................................. 1

    A.    Legal Standard for Judgment as a Matter of Law ................................................. 1

    B.    Legal Standard for Invalidity ............................................................................... 2

    C.    Legal Standard for Section 101 Unpatentability ................................................... 2

III.  TTI HAS PROVEN INVALIDITY OF THE '275 PATENT BY CLEAR AND CONVINCING EVIDENCE ........................................................................................ 3

    A.    Menard PCT Anticipates the '275 Patent .............................................................. 4

    B.    The Combination of Menard PCT and Cohen Renders Obvious the '275 Patent Asserted Claims. ...................................................................................... 11

IV.  TTI HAS PROVEN INVALIDITY OF THE '966 PATENT BY CLEAR AND CONVINCING EVIDENCE ...................................................................................... 12

V.   TTI HAS PROVEN THE ASSERTED CLAIMS ARE PATENT-INELIGIBLE ........... 25

VI.  CGI HAS NOT PROVEN IT IS ENTITLED TO ANY RELIEF .................................. 26

VII. CONCLUSION ......................................................................................................... 27

DB1/ 93478197.1

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
    134 S. Ct. 2347 (2014) ................................................................ 2, 3, 26

*Bilski v. Kappos,*
    561 U.S. 593 (2010) ............................................................................ 2

*Brown v. Snow,*
    94 F. App'x 369 (7th Cir. 2004) ........................................................ 1

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
    776 F.3d 1343 (Fed. Cir. 2014) ...................................................... 2, 3

*Cordis Corp. v. Boston Scientific Corp.,*
    658 F.3d 1347 (Fed. Cir. 2011) ......................................................... 1

*Hedberg v. Indiana Bell Tel. Co.,*
    47 F.3d 928 (7th Cir. 1995) ............................................................... 1

*KSR Intern. Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007) ........................................................................... 2

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
    566 U.S. 66 (2012) ........................................................................... 26

*Spansion, Inc. v. Int'l Trade Comm'n,*
    629 F.3d 1331 (Fed. Cir. 2010) ......................................................... 2

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014) ........................................................... 3

*Williams v. Chavez,*
    248 F.3d 1162 (7th Cir. 2000) ........................................................... 1

**STATUTES**

35 U.S.C. § 101 ................................................................................*passim*

35 U.S.C. § 102 ......................................................................... 2, 3, 12

35 U.S.C. § 103 ......................................................................... 2, 3, 12

35 U.S.C. § 284 ................................................................................. 27

DB1/ 93478197.1

**OTHER AUTHORITIES**

Fed. R. Civ. P. 50 (a)(1) ............................................................................................ 1, 27

DB1/ 93478197.1

# I.     INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 50(a), Defendants Techtronic Industries Co. Ltd., Techtronic Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc. (collectively, "TTI") hereby move for entry of judgment as a matter of law that claims 1, 5, and 15 of U.S. Patent No. 7,224,275 ("the '275 patent") and claims 14, 17, and 18 of U.S. Pat No. 7,635,966 ("the '966 patent") are invalid, including the claims from which the asserted claims depend.

# II.    LEGAL STANDARDS

## A.     Legal Standard for Judgment as a Matter of Law.

Rule 50 of the Federal Rules of Civil Procedure allows the court to grant judgment as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50 (a)(1).  The court "must presume that the jury resolved all factual disputes in favor of the prevailing party, and . . . must leave those findings undisturbed as long as they are supported by substantial evidence." *Cordis Corp. v. Boston Scientific Corp.*, 658 F.3d 1347, 1357 (Fed. Cir. 2011).  "Substantial evidence requires more than a mere scintilla . . . and [the court] must review the record as a whole, taking into consideration evidence that both justifies and detracts from the jury's decision."  *Id.*;  *see also Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995) ("Conclusory allegations by the party opposing the motion cannot defeat the motion."); *Williams v. Chavez*, 248 F.3d 1162 (7th Cir. 2000) (affirming JMOL when plaintiff "offered no evidence to support [a] speculative and conclusory assertion); *Brown v. Snow*, 94 F. App'x 369, 372 (7th Cir. 2004) (stating that a "conclusory assertion is not enough to overcome judgment as a matter of law.").

-1-

**B.      Legal Standard for Invalidity.**

A patent claim is invalid as anticipated under pre-AIA 35 U.S.C. § 102 if a single prior art reference describes "every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation." *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1356 (Fed. Cir. 2010). A patent claim is invalid as obvious if the "differences between the claimed subject matter and the prior art are such that the subject matter as a whole would have been obvious at the time of invention to a person having ordinary skill in the art." 35 U.S.C. § 103(a); *KSR Intern. Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007).

**C.      Legal Standard for Section 101 Unpatentability.**

Under section 101 of the Patent Act, "laws of nature, natural phenomena, and abstract ideas" are not patentable. *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). The fundamental concern underlying these limitations is that "[l]aws of nature, natural phenomena, and abstract ideas are the basic tools of scientific and technological work." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (quotations, citations, and alterations omitted).

*Alice* provides a two-step inquiry for adjudicating patent eligibility under section 101. The Court must first "determine whether the claims at issue are directed to" a "patent-ineligible concept[]." *Id*. at 2355. If so, the Court must then "determine whether [any] additional elements 'transform the nature of the claim' into a patent-eligible application …. [presenting an] 'inventive concept.'" *Id*. (citations omitted). Determinations of ineligibility under section 101 can be made on the basis of representative claims of the patents at issue. *See Content Extraction & Transmission*

2

*LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014).

