IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| THE CHAMBERLAIN GROUP, INC., <br><br> Plaintiff, <br> v. <br><br> TECHTRONIC INDUSTRIES CO. LTD., TECHTRONIC INDUSTRIES NORTH AMERICA, INC., ONE WORLD TECHNOLOGIES INC., OWT INDUSTRIES, INC., ET TECHNOLOGY (WUXI) CO. LTD., AND RYOBI TECHNOLOGIES, INC. <br><br> Defendants. | Civil Action No.: 1:16-cv-06097 <br><br> The Honorable Harry D. Leinenweber <br><br> Magistrate Judge Sidney Schenkier <br><br><br> **PUBLIC, REDACTED** |

**PLAINTIFF THE CHAMBERLAIN GROUP, INC.'S OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

I.  INTRODUCTION ..........................................................................................................1

II.  LEGAL STANDARD ...................................................................................................2

III.  ARGUMENT REGARDING THE '275 PATENT .......................................................3

    A.  The Asserted Claims of the '275 Patent Are Patent Eligible................................3

    B.  Substantial Evidence Supports the Jury's Finding that Menard
    PCT Does Not Anticipate the Asserted '275 Patent Claims.................................7

        1.  Menard PCT's System 10000 is Not the Claimed
        "Movable Barrier Operator" .................................................................8

        2.  Menard PCT Does Not Disclose the Claimed
        "Operational Status Conditions"..........................................................11

        3.  TTI's IPR Petition Involving the Menard US
        Application Supports the Jury's Verdict...............................................12

    C.  Substantial Evidence Supports the Jury's Finding that the
    Combination of Menard PCT and Cohen Does Not Render
    Obvious the Asserted '275 Patent Claims ..........................................................13

    D.  Substantial Evidence Supports the Jury's Finding that TTI
    Products Literally Infringe the '275 Patent.........................................................15

    E.  Substantial Evidence Supports the Jury's Finding that TTI
    Products Infringe the '275 Patent Under The Doctrine of
    Equivalents..........................................................................................................18

    F.  Substantial Evidence Supports the Jury's Finding that TTI
    Induces Infringement of the '275 Patent.............................................................21

    G.  Substantial Evidence Supports the Jury's Finding that TTI
    Willfully Infringes the '275 Patent .....................................................................21

IV.  ARGUMENT REGARDING THE '966 PATENT .......................................................24

    A.  Substantial Evidence Supports the Jury's Finding that
    Craftsman Does Not Anticipate the Asserted '966 Patent Claims .....................24

    B.  Substantial Evidence Supports the Jury's Finding that Crusius
    Does Not Anticipate or Render Obvious the Asserted '966
    Patent Claims ......................................................................................................25

    C.  Substantial Evidence Supports the Jury's Finding that Weik
    Does Not Anticipate or Render Obvious the Asserted '966
    Patent Claims ......................................................................................................26

D.  Substantial Evidence Supports the Jury's Finding that TTI
    Literally Infringes the '966 Patent ...................................................................27

E.  Substantial Evidence Supports the Jury's Finding that TTI
    Induces Infringement of the '966 Patent ...............................................................28

F.  Substantial Evidence Supports the Jury's Finding that TTI
    Willfully Infringes the '966 Patent ...................................................................29

V.  SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S DAMAGES
    VERDICT .................................................................................................................30

VI. CONCLUSION ..........................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Lab of Tx, LLC v. Amazon.com Inc.*,
838 F.3d 1266 (Fed. Cir. 2016)...................................................................4, 5

*Affinity Labs. of Tx., LLC v. DIRECTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016)...................................................................4, 5

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*,
344 F.3d 1186 (Fed. Cir. 2003).......................................................................2

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014)..................................................................................3, 7

*Apple Inc. v. Samsung Elecs. Co.*,
No. 12-CV-00630-LHK, 2017 WL 2720220 (N.D. Cal. June 22, 2017) .........................22, 29

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015).......................................................................7

*Astrazeneca LP v. Apotex, Inc.*
633 F.3d 1042 (Fed. Cir. 2010).....................................................................29

*Barry v. Medtronic, Inc.*,
230 F. Supp. 3d 630 (E.D. Tex. 2017) ..........................................................23

*Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*,
827 F.3d 1341 (Fed. Cir. 2014)....................................................................6, 7

*Brilliant Instruments, Inc. v. Guidetech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013).....................................................................20

*Chamberlain Grp. v. Linear LLC*,
114 F. Supp. 3d 614 (N.D. Ill. 2015) ...........................................................1, 5

*Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001).....................................................................30

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2015).......................................................................6

*EBS Auto. Servs. v. Ill. Tool Works, Inc.*,
No. 09-CV-996 JLS MDD, 2011 WL 4021323 (S.D. Cal. Sept. 12, 2011) .........................28

*Electric. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed. Cir. 2016)..................................................................................5, 6

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016)......................................................................................4

*Ericsson, Inc. v. Harris Corp.*,
  352 F.3d 1369 (Fed. Cir. 2003)....................................................................................30

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002).....................................................................................................19

*GPNE Corp. v. Apple Inc.*,
  830 F.3d 1365 (Fed. Cir. 2016)....................................................................................17

*Haley v. Gross*,
  86 F.3d 630 (7th Cir. 1996) .........................................................................................10

*Halo Elecs., Inc. v. Pulse Electronics*,
  136 S. Ct. 1923 (2016) ...........................................................................................23, 30

*Harvey v. Office of Banks & Real Estate*,
  377 F.3d 698 (7th Cir. 2004) .............................................................................16, 21, 24

*Immersion Corp. v. Sony Comput. Entm't Am., Inc.*,
  4:02-CV-00710-CW, Dkt. No. 1481, slip op. (N.D. Cal. Jan. 10, 2005) ..............................27

*Insite Vision Inc. v. Sandoz, Inc.*,
  783 F.3d 853 (Fed. Cir. 2015).......................................................................................13

*Joao Control & Monitoring Sys., LLC v. Telular Corp.*,
  173 F. Supp. 3d 717 (N.D. Ill. 2016) ...............................................................................6

*Mayo Collaborative Servs. v. Prometheus Labs.*,
  566 U.S. 66 (2012)....................................................................................................3, 4

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
  545 F.3d 1359 (Fed. Cir. 2008)...................................................................................8, 9

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
  575 F.2d 1152 (6th Cir. 1978) ......................................................................................30

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  702 F.3d 1351 (Fed. Cir. 2012).....................................................................................30

*Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*,
  827 F.3d 1042 (Fed. Cir. 2016).......................................................................................7

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000) .................................................................................................2

*St. Clair Intellectual Prop. Consultants, Inc. v. Toshiba Corp.*,
    No. 09-354-LPS, 2014 WL 4253259 (D. Del. Aug. 27, 2014) ............................27

*Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*,
    785 F.3d 625 (Fed. Cir. 2015) ...........................................................................21

*Third Wave Techs., Inc. v. Stratagene Corp.*,
    405 F. Supp. 2d 991 (W.D. Wis. 2005) .............................................................11

*Thompson v. Mem'l Hosp. of Carbondale*,
    625 F.3d 394 (7th Cir. 2010) .............................................................................20

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016) ........................................................................5, 6

*TWM Mfg. Co. v. Dura Corp.*,
    789 F.2d 895 (Fed. Cir. 1986) .....................................................................30, 32

*Warner-Lambert Co. v. Apotex Corp.*,
    316 F.3d 1348 (Fed. Cir. 2003) .........................................................................28

*Wilson v. AM General Corp.*,
    167 F.3d 1114 (7th Cir. 1999) ...........................................................................17

**Statutes**

35 U.S.C. § 101 .....................................................................................................1, 4, 7

Fed. R. Civ. P. § 50 ....................................................................................16, 17, 21, 24

Fed. R. Civ. P. § 50(a) ....................................................................................10, 17, 20

Fed. R. Civ. P. § 50(b) .................................................................................................10

# I.    INTRODUCTION

Plaintiff The Chamberlain Group, Inc. ("CGI") respectfully requests that the Court deny Defendants' (collectively, "TTI") motion for judgment as a matter of law ("JMOL"). During the course of the parties' eight-day trial, the jury was shown substantial evidence, including documents and testimony from both CGI and TTI, and heard from numerous witnesses. The jury's verdict is fully supported by such evidence. As for TTI's legal arguments, they lack merit. TTI has not met, and cannot meet, the extremely high JMOL burden.