After finding an abstract idea, the Court must search for an "inventive concept" by determining whether "an element or combination of elements … amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 134 S. Ct. at 2355 (quotations omitted; brackets in original). If the claims merely add "conventional" activity or recitations "limiting the use of an abstract idea to a particular technological environment," they fail under section 101. *Id.* at 2357–59 (quotations omitted). As the Court in *Alice* explained, taking an otherwise ineligible abstract idea and merely adding "well-understood, routine, conventional activities previously known to the industry" is also not enough. *Id.* at 2359 (quotations and alterations omitted). For example, applying an abstract idea on a generic computer or limiting the idea to a particular field of use or technological environment does not provide an inventive concept. *See, e.g., Alice*, 134 S. Ct. at 2357-59; *Content Extraction*, 776 F.3d at 1348; *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014).

## III. TTI HAS PROVEN INVALIDITY OF THE '275 PATENT BY CLEAR AND CONVINCING EVIDENCE.

TTI has adduced substantial evidence such that no reasonable jury could find, under the clear and convincing evidence standard, that asserted claims 1, 5, and 15 of the '275 patent are not invalid.

No reasonable jury could conclude that the asserted claims 1, 5 and 15 of the '275 patent: (1) are not invalid under 35 U.S.C. § 102 as anticipated by Patent Cooperation Treaty Application No. WO2001/93220A1 to Menard ("Menard PCT), published December 6, 2001; and (2) are not invalid under 35 U.S.C. § 103 as obvious in view of

3

Menard PCT combined with U.S. Patent No. 6,388,559 ("Cohen"), published May 14, 2002.

### A.    Menard PCT Anticipates the '275 Patent

Menard PCT discloses each element of the asserted claims of the '275 patent. Menard PCT is prior art to the '275 patent, because it published on December 6, 2001. DX-35.

### 1.    Preamble (claim 1 of the '275 patent)

Menard PCT discloses the movable barrier operator required by the Preamble of Claim 1. The Court construed "a movable barrier operator comprising" to be "an operator that controls movement of the movable barrier and may contain additional functionality, comprising." Trial Tr. 855:23-856:1; *Markman* Order at 19. Menard PCT describes the system and method which allows for remote control of single or multiple doors. Trial Tr. at 856:2-7; DX-35, Menard PCT at 10:3-7 ("A system and method is described which allows remote control and management of single or multiple door openers using a wired or wireless communication device."). Therefore, the Menard application describes the first requirement of the claim. Trial Tr. at 856:20-22.

### 2.    "(a) a controller having a plurality of potential operational status conditions defined, at least in part, by a plurality of operating states" (claims 1 and 5 of the '275 patent)

Menard PCT also discloses "a controller having a plurality of potential operational status conditions, defined, at least in part, by a plurality of operating states" as construed by the Court. The Court construed this claim element as: "a programmable platform (such as, for example, a microprocessor, a microcontroller, a programmable logic or gate array, or the like), that can obtain, through self-awareness or through

externally developed information (e.g., from sensors), two or more potential operational status conditions defined, at least in part, by two or more operational conditions being experienced by the controller [programmable platform]."

A programmable platform (such as, for example, a microprocessor, a microcontroller, a programmable logic or gate away, or the like):

Menard PCT discloses this part of the claim. 857:22-848:5. Menard PCT's processor 12000 in Figure 31 is a programmable platform that has "two or more potential operational status conditions defined, at least in part, by two or more operational conditions being experienced by the controller." DX-35, Menard PCT at 33:9-15 & Fig. 31. "Processor 12000 may include a microprocessor as well as memory to perform the programmed functions and to retain settings and configuration information." *Id.* at 33:9-15.

That can obtain, through self-awareness or through externally developed information (e.g., from sensors):

Menard PCT discloses this part of the claim. Trial Tr. at 858:5-12. Menard PCT discloses that the "Processor 12000 may also include a circuit to receive electrical signals from electrical, or electromechanical sensors and monitors and to provide an electrical signal to drive and actuator." DX-35, Menard PCT at 34:11-15; Trial Tr. at 858:5-12. . Menard PCT further discloses what type of information is received from the sensors, including position information. Trial Tr. 858:13-21; DX-35, Menard PCT at 46:24-26 ("sensor 15500 provides the position information to processor 12000.").

Two or more potential operational status conditions defined, at least in part, by two or more operational conditions being experienced by the controller [programmable platform]:

Menard PCT discloses this part of the claim. Trial Tr. 858:22-861:2. Menard

5

PCT discloses that:

> In one embodiment, sensor 15500 provides the position information to processor 12000. At 37000, the user receives notification of the door position information. The door position may be indicated by a pair of lights on a pager (one light labeled "open" and another "close"), by a graphical image on a screen, a recognizable audio tone, a recognizable vibration, or any other means of indicating position to a user."

DX-35, Menard PCT at 46:24-30.

Menard further discloses that the position sensor programming 26500 "may include software routines and modules that receive and interpret position information" from the door position sensor. *Id.* at 44:1-10. Software routines and modules also "receive and interpret information from optical sensor 17000" and "from temperature sensor 17500." *Id.* Thus, the several potential operational status conditions identified by Menard PCT include door position, light and temperature. Trial Tr. 859:11-860:2. The operational status condition of a door position is defined by the operating states open, closed and partially closing. *Id.* at 860:3-5. The operational status condition of a light is defined by the operating states on, off and the brightness level. *Id.* at 860:6-8. The operational status condition of a temperature sensor is defined by freezing, normal and overheating. *Id.* at 860:9-11.

The controller actually experiences these operational status conditions as described in Menard PCT. *Id.* at 860:12-22. Thus, Menard PCT describes this claim element. *Id.* at 860:23-861:2.