First, as a legal matter, the asserted '275 patent's claims are patent eligible. As fully laid out in CGI's response to TTI's late-filed motion for summary judgment,[1] the '275 patent's claims meet the *Mayo/Alice* framework by reciting an entirely new type of machine that provides specific technical improvements to the prior art. The claims do not recite an abstract idea, and indeed another court in this District previously confirmed in a well-reasoned opinion that similar CGI patent claims that recite an improved moveable barrier operator are patent eligible. *See Chamberlain Grp. v. Linear LLC*, 114 F. Supp. 3d 614, 625 (N.D. Ill. 2015).

Second, just as this court anticipated in its preliminary injunction findings, and consistent with the Patent Office's decision not to institute the relevant IPRs,[2] the jury's verdict that the '275 patent's claims are not invalid is supported and should stand. The jury carefully considered the Menard PCT and Cohen references, and related expert and inventor testimony even after objection from CGI counsel, before properly concluding that TTI failed in its burden to prove invalidity.

---

[1] *See* ECF 528 at 1 n.1 (noting that TTI's Section 101 summary judgment "motion presents yet another example of TTI taking non-meritorious positions, increasing the burden on this Court and the costs to CGI. If TTI legitimately thought it had a sound basis for challenging the '275 patent on 101 grounds, they no doubt would have followed common practice and filed a 12(b)(6) or 12(c) motion early in the case like *Linear* did, especially when faced with a pending Preliminary Injunction threat. CGI will address fees as part of a broader motion and will not ask the court to assess them on a motion-by-motion basis.").

[2] The Patent Office rejected TTI's IPR invalidity arguments in view of multiple references (including a substantially similar Menard reference).

The Menard PCT and Cohen references describe modular devices that can interface with a wide variety of separate devices, including a conventional garage door opener—they do not disclose the novel movable barrier operator as claimed. Nor do these references disclose the claimed "operational status conditions" defined by a plurality of states.

TTI's remaining arguments similarly fail. TTI's remaining arguments rest, for the most part, on TTI's own experts and/or attorney argument. This strategy ignores that the Court must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). TTI's motion makes argument that this Court and CGI have been forced to address numerous times—some of which are being made for at least the fourth time—a practice that has forced both CGI and this Court to devote a tremendous amount of resources throughout this case. *See, e.g.,* ECF 625 at 13-17 (CGI's pending motion for enhanced damages). The Court should reject each and every one of TTI's arguments and confirm that the jury's verdict is supported by substantial evidence and will stand.

## II. LEGAL STANDARD

When deciding whether to grant a motion for JMOL, the Supreme Court has explained that a reviewing court must view the facts in the light most favorable to the prevailing party, and must grant the benefit of all reasonable inferences as to factual conclusions to the party to whom the jury awarded the verdict. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). In *Reeves*, the Court explained that the reviewing court on JMOL must "give credence to the evidence favoring the nonmovant," and must "disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* at 151. Further, courts leave the jury's factual findings "undisturbed as long as they are supported by substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003).

## III.     ARGUMENT REGARDING THE '275 PATENT

### A.     The Asserted Claims of the '275 Patent Are Patent Eligible

The '275 claims are not directed to an abstract idea.[3]  Instead, they recite an entirely new machine from separate physical and non-generic components: a movable barrier operator ("MBO") with an on-board wireless transmitter and an onboard controller that "experiences" various status conditions and monitors and communicates status to various hardware peripherals. This invention represented a sea change in the MBO industry, which was accustomed to thinking in terms of transmitting signals to the operator (i.e., simple binary signals sent to open or close the garage door), not from the operator (where the moveable barrier operator is "smart" and can act as a hub for a connected home system, able to use status signals to update users and/or perform other actions).  Tr.[4] (Fitzgibbon) at 93:17-97:2.  The '275 invention is core, enabling technology that paved the way for today's connected garage door openers, allowing users to feel safe and secure in their homes and garages while facilitating advanced functionality.

There is a two-step framework for evaluating patent eligibility.  A claim is ineligible if (1) it is "directed to" an ineligible concept, *i.e.*, a law of nature, natural phenomenon, or abstract idea, and (2) if so, the particular elements of the claim, considered "both individually and 'as an ordered combination,'" do not add enough to "'transform the nature of the claim' into a patent-eligible application" of the concept.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014); *see also Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 77-80 (2012). Courts must "tread carefully in construing this exclusionary principle lest it swallow all of patent law."  *Alice*, 134 S. Ct. at 2355; *see also Mayo*, 566 U.S. at 70 ("too broad an interpretation of this

---

[3] CGI incorporates its opposition to TTI's motion for summary judgment of patent ineligibility (ECF 528) and only summarizes a few of the reasons why the '275's claims are patent eligible herein.

[4] The trial transcript is referred to throughout as Tr. (Witness Name) with page/line number citations.

exclusionary principle could eviscerate patent law"). "[A]ll inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Mayo*, 566 U.S. at 71.

*First*, the '275's claims are not directed to an abstract idea. To determine whether computer-implemented claims are directed to an abstract idea, "it is often helpful to ask whether the claims are directed to 'an improvement in the functioning of a computer,' or merely 'adding conventional computer components to well-known business practices.'" *Affinity Lab of Tx, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1270 (Fed. Cir. 2016) ("*Affinity II*") (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed. Cir. 2016)). The '275 claims, which are implemented on MBOs, do not merely "add[] conventional computer components to well-known business practices." Instead, they improve the MBO's ability to interface with remote peripherals by adding an on-board controller (for controlling the movement of the barrier) and an on-board wireless transmitter (for transmitting the status experienced by the controller) to the MBO. This allows the MBO to send the controller's status to remote peripherals while avoiding the undesired additional cost and increased installation complexity of physical interfaces. '275 Patent at 1:12-30, 1:55-2:3; Figs. 1, 2; *see also* 35 U.S.C. § 101 ("Whoever **invents or discovers any new and useful** process, **machine**, manufacture, or composition of matter, **or any new and useful improvement thereof**, **may obtain a patent therefor**, subject to the conditions and requirements of this title.") (emphasis added).

TTI argues that this is nonetheless an abstract idea because "the Federal Circuit has repeatedly held that the wireless transmission of content is an abstract idea." Motion at 4 (citing *Affinity Labs. of Tx., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258-65 (Fed. Cir. 2016) ("*Affinity I*"); *Affinity II*, 838 F.3d at 1269-72. These cases held no such thing. Instead, in *Affinity Labs* I

the Federal Circuit held that "providing out-of-region access to regional broadcast content is an abstract idea"—a "broad and familiar concept concerning information distribution that is untethered to any specific or concrete way of implementing it." 838 F.3d at 1258. And in *Affinity Labs II*, the Federal Circuit held that "delivering user-selected media content to portable devices" was an abstract idea. 838 F.3d at 1269. The claims in *Affinity I* and *Affinity II* both recited familiar ways to use conventional combinations of generic components. By contrast, the '275 patent claims a specific and unconventional MBO—one with an on-board controller that controls the movement of the barrier and an on-board wireless transmitter that transmits the status experienced by the controller. Tr. (Fitzgibbon) at 93:17-94:23.

TTI's citation to *Electric Power* (Motion at 4) is also inapposite. The focus of the *Electric Power* claims was not on an "improvement in computers as tools, but on certain independently abstract ideas that use computers as tools." *Electric. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016); *see also id.* at 1355 (noting that the claims require nothing more than "off-the-shelf conventional computer, network and display technology"). In contrast, the '275's claims do not recite a generic computer, nor do they recite an abstract idea that merely uses a computer as a tool—the '275's claims recite a new and improved MBO.

Indeed, a court in this District has already soundly rejected a very similar ineligibility challenge to other CGI patent claims covering an MBO having a wireless status monitoring and request system. *See Chamberlain Grp. v. Linear LLC*, 114 F. Supp. 3d 614, 625 (N.D. Ill. 2015). TTI argues that the Federal Circuit rejected *Linear*'s analysis in *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 610-11 (Fed. Cir. 2016). However, the claims in *In re TLI* were directed to the abstract concept of "classifying an image and storing the image based on its classification," and the Federal Circuit found them abstract because "the specification makes clear that the recited

physical components merely provide a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner." *Id.* at 611. In stark contrast, the entirety of the '275 patent addresses issues with respect to MBOs that interface with peripheral devices, and makes clear that the recited MBO is anything but a generic environment used to carry out an abstract idea. And the *Joao* Court distinguished *Linear* because the *Joao* "claims cover a much broader concept than the claims at issue in [*Linear*]." *Joao Control & Monitoring Sys., LLC v. Telular Corp.*, 173 F. Supp. 3d 717, 729 (N.D. Ill. 2016). The *Joao* claims, unlike the *Linear* or '275's claims, were abstract, because they were so broad as to be applicable to "any" device, "contain no description about how the apparatus works generally, other than through the use of generic computer 'devices,' . . . and could apply to any type of conventional computer network and any type of property associated with a vehicle or premises." *Id.* at 728.