### 3. "(b) a movable barrier interface that is operably coupled to the controller" ('275 patent, claims 1 and 5)

Menard PCT discloses the "movable barrier interface" claim limitation. Trial Tr. at 861:3-8. Figure 31 depicts a movable barrier interface as a line connecting the

6

processor 12000 to the GDO 1000. *Id.* at Fig. 31; Trial Tr. at 861:9-12 ("[T]hat's the operable coupling of those two entities."). Menard PCT describes a movable barrier interface with physical elements (motor, belt drive, chain, etc.) to lift the garage door. Trial Tr. 861:15-21; Menard PCT at 31:3-4; *see also id.* at 2:31-3:6 & Fig. 30. Therefore, Menard PCT discloses this claim element. Trial Tr. at 861:22-25.

4. **"(c) a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal that: corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating state" ('275 patent, claims 1 and 5)**

A wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal:

Menard PCT discloses "a wireless status condition data transmitter that is operably coupled to the controller, wherein the wireless status condition data transmitter transmits a status condition signal." Trial Tr. at 862:1-21. Figure 31 shows transceiver 13000, which is a wireless status condition data transmitter coupled to the controller (*i.e.*, processor 12000). *Id.*; DX-35, Menard PCT at Fig. 31. Menard PCT specifically talks about how the processor 12000 is coupled to the element's power and also transciever 13000. Trial Tr. at 862:13-18; DX-35, Menard PCT at 34:1-2.

Corresponds to a present operational status condition defined, at least in part, by at least two operating states from the plurality of operating state:

Menard PCT discloses this claim element as construed by the Court. Trial Tr. at 862:22-863:3. The Court construed this limitation to require transmission of a status condition signal that "corresponds to a present operational status condition defined, at least in part, by at least two from the two or more operational conditions being

7

experienced by the controller [programmable platform]." *Markman* Order at 38-39.

Menard PCT discloses how the position information may be transmitted as well as other information, and gives examples of door position information, temperature levels, and light levels. Trial Tr. at 863:14-19; Menard PCT at 10:24-26 ("Position information is transmitted to the device by a transceiver coupled to the processor. Other information, such as temperature or light levels, may also be transmitted to the device."). These things are all being experienced by the controller, and the signal sent is defined by a plurality of operating states as required by the Court's construction—multiple states are sent together. Trial Tr. at 863:20-864:7. Therefore, Menard PCT discloses this claim element. *Id.* at 864:8-13.

> **5.**    **"a status condition signal that: . . . comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator" ('275 Patent, claims 1, 5, 14, and 15)**

Menard PCT also discloses that the status condition signal "comprises an identifier that is at least relatively unique to the movable barrier operator, such that the status condition signal substantially uniquely identifies the movable barrier operator." Trial Tr. at 864:14-20. In particular, Menard PCT's signal "comprises an identifier that is sufficiently unique to allow identification of the movable barrier operator . . . that sent the signal," as required by the Court's construction. *Markman* Order at 41; Trial Tr. at 864:21-865:3. Menard PCT describes how you can use an identifier in the signals that are transmitted, because it talks about how, in the transceiver, how the communication device can be Bluetooth, HomeRF, wireless LAN (i.e. WiFi), or other entities. DX-35 at 37:24-26; Trial Tr. at 865:6-12. Bluetooth uses a unique identifier. Trial Tr. at 865:16-

8

22.  Therefore, Menard PCT discloses the last claim element.  865:23-25.

### 6.  Dependent Claim 5

Menard PCT also discloses every element of the asserted dependent claim 5. Trial Tr. at 866:9-868:1.  Claim 5 recites a number of possible operating states, including moving the barrier in a first or second direction, detecting the presence of an obstacle, a vacation mode status change, detecting a likely proximal presence of a vehicle or human, and receiving an operating parameter alteration signal.  Because at least one of these requirements is shown in Menard PCT, Menard PCT invalidates the claim.  *Id.* at 866:25-867:2.  Indeed, Menard discloses many of them.  *Id.* at 867:3-6.  Menard PCT discloses door control options include "include partially, or fully, closing the door" (i.e., moving the barrier in a first direction).  *Id.* at 867:8-14; Menard PCT at 46:26-47:1.  Menard PCT also discloses that sensor 17000 "may provide a signal to indicate if an interior or exterior garage light is illuminated."  Trial Tr. at 867:15-22; Menard PCT at 42:7-10.  Therefore, Menard PCT invalidates the claim.  Trial Tr. at 867:23-868:1.

### 7.  Claim 15: "detecting at least one predetermined condition as corresponds to a present operational status defined, at least in part, by at least two operating states, of the movable barrier operator" ('275 patent, claims 14 and 15)

Asserted claim 15 depends from claim 14.  Claim 14 is similar to claim 1 except it recites "detecting at least one predetermined condition as corresponds to a present operational status defined, at least in part, by at least two operating states, of the movable barrier operator."  PX-1, '275 Patent at 9:24-38; Trial Tr. at 868:9-869:8.

The Court construed this element as "detecting at least one predetermined condition as corresponds to a present operational status of the movable barrier operator

[operator that controls movement of the movable barrier and may contain additional functionality], which status is defined, at least in part, by at least two operational conditions being experienced by the controller [programmable platform]." *Markman* Order at 46; Trial Tr. at 869:9-19.

Menard PCT discloses this type of detecting process. Trial Tr. at 869:20-21. Menard PCT is directed to "[a] system and method for detecting and monitoring at least one event or condition of interest." DX-35, Menard PCT at Abstract; Trial Tr. at 869:22-25. Once you detect it, Menard PCT talks about how that outbound signal can be transmitted. Trial Tr. at 870:1-13; DX-35, Menard PCT at 41:2-5. Information about more than one operational status condition could be transmitted in the same signal. Trial Tr. at 870:14-24. As a result, Menard PCT discloses all elements of independent claim 14, from which claim 15 depends. Trial Tr. at 870:18-871:4.