**Second**, even if the '275's claims were directed to an abstract idea, they would nonetheless be eligible under step two of the *Mayo/Alice* test because they set forth specific, concrete improvements/solutions to problems in the prior art. *See Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2014) (claims directed to "a specific, discrete implementation of the abstract idea of filtering content" are patent eligible); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2015) ("the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks"); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) ("[T]here is a critical difference between patenting a particular concrete solution to a problem and attempting to patent the abstract idea of a solution to the problem in general."). The '275 claims solved pervasive existing problems relating to the communication of status by MBOs to peripherals. '275 Patent at 3:16-3:26; 1:55-2:16. And, the '275 patent claims a

*particular implementation* of an MBO—one with an on-board transmitter that transmits the operational status conditions *experienced by the controller*. Tr. (Fitzgibbon) at 93:17-94:23. This specific implementation "carve[s] out" a specific means of solving the problems it sought to solve, rather than reciting generic elements that implement an abstract idea. *See Bascom*, 827 F.3d at 1352. Thus, the '275 claims are patent-eligible under step two of the *Mayo/Alice* inquiry.

*Third*, another factor militating strongly against a finding of patent ineligibility in this case is the lack of preemption. Both parties agree that another garage door opener product capable of wirelessly monitoring the status of the movable barrier operator—the Genie Aladdin—does not infringe the '275 patent. Tr. (Rhyne) at 376:9-11; Tr. (Madisetti) at 1128:23-1129:8. While pre-emption is not the only consideration in a § 101 analysis, it is a critical inquiry that has repeatedly informed this analysis, both in *Alice* and in the Federal Circuit's subsequent decisions. *See Alice*, 134 S. Ct. at 2354 ("We have described the concern that drives [the] exclusionary principle [of § 101] as one of pre-emption."); *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1052 (Fed. Cir. 2016) (same); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015) ("[Q]uestions on preemption are inherent in and resolved by the § 101 analysis."). The fact that the Genie product does not infringe, even though it wirelessly monitors the status of a movable barrier operator, shows that CGI's patent does not attempt to preempt any field of "wireless status communications."

### B. Substantial Evidence Supports the Jury's Finding that Menard PCT Does Not Anticipate the Asserted '275 Patent Claims

Substantial evidence supports the jury's finding that the Menard PCT reference does not anticipate any asserted '275 patent claim. "[U]nless a reference discloses within the four corners of the documents not only all of the limitations claimed but also all of the limitations arranged or combined in the same way as recited in the claim, it cannot be said to prove prior invention of the

thing claimed and, thus, cannot anticipate." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). In order to show every limitation as arrange in the claim, the reference must "show all of the limitations of the claims arranged or combined in the same way as recited in the claims, not merely in a particular order." *Id.* at 1370. Menard PCT does not meet this standard and substantial evidence supports the jury's finding that Menard PCT does not anticipate.

### 1. Menard PCT's System 10000 is Not the Claimed "Movable Barrier Operator"

It was reasonable for the jury to disagree with TTI's argument that system 10000 in Menard PCT was the "movable barrier operator" recited in the asserted claims (*i.e.* a MBO including the claimed "controller" and wireless "transmitter"). As Dr. Rhyne explained, the Menard PCT reference describes a system 10000, which is a modular system that can be connected to a wide variety of separate devices, including a GDO 1000. Tr. (Rhyne) at 1295:16-1297:16. In that way, Menard's modular system is similar to the Genie Aladdin Connect system, which all experts agreed was non-infringing. *Id.* at 1310:22-1311:24. TTI did not identify any controller or wireless transmitter within Menard's GDO 1000 as claimed. Indeed, Dr. Rhyne showed how the system 10000 and GDO 1000 in Menard PCT were separate, for example by citing to Menard PCT's Figure 31, and to disclosure showing that the GDO 1000 and system 10000 have their own separate controllers and power supplies. *Id.* at 1297:16-1299:8. Dr. Rhyne also explained how Menard's modular system does not achieve the benefits offered by the '275 patent. *Id.* at 1303:13-1304:11.

Dr. Rhyne also identified substantial evidence that rebuts TTI's argument that Menard PCT discloses an embodiment where the system 10000 is integrated within the GDO 1000. As Dr. Rhyne explained, TTI attempted to rely upon a single sentence in Menard PCT for this argument, but the sentence does not support TTI's position. *See, e.g., id.* at 1300:19-1301:15 ("[w]hat this [sentence] does not say is that you – you can put this system [10000] in the GDO [1000]"); *see*

*also* Tr. (Foley) at 983:22-984:15 ("[Q.] it doesn't say the system can be included within the garage door operator, correct, sir? A. That's correct"). Dr. Rhyne also identified testimony from the inventor, Mr. Menard, that confirmed his understanding. Tr. (Rhyne) at 1301:16-1302:4. Finally, Dr. Rhyne rebutted TTI's argument by explaining how Menard PCT's disclosure of a single system 10000 being used with multiple GDOs further confirms that they are separate. *Id.* at 1302:5-1303:12. And notably, TTI's own expert Dr. Foley admitted the paragraph in Menard PCT that TTI bases its argument upon is "confusing." Tr. (Foley) at 981:11-15 ("[Q.] if you read this just the way Mr. Menard wrote it, it wouldn't be very clear, would it? A. I could see where if you read it with the Figure 32 and the second 1000 where it could be confusing"). Thus, Dr. Rhyne's testimony, and Dr. Foley's confusion, credibly demonstrated that TTI failed to prove that Menard PCT anticipated because TTI did not show that it discloses all elements of the '275 patent arranged in the same way as the '275 patent. *Net MoneyIN*, 545 F.3d at 1370-71.

TTI's attempt to rely on CGI witness testimony to support its position fails. First, TTI over-stresses Dr. Rhyne's testimony that the claims do not require "the controller, the movable barrier interface, and the wireless status condition data transmitter to be located in a single housing." Tr. (Rhyne) at 1341:9-18. This is undeniably true, as the movable barrier interface includes the belt, chain, and rail which extend outside the head unit. *Id.* at 1341:22-1342:14. But, Dr. Rhyne never argued that Menard must disclose all elements in a single housing. Instead, he testified that "Mr. Menard's invention is different from the '275 patent because it describes a modular add-on core of garage door opener." *Id.* at 1338:8-12.[5] TTI's theory appears to be that any separate device that can send control signals to an MBO *is* part of the MBO—the jury

---

[5] Notably, TTI's motion mischaracterizes this testimony as "Dr. Rhyne argu[ing] that all of the elements of the claimed 'movable barrier operator' must be located inside of the GDO's head unit." Motion at 8. As the quoted language makes clear, Dr. Rhyne's testimony here did not discuss the "head unit" or the concept of a single "housing" being required.

disagreed with that theory. *Compare id.* at 1328:8-20 ("Q. And you agree that the controller [in Menard PCT's system 10000] can control opening and closing the garage door? A. It does it by pushing the button effectively.") *with* 1374:9-24 (observing that a smart phone can send control signals to an MBO, but is not itself an MBO).

Next, TTI over-stresses Cory Sorice's (CGI's VP of Emergent Businesses) limited testimony regarding the MyQ Gateway. TTI argues that Mr. Sorice testified that CGI's MyQ Gateway is "an add-on device to a garage door opener, [that] is covered by the '275 patent claims." Motion at 9. Not true. Mr. Sorice only testified that the MyQ Gateway incorporates the '275 patent claims "[i]n the way it interacts with the garage door opener." Tr. (Sorice) at 210:18-20. Furthermore, this testimony is immaterial because it does reference any specific claim of the '275 patent. For example, the '275 patent includes multiple non-asserted claims that explicitly recite a "remote peripheral." *See* '275 patent at claims 21, 24. A jury could have reasonably concluded that Mr. Sorice's testimony related only to these remote peripheral claims, and thus has no bearing on the validity of the asserted claims. Similarly, a jury could have reasonably concluded that TTI simply failed to meet its burden to establish any significance of the MyQ Gateway given the *very* limited and cursory discussion of the MyQ Gateway at trial. Indeed, the jury could have even reasonably discounted Mr. Sorice's testimony in view of the facts that (i) Mr. Sorice is a marketing/non-technical witness and (ii) TTI chose not to ask CGI's technical witness, Mr. Jim Fitzgibbon, anything about the MyQ Gateway.