Dependent claim 15 is similar to claim 5, in that it claims a list of many predetermined conditions that may be detected. Trial Tr. at 871:9-14. Similar to claim 5, if any one thing on claim 15's list is detected according to Menard PCT, then Menard PCT discloses claim 15. Trial Tr. at 871:15-21. Menard PCT discloses "moving a barrier operator in the first direction." *Id.* at 871:22-872:12; DX-35 at 41:2-5 ("The outbound signal (e.g., indicating the door position) may be transmitted to the pager on a predetermined schedule, or upon inquiry, or upon a change of position of the door (or actuator) at any time."). Therefore, Menard PCT invalidates claim 15. Trial Tr. at 872:13-17.

DB1/ 93478197.1

**B.    The Combination of Menard PCT and Cohen Renders Obvious the '275 Patent Asserted Claims.**

**1.    Disclosure of Cohen**

Cohen is prior art to the '275 patent, because it published on May 14, 2002. Trial Tr. at 874:21-875:4. Cohen discloses that "[a] remote control system uses a state signal that indicates whether a door or lock is opening, open, closing or closed." DX-181, Abstract; *see id.* at Fig. 2 (showing door opener can be a garage door opener); Trial Tr. 875:5-24. Cohen describes a controller that is actually aware of operational states, and wirelessly transmits those states to a remote device. Trial Tr. at 875:11-23. Cohen also describes how the controller actually transmits the signal that can have four states (open, opening, closed, closing). Trial Tr. at 876:24-877:10, 877:23-878:13.

Therefore, to the extent these four states are not disclosed by Menard (and Defendants have proven that they are), Cohen describes those exact four states for the position of the door. Trial Tr. at 877:11-17. Put another way, Cohen describes this signal format of the '275 patent exactly. *Id.*

**2.    Motivation to Combine**

One of ordinary skill in the art would have been motivated to combine Menard PCT's door position information with the signal format disclosed in Cohen. Trial Tr. 878:14-879:4. Both Menard PCT and Cohen are directed to remote monitoring of garage doors. *Id.* Both references are directed to the wireless transmission of state information. *Id.* Both address the same problem using similar technology. *Id.* Moreover, combining the signal format described in Cohen to transmit Menard's door position information would be a simple substitution of known data formats. *Id.* Therefore, one of ordinary

11

skill in the art would have had more than a reasonable probably of success in combining the teachings of Menard PCT and Cohen. *Id.*

As a result, the combination of Menard PCT and Cohen renders the asserted claims of the '275 patent invalid as obvious (*id.*at 879:5-11), and no reasonable jury could find otherwise.

### 3. No Secondary Considerations

No secondary considerations of non-obviousness negate a finding that the '275 patent claims are obvious as a matter of law, because of a lack of nexus and a lack of evidence of copying, among other things. Trial Tr. 879:12-881:7

## IV. TTI HAS PROVEN INVALIDITY OF THE '966 PATENT BY CLEAR AND CONVINCING EVIDENCE

TTI has adduced substantial evidence such that no reasonable jury could find, under the clear and convincing evidence standard, that asserted claims 14, 17, and 18 of the '966 patent are not invalid.

No reasonable jury could conclude that the asserted claims 14, 17, and 18 of the '966 patent: (1) are not invalid under 35 U.S.C. § 102 as anticipated by Craftsman 139.53919 manual and product ("Craftsman"); (2) not invalid under 35 U.S.C. § 102 as anticipated or 35 U.S.C. § 103 as obvious in view of U.S. Patent No. 7,786,619 to Crusius et al. ("Crusius"); and (3) are not invalid under 35 U.S.C. § 102 as anticipated or 35 U.S.C. § 103 as obvious in view of U.S. Patent No. 6,484,784 to Weik et al. ("Weik").

### 1. Craftsman Anticipates the '966 Patent.

Craftsman was available to the public at least as early as November 10, 2004. Trial Tr. at 886:10-24; DX-034. CGI has not contested that Craftsman is prior art to the

DB1/ 93478197.1

'966 patent. Trial Tr. at 887:3-5. As demonstrated below, no reasonable juror could conclude that Craftsman does not anticipate claims 14, 17, and 18 of the '966 Patent.

**Claim 14**: Asserted claim 14 depends from independent claim 9. Craftsman discloses every element of independent claim 9 and every element of asserted dependent claim 14. Dr. Rhyne does not dispute that Elements 9[preamble], 9[a], and 9[c] are taught by Craftsman. *See* Trial Tr. (8/29 Draft) at 67:14 at 71:2.

### a. 9[Preamble] "battery charging apparatus"

Craftsman discloses a "battery charging apparatus." Craftsman discloses a battery backup unit ("BBU") having two rechargeable batteries are charged when the BBU is connected to a power source, such as the head unit of a garage door operator ("GDO"). Trial Tr. at 890:23-9; 891:15-15-25; 893:1-8; DX-134-032; DX-007.

### b. 9[a] "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery"

Craftsman discloses "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery." The Court construed "barrier movement operator" to mean "an operator that controls movement of the movable barrier and may contain additional functionality." *Markman Order* at 62-63. Craftsman discloses that when you connect the BBU to the head unit using the plug there the battery charging station is in electrical communication with the rechargeable battery and the head unit . Trial Tr. at 892:1-893:4; DX-134-032; DX-007. This electrical communication allows the battery charging station to supply power to the BBU's

13

rechargeable batteries.  Trial Tr. at 893:1-893:8; DX-134-032; DX-007.    Dr. Rhyne

agrees.  Trial Tr. (8/29 Draft) at 114:14-20.