Finally, TTI attempts to rely on an admission from James Fitzgibbon (the '275 patent inventor) at the PI hearing. This argument is waived because TTI did not include this testimony in its Rule 50(a) motion, or even elicit this testimony at trial. *See, e.g.*, *Haley v. Gross*, 86 F.3d 630, 632 (7th Cir. 1996) (in considering a Rule 50(b) motion, the Court "must consider *all of the*

*evidence before the jury at trial*"); *see also Third Wave Techs., Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 997 (W.D. Wis. 2005) ("a party cannot obtain judgment as a matter of law or the grant of a new trial in reliance on evidence that was never admitted at trial"). Even if the Court considers this testimony, Mr. Fitzgibbon's testimony only distinguishes between signals from the phone to control the GDO and signals between the operator and a gateway. PI Hearing Tr. at 97:14-98:6. Moreover, Mr. Fitzgibbon's testimony was provided without the benefit of the Court's constructions and he was never presented with an opportunity to explain this testimony, state how it related to the Court's claim construction of "MBO," or provide any detail as to the "gateway" device at issue.

### 2. Menard PCT Does Not Disclose the Claimed "Operational Status Conditions"

Additionally, the jury heard evidence that the Menard PCT did not disclose the asserted claims' recital of an "operational status condition" (claims 1 and 5) or an "operational status" (claim 15) as claimed. Menard PCT does not explain how its signals are defined or transmitted. Tr. (Rhyne) at 1305:24-1306:7. Furthermore, Dr. Rhyne specifically rebutted each of the alleged status conditions cited by Dr. Foley. *Id.* at 1306:8-1308:9.

TTI's argument that nothing in the claims "requires a specific format for the state information" is irrelevant. Motion at 11. No specific format is required by the claims, however, the claims (and the Court's constructions) do require that the condition be "defined, at least in part, by" the plurality of operating states. Thus, there must be some relationship between the operating states and the status condition allegedly disclosed in the prior art. One example of this, as Dr. Rhyne explained, is how the '275 patent itself provides an example of using "flags or other indicia" to define a signal. Tr. (Rhyne) at 273:15-275:2. In contrast, Menard PCT does not disclose using flags or other indicia, or any other disclosure showing a condition defined by at least two states,

11

and Dr. Rhyne explained that there are other ways the Menard PCT could be implemented that are not encompassed by the '275's claims. *See, e.g., id.* at 1307:16-1308:9.

Nor is TTI's argument that "Dr. Rhyne opined that present status conditions are 'defined, at least in part by at least two operating states' so long as there is more than one 'possible' operating state relating to a given status condition" correct. Motion at 12. Dr. Rhyne identified the actual condition fields in the Ryobi GDOs, and showed how these conditions are defined by a plurality of states. Tr. (Rhyne) at 275:5-277:17; 287:4-291:13. Then, on rebuttal, Dr. Rhyne also addressed a hypothetical where a door status condition was "originally defined as the possibility that the door can be open or closed." *Id.* at 1346:4-24. In contrast, Menard PCT discloses a system that can report "in some way that the door can be open or closed," but doesn't disclose a status condition defined by a plurality of states as claimed. *Id.* at 1328:21-1329:11.

Thus, Dr. Rhyne's testimony showed that TTI failed to prove anticipation because it cannot prove that Menard PCT includes the claimed "operational status conditions" defined by at least two operating states or that they are "experienced by the controller" of the GDO 1000, as is required by the Court's construction.

### 3. TTI's IPR Petition Involving the Menard US Application Supports the Jury's Verdict

Indeed, TTI's entire argument that "No Reasonable Jury Could Find That Menard PCT Does Not Anticipate the Asserted Claims" (Motion at 8) is proven objectively false by the Patent Office's IPR opinions. A three-judge panel decision found that TTI failed to demonstrate even a "reasonable likelihood" of prevailing with its IPR arguments with respect to a similar Menard U.S. reference. Ex. A (PTX-499); Ex. B (PTX-500). These opinions are highly significant to the question at issue at least because (i) the references considered by the Patent Office and jury were very similar (Tr. (Foley) at 964:25-965:3; Tr. (Rhyne) at 1308:10-25); (ii) the IPR broadest

reasonable interpretation standard is broader than this Court's construction (Tr. (Rhyne) at 1290:1-14); and (iii) the legal standard for instituting an IPR (reasonable likelihood) is not as high a burden as TTI's burden at trial (clear and convincing evidence) (Tr. (Rhyne) at 1290:15-1291:5).

### C. Substantial Evidence Supports the Jury's Finding that the Combination of Menard PCT and Cohen Does Not Render Obvious the Asserted '275 Patent Claims

TTI's proposed combination of Menard PCT and Cohen fails, for example, because TTI's own expert admitted that he did not believe one would need to combine the references, and that his only reason for doing so was to obtain four specific states, a motivation derived entirely from improper hindsight. Tr. (Foley) at 877:11-17. *Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 859 (Fed. Cir. 2015) ("Defining the problem in terms of its solution reveals improper hindsight in the selection of the prior art relevant to obviousness.") Thus, TTI failed to prove that a person of ordinary skill would have combined these references.

Additionally, Cohen describes an add-on modular device, similar to Menard PCT, and thus fails to disclose the claimed "movable barrier operator." Tr. (Rhyne) at 1310:4-21. Both Cohen and Menard PCT are similar to the Genie Aladdin Connect system that all experts agreed was non-infringing. *Id.* at 1310:22-1311:24. Furthermore, Cohen, like Menard PCT, does not disclose a condition defined by two or more states. *Id.* at 1311:25-1312:9. This evidence supports the jury's finding that the asserted '275 patent claims are not obvious.

Additionally, secondary considerations of non-obviousness support the jury's verdict. First, the strong commercial success of the MyQ system supports that the '275 patent invention was not obvious. Tr. (Rhyne) at 1313:21-1314:5. Similarly, there is evidence that the transmission of status updates in the Ryobi GDO has also lead to commercial success. *Id.* at 1314:6-1315:5. TTI's motion alleges that this testimony lacks a nexus to the asserted claims because the asserted claims do not recite a smartphone application. But, the jury heard evidence of a clear nexus. For

example, Mr. Fitzgibbon testified that a smartphone cannot receive a signal that is not sent. Tr. (Fitzgibbon) at 144:24-145:1. Mr. Sorice also testified that the smartphone "control" functions are secondary to the "monitoring" functions, and that control without monitoring (*i.e.* without the '275 patent invention) would not provide the same "confidence" to a user because he or she wouldn't get confirmation of a successful action being taken. Tr. (Sorice) at 232:18-233:10; *see also* Tr. (Farrah) at 518:19-25 (█████████████████████████████████████████ █████████████); Tr. (Huggins) at 633:9-13 (████████████████████████████████████████ ████████████████████████████████████████████████); Ex. C (PTX-168) at PTX-0168.0021 (██████████████████████████████████████); Tr. (Hansen) at 441:22-442:12 (testifying that PTX-168 shows "that the patent technology reflects kind of core pieces of this technology). Home Depot's representative Ms. Ely agreed, stating that it would be ████████████████████████████████████████████████████████████████████ ██████████ ECF 611-2 (Ely Dep. Designations) at 232:21-233:1 & 233:4-5. Thus, substantial evidence supports that commercial success is a relevant secondary consideration, with a nexus to the patented '275 inventions, that supports the jury's verdict of non-obviousness.

Likewise, there was substantial evidence of industry praise. Grant Carlson, a TTI consultant who formerly worked at Overhead Door (one of CGI's competitors and maker of Genie GDOs), testified that Overhead Door had seen the '275 patent and was "concerned" about it. ECF 610-1 (Carlson Dep. Designations) at 70:3-6, 70:7-11. Overhead Door took efforts to "mak[e] sure that [Overhead Door] didn't read upon" or infringe the '275 patent. *Id.* at 70:20-71:3, 71:4-7; *see also e.g.*, Ex. D (PTX-548) (████████████████████████████████████████████ █████████████████████████████████). TTI incorrectly argues that this testimony does not evidence a form of industry praise because it is "simply a way to avoid infringement."