> c.    9[b] "the at least one rechargeable battery being
> removably connectable to electrically powered
> equipment other than and physically separate or
> separable from the barrier movement operator to
> provide power to the electrically powered equipment"

Craftsman discloses "the at least one rechargeable battery being removably

connectable to electrically powered equipment other than and physically separate or

separable from the barrier movement operator to provide power to the electrically

powered equipment."    The Court construed "removably connectable" to mean

"configured to allow a user to insert, plug in, or otherwise manually attach and detach."

*Markman* Order at 71.

Craftsman discloses that the BBU is connectable to the head unit via a plug.  Trial

Tr. at 893:23-894:4; DX-134-032; DX-007.  Thus, the BBU is removably connectable

(i.e., configured to plug in) to the head unit of the Craftsman garage door operator.  The

BBU can be disconnected from a first Craftsman garage door operator and then

connected to and provide power to a second Craftsman garage door operator.  Trial Tr. at

895:9-24; 897:25-4.

It is undisputed that the second Craftsman GDO is electrically powered

equipment.  Trial Tr. (8/29 Rough) at 111:11-13 (Dr. Rhyne: "Q. Now you agree that a

garage door opener is electrically powered equipment, correct? A. It is.");  *see also* Trial

Tr. at 894:5-16; DX-134-032; DX-007.  Dr. Rhyne also agrees the second Craftsman

GDO is physically separate from the first Craftsman GDO.  Trial Tr. (8/29 Draft) at

119:4-6 ("Q. You'll agree with me that the first garage door opener, DX-7, is physically

separate from DX 7-D, right? A. Yes.").  Thus, the second Craftsman GDO is "other than and physically separate or separable from ***the*** barrier movement operator," as claimed. The second Craftsman GDO can also be powered by the BBU.

>   **d.**     **9[c] "circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit"**

Craftsman discloses "circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit." Craftsman discloses that when the head unit loses AC power, the battery charging station contains circuitry that causes the rechargeable batteries to supply power to the head unit. Trial Tr. at 898:5-23; DX-134-033; DX-007.  Dr. Rhyne agrees.  Trial Tr. (8/29 Draft) at 114:21-24.

>   **e.**      **[14] "electrically powered equipment comprises a tool"**

Craftsman discloses that the "electrically powered equipment comprises at tool." The '966 patent explains that a "tool" is anything "capable of being powered by a battery."  DX-003-008 at 3:44-50.  Dr. Foley testified that a second garage door operator qualifies as a tool under the language of the '966 patent.  Trial Tr. at 901:18-24. Dr. Foley testified that the Craftsman manual shows that the garage door operator is a tool that is designed to move the garage door.  Trial Tr. at 902:4-12; DX-134-027.

**Claim 17**: Asserted claim 17 depends from claim 16 that depends from claim 15. Claim 15 recites, in part, "a method of power flow between at least one rechargeable battery, a barrier movement operator, electrically powered equipment other than and physically separate or separable from the barrier movement operator."  Claim 16 depends from claim 15 and recites "further comprising notifying a user in response to at least one

of: the at least one rechargeable battery being removed from the battery charging station, and the stored power of the at least one rechargeable battery being below the threshold amount." Claim 17 recites "wherein notifying comprises generating at least one of an audible indication and a visual indication." Craftsman anticipates claim 17.

Craftsman discloses a method of power flow between a BBU, a motor unit of a Craftsman GDO, and a second Craftsman GDO. Trial Tr. at 909:4-911:4. Craftsman also discloses detecting whether the at least one rechargeable battery is in electrical communication with a battery charging station. *Id.* at 911:5-912:7. Craftsman also discloses providing power from a power source to the at least one rechargeable battery via the battery charging station. *Id.* at 912:8-913:10. Craftsman also discloses providing stored power from the at least one rechargeable battery to the head unit via the battery charging station to perform movable barrier functions. *Id.* at 913:11-914:17. Craftsman also discloses "providing power from the at least one rechargeable battery to the electrically powered equipment in response to the at least one rechargeable battery being electrically connected to the electrically powered equipment." *Id.* at 914:18-916:6. Thus, Craftsman also discloses every element of claim 15.

Craftsman also discloses notifying a user in response to at least the stored power of the at least one rechargeable battery being below the threshold amount, and that notification is an audible and visual alarm, as required by claims 16 and 17. Trial Tr. at 916:11-918:21.

Like claim 9, the only limitation that Dr. Rhyne disputes from claims 15, 16, and 17 is whether the Craftsman GDO is electrically powered equipment other than and physically separate or separable from the barrier movement operator. For the same

16

reasons as discussed for claim 9, the second Craftsman GDO is both (1) electrically powered equipment and (2) physically separate or separable from the barrier movement operator.

**Claim 18**: Asserted claim 18 depends from claim 15. As explained, Craftsman discloses every element of claims 15. Like claim 14, claim 18 recites "wherein the electrically powered equipment comprises a tool." Thus, for the same reasons as discussed for claim 14, Craftsman discloses the additional elements of claim 18.

### 2. Crusius Anticipates and/or Renders Obvious the '966 Patent.

Crusius was filed September 12, 2003 and published March 17, 2005, and is therefore prior art to the '966 Patent. DX-023. Crusius describes a DC power backup unit for a garage door operator. *Id.* at Abstract. The Crusius DC power backup has a plug for removably connecting the backup to a garage door opener. The plug can also be used to connect the power backup to other electrically powered equipment, such as a second garage door opener. To the extent the other electrically powered equipment is not expressly described in Crusius, it would be obvious to a person of ordinary skill that the Crusius system could be used with other electrically powered equipment. Thus, as discussed further below, Crusius anticipates and/or renders obvious claims 14, 17, and 18 of the '966 Patent. No reasonable juror could conclude that Crusius does not anticipate and/or render obvious claims 14, 17, and 18 of the '966 Patent.