Motion at 17. No case supports TTI's argument that it is improper to consider a competitor's infringement concern and design around efforts as evidence of secondary considerations. Indeed, the jury was entitled to conclude that these concerns and resulting actions indicate industry praise regarding the novelty of the CGI invention. Furthermore, TTI's argument that "Dr. Rhyne did not testify that Overhead Door designed around the asserted claims and thus failed to meet the nexus requirement" also fails. Dr. Rhyne explained how Overhead Door's design around was a form of industry praise (Tr. (Rhyne) at 1312:22-1313:20) and both sides' experts explained how the Genie product did not infringe the asserted claims (Tr. (Rhyne) at 376:9-11; Tr. (Madisetti) at 1128:23-1129:8).

### D. Substantial Evidence Supports the Jury's Finding that TTI Products Literally Infringe the '275 Patent

Substantial evidence supports the jury's literal infringement verdict. For example, Dr. Rhyne explained how the status conditions in the Ryobi GDO are defined by multiple states: ███

████████████████████████████████████████████████████████

██████████████████. Tr. (Rhyne) at 275:4-276:12; Ex. E (PTX-239) at 38. Dr. Rhyne showed in the source code how the conditions are defined and the messages are transmitted. In the GD200, he showed that ███████████████████████████████████. Tr. (Rhyne) at 285:15-286:9. In the redesigned GD200A, Dr. Rhyne showed that it ████████████████████████ ████████████████████████. *Id.* at 284:1-285:14. Dr. Rhyne then explained how this proved literal infringement because the claims only require transmission of a signal corresponding to "a" present operational status condition. *Id.* at 287:18-288:13.

Dr. Rhyne also explained how the "IgnoreVal" in the GD200A supports a finding of literal infringement. ████████████████████████████████████. *Id.* at 285:3-8. TTI's arguments that the IgnoreVal is (i) not itself a state, (ii) not stored on the Ryobi

controller, and (iii) does not tell you the current value of a status field by itself are irrelevant. The asserted claims do not require transmitting an operational status condition itself, but only a signal that "corresponds to" (claims 1 & 5) or "represents" (claim 15) a present operational status condition. Nor do the claims specify any specific storage with respect to components of the transmitted signal. Thus, IgnoreVal is further evidence that supports the jury's finding of literal infringement.

TTI's argument that the redesigned Ryobi GDOs do not infringe because they transmit a signal containing only one current state or a single condition are inapposite. The experts disputed this non-infringement theory and the jury was entitled to make a determination of the expert's credibility and apparently did so in favor of CGI's expert. *Harvey v. Office of Banks & Real Estate,* 377 F.3d 698, 712 (7th Cir. 2004) ("In reviewing a Rule 50 motion, we will not second-guess a jury on credibility issues."). Moreover, the Court has rejected this argument repeatedly:

> ***After months ago rejecting Defendants' argument that the claims require transmission of a signal containing information reflecting multiple changes*** (ECF No. 263 at 8-9), ***the Court rejected their analogous contention that the "controller" and "status condition signal" limitations should be construed to require*** "a status condition signal containing information reflecting a present status condition of the controller's operation, ***where the present status condition is defined by at least two actions being performed by the controller at the present time***." (ECF No. 339 at 29-30, 37, 39-41.) ***The chief problem with this construction was that it baselessly precluded disclosed embodiments***, such as the embodiment where "the GDO sends a status condition signal to a lighting peripheral to identify that the GDO performed the single action of turning its lights on or the single action of turning them off" and the "embodiment using a 'single data field' to provide information about a single 'monitored condition.'" (ECF No. 339 at 40-41 (citing '275 patent at 5:59-6:3, 6:46-51).) ***Defendants' current argument is merely these same prior contentions dressed differently. Nowhere in Defendants' summary judgment briefing do they explain how the redesigned Ryobi GDO is any different from these two embodiments that backstop the Court's construction.***

ECF 397 at 5.

Furthermore, TTI's argument regarding the Ryobi GD200A transmitting a single state or condition is unsupportable given that the argument excludes the '275 patent's embodiments. For example, the Court previously criticized TTI for excluding an embodiment that used a "single data field" to correspond to a "single 'monitored condition.'" ECF 397 at 5; *see also* Tr. (Rhyne) at 274:2-7 (explaining "single data field" embodiment). TTI's JMOL interpretation excludes this embodiment. Moreover, TTI's hypothetical involving a system that is designed to use a field with a "'0' to represent the 'light is off and the door is shut' and a '1' to represent 'the light on and the door is shut' (Motion 20-21) merely attempts to obfuscate the issue by identifying a single data field for *two* monitored conditions.

TTI's "disavowal" arguments (Motion at 20) is entirely new, it was never presented at claim construction or in TTI's Rule 50(a) motion, and is thus waived. *Wilson v. AM General Corp.*, 167 F.3d 1114, 1123 n.1 (7th Cir. 1999) ("The Rule 50 motion made after the jury's verdict is merely a renewal of the motion made prior to the jury deliberations . . . [T]he renewed motion may not be based on any ground not raised in the original motion."); *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1372 (Fed. Cir. 2016) ("In general, 'litigants waive their right to present new claim construction disputes if they are raised for the first time after trial.'") Moreover, there was no disavowal. As the Court has already found, the amendment over Doyle was related to the fact that "Doyle could only ever be defined by one operating state: a single intermediate position of a garage door, as opposed to the dual operating states of open/closed." ECF 263 at 14-15. Additionally, the Court stated that "Applicant's cancelation of application dependent claim 4 and simultaneous amendment of claim 1 is more fairly read as an attempt to clarify that the already-claimed 'potential operational status conditions' and 'plurality of operating states' relate to each other." *Id.* at 15.

Thus, the Court has already confirmed that CGI did not clearly and unmistakably disavow the claim scope relating to TTI's redesigned GDO.

Furthermore, TTI's citation to a prior Court order to suggest that the GD200A must transmit door position information that is also defined by any other condition "relat[ing] to a system component other than the door" (Motion at 19) does not support JMOL. The Court's order was clear that this configuration was only one "example." ECF 397 at 4. The Court did not suggest that the referenced configuration was required for infringement. Nor did TTI move for reconsideration of the Court's claim construction to include this configuration as a requirement.

Finally, TTI's argument that its GD200A non-infringement theories apply to the GD200 "[b]ecause CGI relied on the same reasoning for the GD200" (Motion at 20) is incorrect. Dr. Rhyne separately explained the source code for the GD200 and GD200A to the jury. For example, for the GD200, Dr. Rhyne showed that ████████████████████████████████████. *Id.* at 285:15-286:9.

### E.  Substantial Evidence Supports the Jury's Finding that TTI Products Infringe the '275 Patent Under The Doctrine of Equivalents

There is substantial evidence supporting the finding that the Ryobi GD200A infringes the '275 patent under the doctrine of equivalents. Tr. (Rhyne) at 292:4-293:20 (Dr. Rhyne testifying about how his 1973 textbook shows that "these two approaches . . . were equivalent"). Dr. Rhyne also offered testimony under the function-way-result test. *Id.* at 293:21-294:14. Under this test, he compared the GD200A to the claim language and the GD200 and concluded that there was infringement under the doctrine of equivalents. *Id.* TTI does not address this testimony at all. This alternative testimony—unchallenged by TTI—is by itself sufficient evidence to support the jury's verdict on the doctrine of equivalents, and JMOL must be denied.

TTI's arguments to the contrary are misplaced. First, TTI objects that Dr. Rhyne did not provide testimony regarding claims 5 and 15. But, TTI ignores that claim 5 incorporates all limitations of claim 1 and therefore incorporates the limitation for which Dr. Rhyne indisputably provided an opinion under the doctrine of equivalents. Similarly, claim 15 incorporates the limitations of claim 14, and Dr. Rhyne explained that his opinions on claim 14 were the same as for claim 1. *Id.* at 298:16-299:8 ("we've taken care of all those that are the same as Claim 1"). Thus, Dr. Rhyne properly provided an opinion for the doctrine of equivalents for claim 15 as well.

Next, TTI attempts to dismiss Dr. Rhyne's testimony based on his 1973 textbook as "superficial." Motion at 24. However, Dr. Rhyne used his textbook as an example of the type of equivalent serial and parallel systems present in the GD200 and GD200A. Tr. (Rhyne) at 292:4-293:20. Dr. Rhyne explained that serial "means you do one thing after the other" and parallel "means I'm doing them both at the same time." *Id.* at 293:3-5. He then explicitly compared this to TTI's argument about what the claim language meant: "So if the claim actually requires that you send the two state -- the two status conditions out in one message but the alternative is to send two messages out close together that give you the two, I said here that those things are equivalent." *Id.* at 293:5-10. This testimony supports Dr. Rhyne's expert opinion that the claims are infringed under the doctrine of equivalents.