**Claim 14**: Asserted claim 14 depends from independent claim 9. Crusius discloses every element of independent claim 9 and every element of asserted dependent claim 14. Dr. Rhyne does not dispute that Elements 9[preamble], 9[a], and 9[c] are taught by Crusius. *See* Trial Tr. (8/29 Draft) at 74:25-75:12.

17

#### a.     9[Preamble] "battery charging apparatus"

Crusius discloses a "battery charging apparatus." Trial Tr. at 925:22- 926:10; DX-23, Crusius at Fig. 1.

#### b.     9[a] "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery"

Crusius discloses "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery."  The Court construed "barrier movement operator" to mean "an operator that controls movement of the movable barrier and may contain additional functionality."  *Markman Order* at 62-63. Crusius discloses a battery charging station.  Trial Tr. at 922:11-18; DX-23, Crusius at 2:24-27.  The Crusius battery charging station is in electrical communication with a rechargeable battery.  Trial Tr. at 922:14-923:1; DX-23, Crusius at 2:24-27.  And the battery charging station is in electrical communication with the head unit.  Trial Tr. at 923:2-13; DX-23, Crusius at 1:51-54.

#### c.     9[b] "the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment"

Crusius discloses "the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment."  The Court construed "removably connectable" to mean

18

"configured to allow a user to insert, plug in, or otherwise manually attach and detach." *Markman* Order at 71.

Crusius discloses that the rechargeable battery is removably connectible. Trial Tr. 923:20-924:17. Crusius expressly describes the plug and how you can plug the rechargeable battery into the garage door opener, so it is clear that you can plug the battery into multiple physically separate head units. Trial Tr. at 924:18-25. Therefore, Crusius discloses that you can power other electrically powered equipment with the rechargeable battery, because a second GDO can be powered by the Crusius backup battery. *Id.*

### d. [9c] "circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit"

Crusius discloses "circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit." Crusius discloses that, if the main power fails, the current will begin to flow from the battery to the backup in order to power the movable barrier operator. Trial Tr. at 925:1-12 ("So that's describing how power can go from the battery to the head unit."). Therefore, the circuitry allows power to be supplied from the rechargeable battery to the head unit. Trial Tr. at 928:9-13; DX-23, Crusius at Fig. 1.

### e. [14] "electrically powered equipment comprises a tool"

Crusius discloses that the "electrically powered equipment comprises at tool." The '966 patent explains that a "tool" is anything "capable of being powered by a battery." DX-003-008 at 3:44-50. Dr. Foley testified that a second garage door operator qualifies as a tool under the language of the '966 patent. Trial Tr. at 901:18-24. As

19

described above, Crusius expressly describes the plug and how you can plug the rechargeable battery into the garage door opener, so it is clear that you can plug the battery into multiple physically separate head units. Trial Tr. at 924:18-25. Therefore, Crusius discloses that you can power other electrically powered equipment with the rechargeable battery, because a second GDO can be powered by the Crusius backup battery. *Id.* at 924:18-25, 928:18-23. Crusius describes all the requirements of claim 14 of the '966 patent as a result. *Id.* at 928:24-929:1.

**Claim 17**:

Asserted claim 17 depends from claim 16 that depends from claim 15. Claim 15 recites, in part, "a method of power flow between at least one rechargeable battery, a barrier movement operator, electrically powered equipment other than and physically separate or separable from the barrier movement operator." Claim 16 depends from claim 15 and recites "further comprising notifying a user in response to at least one of: the at least one rechargeable battery being removed from the battery charging station, and the stored power of the at least one rechargeable battery being below the threshold amount." Claim 17 recites "wherein notifying comprises generating at least one of an audible indication and a visual indication." Crusius anticipates and/or renders obvious claim 17.

Crusius discloses a method of power flow between a BBU, a motor unit of a GDO, and a second GDO. Trial Tr. at 929:8-22; DX-23, Crusius at 3:61-67. Crusius also discloses detecting whether the at least one rechargeable battery is in electrical communication with a battery charging station. Trial Tr. at 929:23-930:12; DX-23, Crusius at 3:56-60. Crusius also discloses providing power from a power source to the at

least one rechargeable battery via the battery charging station. Trial Tr. at 930:13-22; DX-23, Crusius at 2:23-27. Crusius also discloses providing stored power from the at least one rechargeable battery to the head unit via the battery charging station to perform movable barrier functions. Trial Tr. at 930:23-931:15; DX-23, Crusius at Abstract, 3:60-67. Crusius also discloses "providing power from the at least one rechargeable battery to the electrically powered equipment in response to the at least one rechargeable battery being electrically connected to the electrically powered equipment." Trial Tr. at 931:16-932:5; DX-23, Crusius at 2:18-20. Thus, Crusius also discloses every element of claim 15. Trial Tr. at 932:6-934:1.

Crusius also discloses notifying a user in response to at least the stored power of the at least one rechargeable battery being below the threshold amount, and that notification is an audible and visual alarm, as required by claims 16 and 17. Trial Tr. at 934:2-935:1.

Like claim 9, the only limitation that Dr. Rhyne disputes from claims 15, 16, and 17 is whether a second GDO is electrically powered equipment other than and physically separate or separable from the barrier movement operator. Trial Tr. (8/29 Draft) at 74:25-75:12. For the same reasons as discussed for claim 9, a second GDO is both (1) electrically powered equipment and (2) physically separate or separable from the barrier movement operator.