Next, TTI attempts to reassert its prosecution history estoppel arguments. However, prosecution history estoppel applies only to amendments made for a "substantial reason related to patentability." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 735 (2002). Here, as this Court has already explained repeatedly, the amendment to the claims made over Doyle was not related to patentability but a clarification:

Applicant's cancelation of application dependent claim 4 and simultaneous amendment of claim 1 is more fairly read as an attempt to clarify that the already-

claimed 'potential operational status conditions' and 'plurality of operating states' relate to each other.

ECF 263 at 15.  Thus, prosecution history estoppel should not apply here.

Furthermore, even if prosecution history estoppel applies it does not stop the particular infringement arguments presented at trial.  Doyle's transmission, as this Court has already held, "could only ever be defined by one operating state: a single intermediate position of a garage door, as opposed to the dual operating states of open/closed."  ECF 263 at 14-15.  In the Ryobi GD200A, however, it is undisputed that the status conditions are defined by more than one state (*e.g.* closed, open, closing, opening, fault for the door).  CGI has not argued infringement based on the capability to transmit a single intermediate door position" as configured in Doyle.  Thus, even if prosecution history estoppel were to apply, it would have no bearing on the doctrine of equivalents theory advanced by CGI.

Finally, TTI's "all-elements rule" argument is waived and inapposite.  TTI never made this argument in its Rule 50(a) motion and the argument is thus waived.  *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 406 (7th Cir. 2010) (defendant waived argument where defendant did not argue the issue to the jury, failed to argue the issue in its pre-verdict motion for JMOL, and did not request a jury instruction on the issue).  Regardless, CGI never argued that a present operational status condition that can only ever be defined by a single state is an equivalent of the actual claim language.  And vitiation requires a showing that "one of skill in the art would understand that the literal and substitute limitations are not interchangeable, not insubstantially different, and when they do not perform substantially the same function in substantially the same way, to accomplish substantially the same result."  *Brilliant Instruments, Inc. v. Guidetech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013).  TTI cannot make such a showing here, given the testimony from Dr. Rhyne

discussed above, which the jury evidently credited over that of TTI's expert. *Harvey*, 377 F.3d at 712 ("In reviewing a Rule 50 motion, we will not second-guess a jury on credibility issues.").

### F. Substantial Evidence Supports the Jury's Finding that TTI Induces Infringement of the '275 Patent

First, TTI alleges there is no inducement because there is no direct infringement. For the reasons discussed above, there was substantial evidence to support the jury's finding of direct infringement both by literal infringement and under the doctrine of equivalents.

TTI alleges that there is no inducement because it does not encourage direct infringement.[6] This is directly contradicted by the evidence. For example, the Ryobi website shows a picture of a phone running the Ryobi smartphone application with the instruction: "***Make your garage smart***. Control, ***monitor***, and personalize ***your garage door remotely***." Ex. F (PTX-306). Dr. Rhyne testified that this evidence supports inducement because TTI is affirmatively instructing its users to make their garages smart by use of the infringing technology. Tr. (Rhyne) at 306:11-21. Dr. Rhyne also explained how the advertisements on the Ryobi GDO box and videos on the web also support a finding of inducement because of the ways that TTI is instructing users to install and use the smartphone application. *Id.* at 307:1-20. This evidence is more than sufficient to constitute "active steps taken to encourage direct infringement" and thus supports a finding of inducement. *Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015).

### G. Substantial Evidence Supports the Jury's Finding that TTI Willfully Infringes the '275 Patent

Substantial evidence supports the jury's finding of willfulness. This evidence is briefed more fully in CGI's motion for enhanced damages, which CGI incorporates by reference herein. *See* ECF 625.

---

[6] Notably, TTI does not contest that there is sufficient evidence of knowledge of the '275 patent.

To briefly summarize the relevant evidence: one of the very first steps TTI took was to

█████████████████████████████████████████████████████████████████

██████████████████████████████████████. ECF 625 at 5-6. ███████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ECF 625 at

6; Ex. D (PTX-548) at 2-3. Later, ███████████████████████████████████

██████████████████████████████. ECF 625 at 7. Then, TTI hired a consultant who

worked at Overhead Door, CGI's then-top competitor, who warned TTI to be careful about IP.

ECF 625 at 8; ECF 610-1 (Carlson Dep. Designations). ██████████████████████

██████████████████████████ ECF 625 at 8; Ex. G (PTX-188) at 2. TTI's documents also

confirmed that TTI knew ████████████████████████████████████████ ECF

625 at 9; Ex. H (PTX-67). Ultimately, however, TTI did nothing to reduce these risks, supporting

a finding of willful infringement.[7] *Apple Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK,

2017 WL 2720220, at *16 (N.D. Cal. June 22, 2017) ("The absence of evidence of an adequate

investigation and of [defendant's] reliance on its defenses weighs in favor of enhanced damages.").

All of this evidence strongly supports the jury's finding that TTI willfully infringed the

'275 patent. TTI alleges that it had a reasonable good faith basis for contesting infringement and

validity (Motion at 26-27), but never identifies when these alleged bases developed. TTI's citation

to the Federal Circuit's decision on the preliminary injunction, suggesting that TTI's litigation

inspired defenses insulate it from a finding of willfulness, is inapposite. Indeed, the Supreme Court

---

[7] Instead of trying to avoid infringement after all these warnings about the risk, TTI actually tried to copy the MyQ app by hiring LSR—a vendor that TTI incorrectly believed wrote CGI's MyQ app. ECF 625 at 9-10. TTI's lead product manager was very upset when he found out that TTI had failed to hire the correct vendor. *Id.*; Ex. I (PTX-387).

expressly criticized this sort of argument as improperly allowing a party to "escape any comeuppance under § 284 solely on the strength of his attorney's ingenuity." *Halo Elecs., Inc. v. Pulse Electronics*, 136 S. Ct. 1923, 1933 (2016); *see also id.* ("culpability is generally measured against the knowledge of the actor at the time of the challenged conduct"); *Barry v. Medtronic, Inc.*, 230 F. Supp. 3d 630, 650 (E.D. Tex. 2017) ("an after-the-fact robust defense of invalidity cannot defeat a willfulness finding by a jury").[8]  Thus, TTI failed to prove it is entitled to JMOL on this basis.

TTI did not engage in good faith efforts to avoid infringement.  TTI expressly instructed its 30(b)(6) witness not to testify regarding "what did TTI do in order to ensure that it's not infringing any third-party patent rights."  ECF 625-11 (Huggins Dep. Tr.) at 109:2-9.  TTI then improperly attempted to elicit testimony about this clearance for the first time at trial.  Tr. (Farrah) at 586:8-587:2; Tr. (Huggins) at 660:21-663:25.  This does not show a good-faith effort to avoid infringement.  Instead, the only reasonable inference is that the results of this "clearance" were unfavorable.  The jury was properly entitled to make that inference as part of its willfulness finding.

Finally, TTI alleges that its redesigned GD200A was a good faith effort to avoid infringement.  Not true.  The Court found TTI in contempt for selling the redesigned GD200A garage door opener, noting that "no one disputes that the original and redesigned Ryobi GDOs are functionally equivalent" and that to the extent TTI's arguments "furnish an ounce of support for Defendants' redesign, two ounces of support evaporate."  ECF 263 at 9; *see also R-BOC*, 233 F.

---

[8] Nor could the Federal Circuit's preliminary injunction opinion negate the willfulness finding.  The Federal Circuit's opinion addressed claim construction and did not address non-infringement.  *See, e.g.,* ECF 266 at 12 (noting that an "incorrect construction was the court's sole basis for determining that TTI had not raised a substantial question of invalidity").  Nor did TTI even ask its expert to examine its GDOs for non-infringement during the preliminary injunction phase.  *See, e.g.,* ECF 104 at 7.  Additionally, the Patent Office's February 2017 IPR opinions substantively rejected TTI's trial invalidity arguments with respect to a very similar Menard reference. Tr. (Foley) at 964:25-965:3; Tr. (Rhyne) at 1308:10-25.

Supp. 3d 647, 689 (N.D. Ill. 2017) (awarding treble damages where defendants "silently avoided" injunction and later presented a "metaphysical" argument about an alleged design around).