**Claim 18**: Asserted claim 18 depends from claim 15. As explained, Crusius discloses every element of claims 15. *See, e.g.,* Trial Tr. at 932:6-934:1. Like claim 14, claim 18 recites "wherein the electrically powered equipment comprises a tool." Trial Tr. at 935:2-11. Thus, for the same reasons as discussed for claim 14, Crusius discloses the

21

additional elements of claim 18. *Id.* at 935:2-14.

### 3. Weik Anticipates and/or Renders Obvious the '966 Patent.

Weik was filed August 24, 200 and published November 26, 2002 and is therefore prior art to the '966 Patent. DX-093. As demonstrated below, no reasonable juror could conclude that Weik does not anticipate and/or render obvious claims 14, 17, and 18 of the '966 Patent.

Weik discloses a barrier movement operator system, which is a fire door operator. DX-093, Abstract. As explained below, Weik discloses two exemplary implementations for his control circuit. Figure 7 illustrates a rechargeable battery 52 in in electrical communication with the motor generator 68. DX-093 at 10:19-29, Fig. 7. Weik also discloses that Figure 7 is particularly susceptible to modification using the various ways to interconnect electrical elements described in the patent. *Id.* 12:30-18; Trial Tr. at 940:7-12. One way to interconnect electrical elements described by Weik is using a trickle charger 102 in electrical communication with a rechargeable battery 100 and in electrical communication with the motor generator 68. Trial Tr. at 937:17-938:18; DX-093 at 11:13-15, Fig. 9. Thus, as explained further below, Weik anticipates claims 14, 17, and 18 of the '966 Patent because it describes that the trickle charger 102 can be used in connection with rechargeable battery 52. Additionally, to the extent necessary, it would be obvious to a person of ordinary skill to combine Weik's disclosures from Figure 7 and 9 based on, among other things, Weik's explicit instruction to that Figure 7 is particularly susceptible to modification using the various ways to interconnect electrical elements described in the patent. DX-093 at 12:30-18.

**Claim 14**: Asserted claim 14 depends from independent claim 9. Weik discloses

22

every element of independent claim 9 and every element of asserted dependent claim 14. Rhyne does not dispute that Elements 9[preamble], 9[a], and 9[c] are taught by Weik. *See* Trial Tr. (8/29 Draft) at 72:17-74:24

### a. "battery charging apparatus"

Weik discloses a "battery charging apparatus." Weik disclose a trickle charger, which charges a rechargeable battery. Trial Tr. at 937:8-16; DX-093-013 at 11:13-15.

### b. "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery"

Weik discloses "a battery charging station in electrical communication with a rechargeable battery and in electrical communication with a head unit of a barrier movement operator for supplying power to at least one rechargeable battery." The Court construed "barrier movement operator" to mean "an operator that controls movement of the movable barrier and may contain additional functionality." *Markman Order* at 62-63. Weik discloses a barrier movement operator that controls movement of a movable barrier, which, in this case, is a fire door. DX-093 at 7:44-51; Trial Tr. at 936:11-937:1.

Weik discloses a rechargeable battery 52 in in electrical communication with the motor generator 68. DX-093 at 10:19-29, Fig. 7. Weik discloses also that Figure 7 is particularly susceptible modification using the various ways to interconnect electrical elements described in the patent. *Id.* 12:30-18; Trial Tr. at 940:7-12. One way to interconnect electrical elements described by Weik is using a trickle charger 102 in electrical communication with a rechargeable battery 100 and in electrical communication with the motor generator 68. Trial Tr. at 937:17-938:18; DX-093 at

23

11:13-15, Fig. 9. Trickle charger 102 supplies power to the rechargeable battery. *Id.*

          **c.**      **"the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment"**

Weik discloses "the at least one rechargeable battery being removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment." The Court construed "removably connectable" to mean "configured to allow a user to insert, plug in, or otherwise manually attach and detach." *Markman* Order at 71.

Weik discloses the rechargeable battery 52 may be in accordance with a portable power tool's rechargeable battery, such as a drill's battery. DX-093 at 12:42-45; Trial Tr. 938:19-939:13. Thus, rechargeable battery 52 is removably connectable to electrically powered equipment other than and physically separate or separable from the barrier movement operator to provide power to the electrically powered equipment.

          **d.**      **"circuitry electrically connected to the battery charging station to supply power from the at least one rechargeable battery to the head unit"**

Weik discloses circuitry electrically connected to the trickle charger 102 to supply power from the rechargeable battery motor generator 68. DX-093 at 10:19-29, Fig. 7; Trial Tr. at 941:13-23.

          **e.**      **"electrically powered equipment comprises a tool"**

Weik the "electrically powered equipment comprises at tool." Weik discloses the rechargeable battery 52 may be in accordance with a portable power tool's rechargeable

24

battery, such as a drill's battery.  DX-093 at 12:42-45; Trial Tr. 941:24-942:10.

**Claim 17**: Asserted claim 17 depends from claim 16 that depends from claim 15. Claim 15 recites, in part, "a method of power flow between at least one rechargeable battery, a barrier movement operator, electrically powered equipment other than and physically separate or separable from the barrier movement operator."  Claim 16 depends from claim 15 and recites "further comprising notifying a user in response to at least one of: the at least one rechargeable battery being removed from the battery charging station, and the stored power of the at least one rechargeable battery being below the threshold amount."  Claim 17 recites "wherein notifying comprises generating at least one of an audible indication and a visual indication."  Weik anticipates and/or renders obvious claim 17.