## IV.    ARGUMENT REGARDING THE '966 PATENT

### A.    Substantial Evidence Supports the Jury's Finding that Craftsman Does Not Anticipate the Asserted '966 Patent Claims

The Craftsman GDO and manual are fundamentally different from the '966 patent, and thus do not anticipate.  TTI's invalidity theory is based on a theory involving switching the Craftsman battery between two GDOs—a disputed theory that the jury evidently rejected.

As a threshold issue, Craftsman was already considered by the Patent Office as a result of TTI's IPR petitions.  Ex. J (PTX-497); Ex. K (PTX-495).  The Patent Office's finding that TTI failed to establish a reasonable likelihood of prevailing with respect to Craftsman is objective evidence rebutting TTI's argument that no reasonable jury could find the '966 patent's claims valid in view of Craftsman.

Furthermore, Craftsman does not disclose electrically powered equipment ***other than*** and physically separate or separable form the barrier movement operator, a limitation recited by every asserted '966 patent claim and disclosed in the specification.  Tr. (Rhyne) at 1315:10-1316:11. TTI's invalidity expert argued that the recited electrically powered equipment is met by a second GDO.  But Dr. Rhyne rebutted this argument and explained how the Craftsman reference did not invalidate the claims.  *Id.*  The jury was entitled to make a credibility determination as between Dr. Foley and Dr. Rhyne, which this Court must defer to on a motion for JMOL.  *Harvey*, 377 F.3d at 712 ("In reviewing a Rule 50 motion, we will not second-guess a jury on credibility issues.").

Craftsman also does not describe a removably connectable battery as required by claim 14. As Dr. Rhyne explained, the Craftsman battery is screwed into either the ceiling or the sides of the GDO head unit.  Tr. (Rhyne) at 1316:12-1317:24.  Brian Butler, the '966 patent inventor, also

testified that prior to his invention CGI only had "replaceable" batteries but not "removable" because the "replaceable" batteries needed to be removed by a qualified service person. ECF 610-4 (Butler Dep. Designations) at 81:13-15, 81:20-82:3; Tr. (Rhyne) at 1317:25-1319:12 (Dr. Rhyne explaining that this testimony supports a finding of validity).

Finally, asserted claims 14 and 18 require that the electrically powered equipment be a tool. Dr. Rhyne testified that a garage door opener is not a tool. Tr. at 1320:7-23. In contrast, Dr. Foley's interpretation of "tool" was not credible in that it broadly encompassed battery-powered elevators, escalators, and children's toys. Tr. (Foley) at 1012:17-1014:2.

### B. Substantial Evidence Supports the Jury's Finding that Crusius Does Not Anticipate or Render Obvious the Asserted '966 Patent Claims

Dr. Rhyne explained that Crusius is very similar to Craftsman because it is "just a patent that covers essentially the same thing as the Craftsman battery." Tr. (Rhyne) at 1324:7-12. Thus, for each of the reasons that Craftsman does not anticipate, Crusius does not anticipate or render obvious. TTI does not appear to contest that these arguments apply to Crusius as well or allege that there are any factual differences between Crusius and Craftsman that are relevant to the invalidity analysis.

Dr. Rhyne also explained that Crusius does not describe a removable battery, as required by all asserted claims, because Crusius explicitly states that the battery is "in circuit *at all times* with the barrier movement operator power supply." Tr. (Rhyne) at 1324:13-19.

There are also secondary considerations supporting a finding of non-obviousness. *See, e.g.,* Tr. (Rhyne) at 1324:20-1327:1. For example, TTI's employees ███████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████ *Id.* at

25

1325:8-24; Ex. L (PTX-57). TTI has attempted to distance itself from these statements now that they are inconvenient, but the fact that they were written years ago, before any prospect of litigation between CGI and TTI, is exactly why these statement are far more credible than Dr. Foley's litigation-inspired defenses. There was also a substantial showing of nexus at trial. Dr. Rhyne established the nexus when he explained how the technology in ███████████████ was very similar to the '966 patent claims, with similar advantages, and ultimately concluding: "Same idea. Chamberlain had it first." Tr. (Rhyne) at 1325:8-1327:1.

## C. Substantial Evidence Supports the Jury's Finding that Weik Does Not Anticipate or Render Obvious the Asserted '966 Patent Claims

The Weik reference relates to fire door operators and discloses "two different embodiments, one of which has a portable battery and no charger and one of which has a non-portable battery but does have a charger." Tr. (Rhyne) at 1322:2-1323:3. There is no dispute that the embodiments on their own would not anticipate or render obvious any '966 patent asserted claim. Instead, TTI asserts that it would be obvious to combine these two embodiments.

Dr. Rhyne's testimony, however, explained that the Weik reference teaches away from combining the two embodiments. For example, Weik identifies that the integrated charger embodiment offers the benefit that service personnel do not have to bring their own battery. *Id.* at 1323:4-12. Additionally, Dr. Rhyne identified that it would also take hours to charge the portable battery from one Weik embodiment with the trickle battery charger in the other Weik embodiment, defeating the quick emergency response needed in case of a fire. *Id.* at 1323:13-1324:2. Dr. Rhyne also pointed out that the testing disclosed in Weik would take hours longer under TTI's proposed combination. *Id.* Thus, substantial evidence supports the jury's finding of validity.

Additionally, as explained above, TTI's patent application for similar technology is a secondary consideration that supports finding the '966 patent non-obvious over Weik.

### D. Substantial Evidence Supports the Jury's Finding that TTI Literally Infringes the '966 Patent

The jury heard substantial evidence showing literal infringement of the '966's asserted claims. Tr. (Rhyne) at 318:11-328:1.

TTI's arguments to the contrary are inapposite. First, TTI's "multiple actors" argument (Motion at 39) is incorrect. TTI appears to base its argument on claim language reciting the battery is "in electrical communication" with a battery charging station or electrically powered equipment. *Id*. But, this claim language does not require multiple actors and the '966's claims do not even recite the act of connecting the battery or the act of removing the battery as a required step.

Next, TTI's argument that it does not literally infringe because it sells batteries separately from the GDO (Motion at 39) also fails. Indeed, this Court has previously noted that "TTI sells the battery alongside the system, and this coupled with the design of a rechargeable station integrate into the Ryobi GDO could constitute potential direct infringement." ECF 104 at 12. And, a jury may find direct infringement where a party sells components separately, but those components are designed to be used together as a complete and operable system. *See, e.g.*, *St. Clair Intellectual Prop. Consultants, Inc. v. Toshiba Corp.*, No. 09-354-LPS, 2014 WL 4253259, *3 (D. Del. Aug. 27, 2014) ("direct infringement may be found where one sells or offers to sell all of the components of a claimed system, even if the components are sold separately and are required to be assembled by the customer"); *Immersion Corp. v. Sony Comput. Entm't Am., Inc.*, 4:02-CV-00710-CW, Dkt. No. 1481, slip op. at 11 (N.D. Cal. Jan. 10, 2005) ("the jury could reasonably have found that [Defendant] sells a complete and operable system or apparatus rather than mere constituent parts, despite the fact that most of the consoles, controllers and games are sold separately"); *EBS Auto. Servs. v. Ill. Tool Works, Inc.*, No. 09-CV-996 JLS MDD, 2011 WL 4021323, at *9 (S.D. Cal. Sept. 12, 2011) ("a reasonable jury could conclude that [Defendant] sells

a complete and operable apparatus, as opposed to mere components, even if the BrakeTech and the fresh and waste fluid containers are sold separately"). Substantial evidence supports the verdict that TTI directly infringed by selling separate components designed to be used as a complete and operable system. Dr. Rhyne explained in detail how the TTI components are designed to be used together and how TTI intends for users to use them that way. Tr. (Rhyne) at 407:16-408:21.

### E. Substantial Evidence Supports the Jury's Finding that TTI Induces Infringement of the '966 Patent

Substantial evidence supported the jury's verdict of induced infringement of the '966's claims. Tr. (Rhyne) at 328:2-330:15. TTI's arguments to the contrary are inapposite.

First, TTI alleges there is no inducement because there is no direct infringement. For the reasons discussed above, there was substantial evidence to support the jury's finding of direct infringement.