Weik discloses a method of power flow between a rechargeable battery 52, a motor generator 68, and a power tool.  Trial Tr. at 942:18-943:20.  Weik also discloses detecting whether the at least one rechargeable battery is in electrical communication with a battery charging station.  *Id.* at 943:21-944:5; DX-093 at 11:13-15.  Weik also discloses providing power from a power source to the at least one rechargeable battery via the battery charging station.  Trial Tr. at 944:6-22; DX-093 at 11:13-17.  Weik also discloses providing stored power from the at least one rechargeable battery to the head unit via the battery charging station to perform movable barrier functions.  Trial Tr. at 944:23-945:7; DX-093 at Figs. 7, 9.  Weik also discloses providing power from the at least one rechargeable battery to the electrically powered equipment in response to the at least one rechargeable battery being electrically connected to the electrically powered equipment.  Trial Tr. at 945:8-21; DX-093 at 12:42-46.  Thus, Weik also discloses every

25

element of claim 15.

Weik also discloses notifying a user in response to at least one of: the at least one rechargeable battery being removed from the battery charging station, and the stored power of the at least one rechargeable battery being below the threshold amount, and that notification is an audible and visual alarm, as required by claims 16 and 17. Trial Tr. at 945:22-947:2; DX-093 at 5:39-46.

**Claim 18**: Asserted claim 18 depends from claim 15. As explained, Weik discloses every element of claims 15. Like claim 14, claim 18 recites "wherein the electrically powered equipment comprises a tool." Thus, for the same reasons as discussed for claim 14, Craftsman discloses the additional elements of claim 18.

## V. TTI HAS PROVEN THE ASSERTED CLAIMS ARE PATENT-INELIGIBLE.

TTI has proven as a matter of law that the asserted claims of the '275 patent are patent-ineligible under Section 101, as set forth in Defendant's motion for summary judgment on the issue. Docket # 458. The '275 patent is directed to patent-ineligible subject matter under 35 U.S.C. § 101. The asserted claims recite only abstract ideas—not an inventive concept. Under the *Mayo/Alice* "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts," these claims do not satisfy section 101. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 77–80 (2012).

The asserted claims are drawn to the abstract idea of wirelessly transmitting status conditions about a moveable barrier operator. Federal Circuit precedent confirms that the

26

wireless transmission of content is an abstract idea, and the asserted claims embody that same ineligible idea. Nor does the recitation of a "controller," "moveable barrier interface," "transmitter," and "remote peripheral" transform this abstract idea into an inventive concept. The specification to the '275 patent explains—and Chamberlain's expert (Dr. Rhyne) admits—that each of these components is conventional. Furthermore, these components are conventionally ordered in the asserted claims to transmit a status condition signal, and in some instances, receive it using a remote peripheral. That the asserted claims perform such basic functionality on a moveable barrier operator does not save them from invalidation. Settled law provides that implementing an abstract idea on concrete or otherwise tangible components (such as a garage door opener) will not rescue an otherwise unpatentable claim.

## VI.    CGI HAS NOT PROVEN IT IS ENTITLED TO ANY RELIEF

TTI has proven as a matter of law that the asserted patent claims are invalid under the clear and convincing evidence standard, and no reasonable jury could find otherwise. TTI also has proven as a matter of law that the '275 patent claims are patent-ineligible under Section 101. Therefore, CGI has not proven and cannot prove that it is entitled to a permanent injunction; interest, costs, treble damages, or other damages permitted by 35 U.S.C. § 284; attorneys' fees; or any other equitable or legal relief.

## VII.   CONCLUSION

Under Federal Rule of Civil Procedure 50(a), TTI respectfully requests entry of judgment as a matter of law that claims 1, 5, and 15 of the '275 patent and claims 14, 17, and 18 of the '966 patent are invalid, including the claims from which the asserted claims depend, and that the '275 patent claims are patent-ineligible under Section 101.

27

Dated:  August 29, 2017                                          Respectfully submitted,

By: /s/ *Jason C. White*          
    Jason C. White
    Michael J. Abernathy
    Sanjay K. Murthy
    Nicholas A. Restauri
    Jesse T. Dyer
    Caroline S. Lourgos
    Morgan, Lewis & Bockius LLP
    77 W. Wacker Drive, Ste. 500
    Chicago, IL  60601
    Tel:  (312) 324-1000
    Fax:  (312) 324-1001
    E-mail:
    jason.white@morganlewis.com
    michael.abernathy@morganlewis.com
    sanjay.murthy@morganlewis.com
    nicholas.restauri@morganlewis.com
    jesse.dyer@morganlewis.com
    caroline.lourgos@morganlewis.com

    Margaret A. McGreal
    Morgan, Lewis & Bockius LLP
    1701 Market Street
    Philadelphia, PA 19103-2921
    Tel:  (215) 963-5000
    Fax:  (215) 963-5001
    E-mail:
    margaret.mcgreal@morganlewis.com

    Sean C. Cunningham (*pro hac vice*)
    Erin Gibson (*pro hac vice*)
    Stanley Panikowski (*pro hac vice*)
    DLA PIPER LLP (US)
    401 B Street, Suite 1700
    San Diego, CA 92101
    Tel:  (619) 699-2700
    E-mail:
    Sean.Cunningham@dlapiper.com
    Erin.Gibson@dlapiper.com
    Stanley.Panikowski@dlapiper.com

    *Attorneys  for  Defendants  Techtronic*

DB1/ 93478197.1

*Industries North America, Inc., One World Technologies Inc., OWT Industries, Inc., and Ryobi Technologies, Inc.*

DB1/ 93478197.1

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing document was served via CM/ECF on August 29, 2017 upon all counsel of record.


/s/ *Jason C. White*
Jason C. White

DB1/ 93478197.1