Next, TTI alleges there is no inducement because there are substantial non-infringing uses. This is not a defense to inducement. Instead, in certain cases, and only if the facts clearly support it, a substantial non-infringing use *may* be probative of a party's intent. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003). For example, in *Warner-Lambert*, the primary use of a drug advertised on the label accounted for 97.9% of all sales and was non-infringing, with the remaining 2.1% was infringing. *Id.* The Court noted that it would defy common sense to infer intent to infringe when the minimal infringing use was never promoted by the Defendant and when doing so would have violated FDA regulations. *Id.* But, none of these factors are present here. Here, TTI directly advertises the products and encourages users to install it with their Ryobi GDO, facts that support the jury's verdict. Tr. (Rhyne) at 328:12-329:14, 407:16-408:21. Similarly, in *Astrazeneca LP v. Apotex, Inc.*, the court concluded that even where there was a substantial non-infringing use for a drug, the defendant could still be liable for

inducement where they "included instructions in its proposed label that will cause at least some users to infringe the asserted method claims." 633 F.3d 1042, 1060 (Fed. Cir. 2010).

### F. Substantial Evidence Supports the Jury's Finding that TTI Willfully Infringes the '966 Patent

Substantial evidence supports the jury's finding of willfulness. This evidence is briefed more fully in CGI's motion for enhanced damages, which CGI incorporates by reference herein. *See* ECF 625; *see also supra* at Section III.G (summarizing TTI development and repeatedly ignored warnings about IP).

The evidence of TTI's deliberate infringement of the '966 patent is very strong. TTI has known of the '966 patent since at least April 2, 2010, ████████████████████████████. Ex. M (PTX-308) at 9; Tr. (Huggins) at 609:23-611:10. In 2009, TTI had filed a PCT patent application, which the international search reports said was not novel and was obvious over the '966 patent application. Ex. N (PTX-630) at 630.0026. This search report also identified two other patents by Jim Fitzgibbon, a CGI employee and the inventor of the '275 patent. █████████ ████████████████████████████████████████████████████████████ ███████████. Ex. M (PTX-308) at 9. Thus, TTI was clearly aware—both before and during the development of the Ryobi GDO—that CGI had patents in the GDO space that might get in the way of any plans by TTI to create a garage door opener. Despite this, there is no evidence that TTI took any steps to avoid infringement of the '966 patent or any other CGI patent. *Apple*, 2017 WL 2720220, at *16 ("The absence of evidence of an adequate investigation and of [defendant's] reliance on its defenses weighs in favor of enhanced damages.").

TTI's arguments to the contrary are inapposite. TTI alleges that it had a reasonable, good faith basis for contesting infringement. But, TTI fails to identify any evidence whatsoever that it had these belief in non-infringement at the time it started infringing. Thus, the Court should not

consider this litigation-inspired defense. *Halo*, 136 S. Ct. at 1933 (culpability judged at time of relevant conduct and party should not escape liability based on their trial "attorney's ingenuity"). Similarly, for the reasons discussed above, TTI's arguments with respect to an IP "clearance" actually support the jury's willfulness verdict. *See supra* Section III.G.

## V. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S DAMAGES VERDICT

An award of lost profits requires "a reasonable probability that 'but for' the infringing activity, the patentee would have made the infringer's sales." *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc.*, 246 F.3d 1336, 1353 (Fed. Cir. 2001). The test laid out in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978), is one way to show this "but for" causation. To meet this test, there must be an absence of acceptable non-infringing substitutes to the patented product. *Id.* The "[m]ere existence of a competing device does not make that device an acceptable substitute." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986). Instead, to be an acceptable substitute, a non-infringing product must have the advantages of the patented invention. A product lacking these advantages "can hardly be termed a substitute acceptable to the customer who wants those advantages." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1361 (Fed. Cir. 2012). Alternatively, a patentee can compensate for the effects of potential non-infringing substitutes by basing its calculations of lost profits on its market share. *See Ericsson, Inc. v. Harris Corp.*, 352 F.3d 1369, 1378 (Fed. Cir. 2003); *see also* ECF 606 at 53.

For damages, TTI challenges only a single issue—namely, the jury's finding that the Genie Aladdin Connect technology was not an acceptable substitute for the patented technology. Substantial evidence supports this finding. As Mr. Sorice explained, Genie's technology has a separate, powered wall control and a door sensor, requiring additional steps during installation that lead to "more chances for there to be frustration and/or failure." Tr. (Sorice) at 181:24-182:6. By

30

contrast, the '275 technology allowed for connectivity right out of the box—vital to ███████

█████████████████████████████████████████████████████. ECF 611-2 (Ely Dep.

Designations) at 262:10-264:9 (████████████████████████████████████████████████

███████). Indeed, TTI's president, Mr. Farrah, explained:



Tr. (Farrah) at 519:4-8.

TTI attempted to rebut this evidence by focusing on the Genie Aladdin product during its

cross of Mr. Hansen. TTI compared CGI's HD950WF GDO and a GDO containing Genie Aladdin

Connect technology, and questioned Mr. Hansen on the relative ratings of the two products on

Home Depot's website. Mr. Hansen explained that "there are 457 reviews for Chamberlain and

29 reviews for the Genie product" (Tr. (Hansen) at 483:2-5), and denied that the Genie technology

"would be an acceptable solution for Ryobi to try to implement into their own product" (*id.* 484:7-

12). On redirect, Mr. Hansen was shown Apple app store ratings for the two technologies. These

ratings confirmed that Genie's Aladdin technology was not an acceptable substitute for the

patented technology. Tr. (Hansen) at 497:6-498:12 (Genie's Aladdin application had only 2/5

stars on 57 reviews, versus CGI's MyQ application, which had 4.5/5 stars on 5,773 reviews). From

this evidence, the jury could reasonably have concluded that Genie's Aladdin technology was not

an acceptable substitute for the patented technology because it lacked the core '275 patented

technology benefits.

To counter this evidence, TTI points to Mr. Hansen's alleged admission that because Home

Depot and Lowes sold GDOs having Genie Aladdin technology, this technology was "acceptable

for a certain purpose." Mot. 43. However, the "[m]ere existence of a competing device does not

make that device an acceptable substitute." *TWM Mfg. Co.*, 789 F.2d at 901. The fact that Genie's Aladdin products are acceptable to retailers on some level or for some purposes does not mean they are acceptable substitutes for the patented technology. A retailer may stock flip-flops, finding them acceptable for some purposes. That does not mean flip-flops are an acceptable substitute for winter boots.

In any case, the jury was also instructed on the market share approach, which allows for the recovery of lost profits even if there are acceptable non-infringing alternatives. ECF 606 at 53. CGI requested—and received—damages commensurate with its share of the market. Even if this Court holds that the jury could *only* reasonably have concluded that Genie's Aladdin Connect technology was an acceptable substitute for the patented technology, the jury's damages award would still stand under the market share approach.

## VI.    CONCLUSION

For the foregoing reasons, CGI respectfully requests the Court deny Defendants' Motion for Judgment as a Matter of Law.


Dated: October 18, 2017          By:      */s/ Katherine Vidal*
                                          George C. Lombardi
                                          glombard@winston.com
                                          WINSTON & STRAWN LLP
                                          35 W. Wacker Drive
                                          Chicago, IL  60601-9703
                                          Telephone:  (312) 558-5600
                                          Facsimile:   (312) 558-5700

                                          Katherine Vidal
                                          KVidal@winston.com
                                          Michael Rueckheim
                                          MRueckheim@winston.com
                                          Matthew R. McCullough
                                          MRMcCullough@winston.com
                                          WINSTON & STRAWN LLP
                                          275 Middlefield Road, Suite 205

Menlo Park, CA 94025
Telephone: (650) 858-6500
Facsimile: (650) 858-6550

Aldo A. Badini (pro hac vice)
abadini@winston.com
Shanna A. Lehrman (pro hac vice)
slehrman@winston.com
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166-4193
Telephone:  (212) 294-4601
Facsimile:  (212) 294-4700

Benjamin Elacqua (*pro hac vice*)
elacqua@fr.com
FISH & RICHARDSON PC
1221 McKinney Street, Suite 2800
Houston, Texas 77010
Telephone: 713-654-5300
Facsimile: 713-652-0109

Maria Elena Stiteler (*pro hac vice*)
stiteler@fr.com
FISH & RICHARDSON P.C.
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

Nicole L. Little (IL 6297047)
nlittle@fitcheven.com
FITCH, EVEN, TABIN & FLANNERY LLP
120 South LaSalle Street, Suite 1600
Chicago, Illinois 60603
Telephone: (312) 577-7000
Facsimile: (312) 577-7007

ATTORNEYS FOR PLAINTIFF
THE CHAMBERLAIN GROUP, INC.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing document was served on opposing counsel via

CM/ECF on October 18, 2017.

/s/ Katherine Vidal
Katherine Vidal
*Attorneys for Plaintiff*
*The Chamberlain Group, Inc.*